William A. Gilbert, WSBA #30592
Gilbert Law Firm, P.S.
421 W. Riverside Ave, Suite 353
Spokane, WA  99201
T: 509·321·0750
F: 509·343·3315
E: bill@wagilbert.com
Attorney for Plaintiffs

The Honorable James L. Robart

UNITED STATES DISTRICT COURT OF THE WESTERN
DISTRICT OF WASHINGTON AT SEATTLE

CAROLINE ANGULO, a single person, ERIC
KELLER, a single person, and ISABEL
LINDSEY and CHARLES LINDSEY, a
married couple,

                                          Plaintiffs.

        v.

PROVIDENCE HEALTH & SERVICES
WASHINGTON, a non-profit Washington
Corporation, also d/b/a PROVIDENCE ST.
MARY MEDICAL CENTER; Dr. JASON A.
DREYER, DO, and JANE DOE DREYER,
husband and wife and the marital community
thereof; Dr. DANIEL ELSKENS DO, and
JANE DOE ELSKENS, husband and wife and
the marital community thereof; and
JOHN/JANE DOES 1-10, and any marital
communities thereof,

                                          Defendants.

NO.  2:22-cv-00915-JLR

**DECLARATION OF COUNSEL RE: JOINT STATEMENT ON JURISDICTIONAL DISCOVERY PROGRAM**

I, Beth M. Bollinger, declare under penalty of perjury of the laws of the State of Washington that the following is true and correct:

1.    I am an attorney with the Gilbert Law Firm, which represents the Plaintiff Representatives in the above-captioned matter. I make this declaration based on personal knowledge and am competent to be a witness herein.

2.    Attached as **Exhibit 1** is a true and correct copy of the bid proposed by Walt's Mailing Service. Estimates are provided for 1,500 mailings and 2,000 mailings for the initial mailing of Notices. Estimates are further provided for 50 and 500 mailings to demonstrate the range of estimates for any subsequent mailings due to undelivered mail.

3.    Attached as **Exhibit 2** is a true and correct copy of a declaration executed by Kristy Bergland, an experienced paralegal and the former in-house claims administration supervisor for the Scott Law Group.

4.    Attached as **Exhibit 3** is a true and correct copy of the bid proposed by Settlement Services, Inc., from Tallahassee, Florida, along with an Information Sheet at the last two pages at the end of the bid proposal.

5.    Attached as **Exhibit 4** is a true and correct copy of (a) complaints found online against JND Legal Administration, registered with the Better Business Bureau, and (b) a news article regarding the 5,000 checks sent by JND to Equifax claimants where the checks bounced.

6.    Attached as **Exhibit 5** are true and correct copies of excerpts of material found online regarding business associate agreements ("BAA"). They are:

    a.   Excerpts of the Washington State Confidentiality Toolkit for Providers and

    b.   A U.S. HHS information sheet on BAAs (recommended by the Toolkit).

NO. 2:22-cv-00915
DECLARATION OF COUNSEL RE JOINT
STATEMENT ON JURISDICTIONAL DISCOVERY
PROGRAM
PAGE 2 OF 6

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, STE 353
SPOKANE, WA 99201
T: (509) 321-0750 • F: (509) 343-3315

A link for the full 20-page Washington State Confidentiality Toolkit for Providers is: https://www.hca.wa.gov/assets/billers-and-providers/60-0077-washington-confidentiality-toolkit-providers.pdf. A link to 45 CFR § 160.103 (with the definition of business associate, also referenced in the Handbook) is: https://www.law.cornell.edu/cfr/text/45/160.103.

7.      Attached as **Exhibit 6** is a true and correct copy of the Order Approving Plaintiffs' Class Notice Plan, entered on August 16, 2002, in the *Wright v. Jeckle* matter, Spokane County Superior Court Case No. 98-2-07410-2.

8.      Attached as **Exhibit 7** is a true and correct copy of the Opt-Out form (e.g., "Request for Exclusion") that was used in the *Wright v. Jeckle* matter, Spokane County Superior Court Case No. 98-2-07410-2.

9.      Attached as **Exhibit 8** are true and correct copies of excerpts of documents obtained from the Washington Department of Health showing WDOH's investigation into Providence in response to its settlement with the DOJ in the spring of 2022 and its ultimate rulings as well as the Plan of Correction entered by Providence in December 2022 to ensure compliance with mandatory reporting requirements under RCW 70.41.210 in the future. As noted on the eighth page of this packet, according to Providence St. Mary Medical Center, peer review was done on "some cases," there were "still concerns," and "more cases came to light after the two neurosurgeons resigned."

10.      Attached as **Exhibit 9** are true and correct copies of excerpts of a 2019 report made by neurosurgeon Dr. Matt Fewel from Kennewick, Washington (near Walla Walla) who expressed concern over Jason Dreyer's medical files which had come to his attention and which states, in part, that he had "confidentially brought [his] concerns up with several administrators in the system in the hopes that something might change…" (see what is marked as page 123).

NO. 2:22-cv-00915
DECLARATION OF COUNSEL RE JOINT
STATEMENT ON JURISDICTIONAL DISCOVERY
PROGRAM
PAGE 3 OF 6

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, STE 353
SPOKANE, WA 99201
T: (509) 321-0750 • F: (509) 343-3315

1    DATED this 21st day of June in Spokane, Washington.

2

3                                        GILBERT LAW FIRM, P.S.

4                                        By: *s/Beth M. Bollinger*
                                         BETH M. BOLLINGER, WSBA #26645
5                                        Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NO. 2:22-cv-00915
DECLARATION OF COUNSEL RE JOINT
STATEMENT ON JURISDICTIONAL DISCOVERY
PROGRAM
PAGE 4 OF 6

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury under the laws of the state of Washington, that I am now, and at all times material hereto, a citizen of the United States, a resident of the state of Washington, over the age of 18 years, not a party to, nor interested in the above-entitled action, and competent to be a witness herein. I caused to be served, pursuant to CR5(b)(7), on this date the foregoing document in the manner indicated to the parties listed below:

***Counsel for Defendants Dr. Jason A. Dreyer, DO and Jane Doe Dreyer:***

Ryan M. Beaudoin, WSBA #30598
WITHERSPOON, BRAJCICH, McPHEE
601 W. Main, Suite 1400
Spokane, WA 99201-0302
rbeaudoin@workwith.com

- ☐ **HAND DELIVERY**
- ☐ **U.S. FIRST CLASS MAIL**
- ☒ **ELECTRONIC MAIL**
- ☐ **FACSIMILE TRANSMISSION**

***Counsel for Defendants Dr. Daniel Elskens, DO and Jane Doe Elskens:***

Stephen M. Lamberson, WSBA #12985
Ronald A. Van Wert, WSBA #32050
ETTER, MCMAHON, LAMBERSON, VAN WERT & ORESKOVICH, P.C.
618 W. Riverside Ave., Ste. 210
Spokane, WA 99201
lambo@ettermcmahon.com
rvw@ettermcmahon.com

- ☐ **HAND DELIVERY**
- ☐ **U.S. FIRST CLASS MAIL**
- ☒ **ELECTRONIC MAIL**
- ☐ **FACSIMILE TRANSMISSION**

***Co-Counsel for Defendant Providence Health & Services:***

Kenneth E. Payson, WSBA #26369
Ross Siler, WSBA #46486
Jordan Harris, WSBA #55499
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave., Ste. 3300
Seattle, WA 98104-1610
kenpayson@dwt.com
ross.siler@dwt.com
jordanharris@dwt.com

- ☐ **HAND DELIVERY**
- ☐ **U.S. FIRST CLASS MAIL**
- ☒ **ELECTRONIC MAIL**
- ☐ **FACSIMILE TRANSMISSION**

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, STE 353
SPOKANE, WA 99201
T: (509) 321-0750 • F: (509) 343-3315

1
2

*Co-Counsel for Defendant Providence Health & Services:*

3   Jennifer K. Oetter, WSBA #26140          ☐   **HAND DELIVERY**
    LEWIS BRISBOIS BISGAARD & SMITH         ☐   **U.S. FIRST CLASS MAIL**
4   LLP                                      ☒   **ELECTRONIC MAIL**
    888 SW Fifth Ave., Ste. 900             ☐   **FACSIMILE TRANSMISSION**
5   Portland, OR 97204-2025
    jennifer.oetter@lewisbrisbois.com

6
    DATED this 21st day of June 2023.
7
8
9   _____
    JOEL CHAVEZ
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

NO. 2:22-cv-00915
DECLARATION OF COUNSEL RE JOINT
STATEMENT ON JURISDICTIONAL DISCOVERY
PROGRAM
PAGE 6 OF 6

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, STE 353
SPOKANE, WA 99201
T: (509) 321-0750 • F: (509) 343-3315

EXHIBIT 1



**Estimate**

| | |
|---|---|
| **Estimate #:** | 29070 |
| **Est Date:** | 6/6/2023 |
| **CustCode:** | Gil003 |

**Walt's Mailing Service - 9610 E 1st Ave - Spokane Valley, WA 99206-3686**

**Phone: (509) 924-5939   Fax: (509) 924-6923**

**CUSTOMER INFO**

**JOB INFO**    **Estimate #** 29070

Attn: Beth Bollinger
Gilbert Law Firm P.S.
421 West Riverside Avenue  Suite 353
Spokane WA  99201

**Phone:** (509) 321-0750     **Cell:**
**Email:**

**Account Rep:**  Dan Mitchell
**Email:**  DanM@WaltsMailing.com
**Job Name:**  Notice
**Terms:**  Net 30
**Data Due:**                    **Pstg $ Due:**
**Material Due:**               **Drop Date:**

Print & Mail: Class Action Notice

Print (4) 8.5x 11 - (3) double sided sheets and (1) single sided sheet printed with black ink. Print #10 regular envelope and #9 envelope (return) with black ink only.

Includes Data Prep (list standarizing and electronic address corection before the mailing is processed). We will supply you a list of the NCOA Removals so that you can try to track these folks down.

All pages would be printed generic. The name and address of the recipient will be inkjetted on the outside of the envelope. Fold and insert the 4 sheets into the envelope,  and affix the postage onto the envelopes. Complete all necessary mail prep and postal forms.

This estimate is based on mailing via Presorted First Class. Turn around time is about 3 business days.
Estimates #1 & #2 are based on mailing at the current USPS postage rates (in affect until 7-9-2023).


Estimates #3 and #4 are based on using projected USPS postage rates. USPS will increase postage rates starting 7-9-2023. Although we do not have the final rates yet, we anticiapte the rates going up around 3 cents per piece for 1st Class.

| **Quantity:** | 1500 | **Services:** | $945.55 | **Postage:** | $862.50 | **Total:** | $1,808.05 |
|---|---|---|---|---|---|---|---|
| **Quantity:** | 2000 | **Services:** | $1,239.67 | **Postage:** | $1,150.00 | **Total:** | $2,389.67 |
| **Quantity:** | 500 | **Services:** | $373.67 | **Postage:** | $315.00 | **Total:** | $688.67 |
| **Quantity:** | 50 | **Services:** | $145.17 | **Postage:** | $31.50 | **Total:** | $176.67 |

EXHIBIT 2

The Honorable James L. Robart

UNITED STATES DISTRICT COURT OF THE WESTERN
DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CAROLINE ANGULO, a single person, ERIC KELLER, a single person, ISABEL LINDSEY and CHARLES LINDSEY, a married couple, and CHRISTINE BASH, individually and as personal representative of the ESTATE OF STEVEN BASH, | NO.  22-CV-00915-JLR **DECLARATION OF KRISTY BERGLAND** |
| Plaintiffs. | |
| v. | |
| PROVIDENCE HEALTH & SERVICES WASHINGTON, a non-profit Washington Corporation, also d/b/a PROVIDENCE ST. MARY MEDICAL CENTER; Dr. JASON A. DREYER, DO, and JANE DOE DREYER, husband and wife and the marital community thereof; Dr. DANIEL ELSKENS DO, and JANE DOE ELSKENS, husband and wife and the marital community thereof; and JOHN/JANE DOES 1-10, and any marital communities thereof, | |
| Defendants. | |

I, Kristy Bergland, hereby declare under penalty of perjury pursuant to the laws of the State of Washington the following:

1.      I am over the age of 18 and competent to testify and provide the following information of my own personal knowledge.

NO. 22-CV-00915-JLR
DECLARATION OF KRISTY BERGLAND
PAGE 1

2.      I am currently a paralegal at the law firm of Eymann Allison Jones P.S. in Spokane, Washington. I previously was the Lead Paralegal at The Scott Law Group, which was a law firm that specialized in class action lawsuits. I had management and supervisory responsibilities, under the direction of the attorneys, over various class action activities performed, including original notice to Class members, issuance of Class Settlement Notice to Class members, and carrying out claims administration functions upon Class settlement. I supervised the Claims Administration for numerous class settlements.

3.      My experience in Claims Administration of class action lawsuits involved the creation of numerous databases in order to analyze who was a member of the class, disseminate and track claim forms, if applicable, and calculate and send out the payment of Court-Approved Settlements to thousands of class members. I supervised all aspects of the Claims Administration. The work I have done has been approved by every Court who has reviewed it.

4.      I also helped set up the Claims Administration facility for the ZAI (Zonolite Attic Insulation) Trust in Charleston, South Carolina, established to allow homeowners to make a claim from a Settlement Trust established pursuant to a nationwide settlement and approved by the Bankruptcy Court overseeing the case. I provided the database in order for the ZAI Trust to send out notices to nearly 20,000 homeowners. The Trustee wanted to have a hands-on claims process (rather than outsourcing it to a professional claims administration facility), and I met with database consultants and web developers, along with the Trustee and his team, in order to set up an online claim submission process.

5.      Throughout my in-house class action Claims Administration work, I created relationships with trusted third-party vendors. I am well versed in selecting, working with, and problem-solving with third party vendors of various sizes in the Claims Administration arena.

NO. 22-CV-00915-JLR
DECLARATION OF KRISTY BERGLAND
PAGE 2

6.      One of our steady contractors at the Scott Law Group was Walt's Mailing Service in Spokane Washington. We had Walt's do much of our printing and mailing work. Walt's Mailing Service is a long-time company in Spokane – established in the 1950s – and was always highly reliable and professional in the work we needed to accomplish. Walt's would proactively red-flag addresses that may have issues so that we could "skip trace" (i.e., look up via electronic or other means) the address in order to ensure accuracy before sending out the mailing. They understood the legal nature of our work and took whatever precautions needed to protect confidentiality. They also provided quick services, without lag time. They are a small, tight shop of longtime employees with little turnover who perform expeditiously and professionally.

7.      Even if we needed to hire a secondary company on occasion for larger class actions to work on such things as collecting notices mailed and acting as a call center (examples of such companies are Analytics Incorporated, Garden City Group, and Hilsoft Notifications), we would still use Walt's Mailing Service for initial mailings and to set up the database, given the quality of their work.

8.      In the early 2000s, I was lead paralegal coordinating notices sent in the <u>Wright v. Jeckle</u> case, in which we handled patient health information (PHI). Our work was compliant to Washington's privacy laws because of the system instituted in that case (with two contractors to coordinate mailings so that no one contractor had access to actual PHI – I understand the parties are familiar with *Wright v. Jeckle*, 90 P.3d 65 (Wash. Ct. App. 2004), the case decided in that matter that discusses our two-step procedure). Walt's Mailing Service was one of the contractors. As always, they conducted themselves professionally and did whatever necessary to respect and comply with Washington health privacy laws.

9.      Because of my experience in the *Wright v. Jeckle* case and in class action Claims Administration in general, I was contacted by Beth Bollinger of the Gilbert Law Firm to discuss this case and what was needed for a database, skip tracing, and possible follow-up phone calling.

10.     I understand that Ms. Bollinger has recommended me to the Court to do that list of work for jurisdictional discovery that the Court must conduct in this case, which will involve PHI. My employer has approved my request to do this work for the Court on a contract basis. I believe my experience is well suited for the work proposed. To the extent that I need to coordinate efforts of other workers, I have supervisory experience to do so. I have agreed to a rate of $45 per hour for this endeavor. I am able to execute a business associate agreement (BAA) as needed. Because of my history with Walt's Mailing Service, I am able to easily coordinate with them as I build the needed database and collect the required data.

11.     My experience with using outside claims administration companies, particularly as call centers, was often a frustrating one. These companies did increase costs but would also create confusion and frustration for claimants who would call me complaining that they were unable to reach the claims administration company or were having other communication difficulties. My experience with most of these companies was that, for data input and call center work, they hired entry-level employees with low hourly wages (while charging them at higher rates).

12.     I attach a copy of my resume that we provided to courts in the Scott Law Group litigation. It captures much of the history of my experience in Claims Administration work. I verify that the contents of that resume are accurate.

Signed at Spokane, Washington this 20th day of June, 2023.

*Kristy Bergland*

KRISTY BERGLAND

NO. 22-CV-00915-JLR
DECLARATION OF KRISTY BERGLAND
PAGE 4

# Kristy L. Bergland
# The Scott Law Group, P.S.

**POSITION**:   Senior Complex Litigation Paralegal, 32 years experience, class action and mass tort litigation, general litigation, and antitrust litigation.

Kristy Bergland is the Senior Complex Litigation Paralegal with The Scott Law Group, P.S. Previously, Kristy was the Complex Litigation Paralegal at Lukins & Annis, P.S.

In addition to her work as a Paralegal and Office Manager at various law firms, Ms. Bergland also taught for several years in the Paralegal program at the Spokane Community College.  Courses she taught included Washington Court Rules, Law Office Computing, and Law Office Procedures.

**EDUCATION:**

- B.A., Music, *cum laude*, 1984, Whitworth University.
- Various courses and Seminars relevant to her work in the legal profession.

**SUMMARY OF LEGAL EXPERIENCE:**

- Kristy Bergland has extensive experience in the area of Complex and Class Action litigation.  She has worked in a supervisory capacity, overseeing a team of paralegals and legal assistants in numerous complex cases, including *In re Firestorm*; *In re Diet Drug Litig.* (Fen-Phen); and *Barbanti, et al. v. W.R. Grace & Co.*

- Ms. Bergland has also acted as Supervisor of Class Action Claims Administration, designing and maintaining specialized databases, and overseeing Class Notice Programs, including *Dean v. Tacoma Electric*; *Koski, et al. v. Dycom; Carlsen v. Freedom Debt Relief; Wheeler v. NoteWorld;* and *Carlsen v. Global Client Solutions*.

- Kristy Bergland's responsibilities include design and maintenance of the relational databases employed in Class Action management, exhibit storage, retrieval and analysis, legal research and analysis, and document production, including discovery and pleadings.

The *Scott Law Group* P.S.

EXHIBIT 3



Thomas A. Warren
President

Toll Free: (866) 385-6216                                            Post Office Drawer 1657
Fax: (850) 385-6008                                            Tallahassee, Florida 32302
info@settlementservicesinc.com                                  2032-D Thomasville Road
www.settlementservicesinc.com                              Tallahassee,  Florida  32308

June 15, 2023

**<u>CONFIDENTIAL</u>**

**<u>VIA EMAIL</u>**
Beth Bollinger, Esq.
Gilbert Law Firm
421 W. Riverside Avenue, Suite. 353
Spokane, WA 99201
p: 509.321.0750
f: 509.343.3315
Cell: 509.220.2203
beth@wagilbert.com
www.wagilbert.com

Re:  <u>Jurisdictional Discovery Administration Estimate</u>

Beth,

As requested, the following is a cost estimate[1] for the Jurisdictional Discovery administration we discussed over the phone, with a list of the assumed duties and the related variables.  Please note that we have made several specific assumptions that affect the overall estimated cost; if you believe that any of the variables we chose are inaccurate or unrealistic, please let us know and we will happily revise our estimate.

1. <u>Case Start-up, Data Handling and Initial Programming</u>.  The Class Member data will be sent to us via email or secure upload in a <u>single (1)</u> Excel spreadsheet and will include the name, Social Security Number ("SSN"), last known address, and phone number for each Class Member.  We will document and track all activity related to each Class Member, including mailings, undeliverable mail, etc.   Any additional spreadsheets received will

---

[1] Please note that providing estimates requires us to rely on certain information provided by the client as well as make a number of significant assumptions.  Accordingly, these estimates are not intended to limit SSI's actual fees and expenses, which due to the scope of actual services or changes to the underlying facts or assumptions, may be less or more than estimated.

result in increased administration costs.  Assumption:  approximately 1,750 Class Members.  Estimated Cost:  $2,000.

2.  <u>Phone Support</u>.  We will obtain a toll-free number that will be used during the information collection period by Class Members with inquiries regarding the litigation and information collection process, with address changes, etc.  The line will be staffed with bilingual (English/Spanish) phone agents on Mondays through Fridays from 9:00 am to 5:30 pm EST.  Assumptions: 1) 5% of Class calls, ~90 calls; and 2) the line will be active for 6 months.  Estimated Cost: $1,050.

3.  <u>Website</u>.  We will build and host a website where Class Members can obtain information, review case-related documentation and file Information Collection Forms and changes of address online.  Assumptions:  1) we will have a minimum of 14 days to obtain the desired domain name and set up the website; and 2) the website will be in English only; 3) the website will be encrypted to protect PHI; 4) Class Members will be able to file an Information Collection Form online; 5) they will also be able to print and return a paper version of the Information Collection Form, which will be linked to the website; and 6) the website will not allow for the uploading of documents.   Estimated Cost:  $6,000.

4.  <u>Email and Fax Support</u>. Estimated Cost: $500.

5.  <u>Notice Packet Translations</u>.  Notice Packet translations are <u>NOT</u> required.  Estimated Cost: $0.

6.  <u>Tracing and NCOA Class Members Prior to Mailing</u>.  We will trace each Class Member using their name, SSN and address prior to mailing Notice Packets.  We will be looking for updated addresses.  We will then use any newly identified addresses as the mailing address for Notices.  However, prior to mailing, we will update the Class Member addresses using the United States Postal Service's (USPS) National Change of Address (NCOA) database.  Estimated Cost:  $500.

7.  <u>Notice Packet Mailing</u>.   We will print and mail a Notice Packet to each Class Member. Assumptions: 1) 1,750 Notices mailed; 2) the Notice Packet will contain a four (4) page (2 sheet) Notice, a single (1) page (1 sheet) Information Collection Form, a single (1) page (1 sheet) Opt-Out Form, and a postage pre-paid Business Reply Mail (BRM) reply envelope; 3) the Notice Packet will be in English only; and 4) the Notice Packet will be mailed via regular USPS First-Class Mail.  Estimated Cost: $3,100. (Including postage)

8.  <u>Returned Undeliverable Notice Packets</u>.  Notice Packets returned as undeliverable by the USPS will be date-stamped and recorded in our database.  Those with forwarding addresses will be remailed to the addresses provided.  Those returned without forwarding addresses will be traced once more and the Notice Packets will be remailed to the best address returned by the trace.  Assumptions: 1) a total of 140 original Notice Packets will be returned as undeliverable; and 2) 15 will be remailed to forwarding addresses. Estimated Cost:  $900. (including the cost of postage).

*For more information about SSI, please visit our website, www.settlementservicesinc.com.*

9. <u>Remailing of Individual Notice Packets upon Request</u>.   Estimated Cost: $450.

10. <u>Information Collection Form Processing</u>.  Each Information Collection Form will be reviewed and information from each will be recorded in the Class Member database.  All data entry is reviewed for accuracy.  Information Collection Forms can be submitted online, via regular mail, email or fax.  Scans of the Information Collection Forms will <u>NOT</u> be sent to the Parties.  Assumption: ~440 (25% response rate) Information Collection Forms received.   Estimated Cost: $3,000.

11. <u>Weekly Statistics Reports</u>.  We will provide weekly reports during the "information collection" period which will include number of Notice Packets returned undeliverable, number of Notice Packets that are remailed, number of Information Collection Forms, and opt-outs received, etc.  The Weekly Stats Reports will include spreadsheets of opt-outs received and a compilation of the information collected.  Estimated Cost: $500.

12. <u>Miscellaneous Reports, Conferencing and Supervision</u>.   Estimated Cost:  $1,500.

13. <u>Conclusion</u>.  We estimate that the services discussed above, based on the assumptions specified, will cost approximately $19,500.

14. <u>Optional Duty – Non-Responder Reminder Postcards</u>.  Approximately 45 days after the Notice Packet mailing, we will mail a non-responder postcard in an effort to increase the response rate.  Assumption: approximately 1,250 Non-Responder Postcards mailed.  Estimated Cost:  $1,000.

15. <u>Optional Duty – Non-Responder Reminder Text Messages.</u>  Approximately 45 days after the Notice Packet mailing, we send non-responder text messages in an effort to increase the response rate.  Assumption: approximately 1,250 Non-Responder text messages sent.  Estimated Cost:  $300.

16. <u>Optional Duty – Non-Responder Reminder Automated Calls.</u>  Approximately 45 days after the Notice Packet mailing, we send non-responder automated call to all non-responders in an effort to increase the response rate.  Assumptions: 1) The Parties will approve the automated messages before they are made; and 2) approximately 1,250 Non-Responder automated calls made.  Estimated Cost:  $500.

Please let us know if there are any additional duties or services that need to be added to our estimate, or if you need us to revise this estimate in any way.

For your information, our hourly rates are:

| | |
|---|---|
| Data Entry: | $45 to $50 an hour |
| Misc. Clerical: | $45 to $50 an hour |
| Claims Processing Staff: | $45 to $50 an hour |

Phone Agents:                       $50 to $65
Programming:                        $125 an hour
Case Management:                    $85 to $125 an hour
Senior Case Management:             $175 an hour

                        Sincerely,

                        Robert Hyte
                        Director of Operations

## TERMS AND CONDITIONS

The following Terms and Conditions apply to all services provided by Settlement Services, Inc. ("SSI") to its Client(s) as set forth in the attached Proposal:

**1.    SERVICES.**  Subject to the terms hereof, SSI agrees to provide the services specified in the Proposal attached hereto (the "Proposal").  Such services are hereinafter referred to as "Services."  The parties agree and understand that none of the Services constitute legal advice.

**2.    CHARGES FOR SERVICES.**

**2.1.    FEES.**  As full compensation for the Services, the Client agrees to pay SSI its fees as outlined in the Proposal.  Fees may include mark-ups and in some cases, SSI may receive a rebate (or credit) from a publication vendor.  All fees will be listed in the fee section of SSI's invoices.  The Client acknowledges that the fees contained in the Proposal were negotiated at arm's length and may vary depending on the circumstances and the length of the case for which the Services are being provided hereunder.  Additionally, the Client acknowledges that the fees quoted in the Proposal are, unless otherwise specifically agreed to by SSI, estimates, based on information provided to SSI by the Client, and no representation is made by SSI that the estimated fees shall equal the actual fees charged by SSI to the Client.  SSI's hourly rates may be adjusted from time to time by SSI in its reasonable discretion, although rates generally are changed no more frequently than on an annual basis.

**2.2.    EXPENSES.**  The Client agrees to pay SSI for expenses reasonably incurred by SSI in connection with the performance of the Services.  These will be listed in the expense (non-fee) section of SSI's invoices and may include, but not be limited to, postage, post office box, brokerage fees, costs of messenger and delivery service, travel, translation, filing fees, and other similar expenses.  The items listed in the expense section of SSI's invoice will be billed at cost except for certain internal expenses, such as copies and faxes, which will be charged in accordance with SSI's current standard rate.

**2.3.    PAYMENT.**  SSI shall invoice the Client for its fees and expenses on a regular basis, and the Client shall pay SSI within thirty (30) days of its receipt of each such invoice, through wire transfer or other payment method approved in writing in advance by SSI.  Late payments are subject to a 1.5% monthly interest charge.  Notwithstanding the foregoing, SSI may require advance payment for certain expenses associated with print notice, media publication, and postage.  Where the Client requires services that are unusual or beyond the normal business practices of SSI, or are otherwise not provided for in the Proposal, the cost of such services shall be charged to the Client at a competitive rate.  Client agrees that it will use its best efforts to include provisions reasonably acceptable to SSI in any relevant court order, settlement agreement or similar document that provide for the payment of SSI's fees and expenses hereunder.  No agreement to which SSI is not a party shall reduce or limit the full and prompt payment of SSI's fees and expenses as set forth herein and in the Proposal.

**3.    BANK ACCOUNTS.**   Client agrees that, at its request, SSI shall be authorized to establish accounts with financial institutions as agent for the Client or as otherwise agreed to between Client and SSI.  All Client accounts established by SSI, unless otherwise instructed by Client, shall be deposit accounts of commercial banks with capital exceeding $1 billion and an S&P rating of "A" or higher ("Approved Bank").  In some cases, SSI may derive financial benefits resulting from settlement funds and other moneys on deposit or invested with a bank, including for example discounts or credits provided on certain banking services and service fees.  It is acknowledged and agreed that SSI shall have no responsibility or liability for any diminution of a settlement fund that may result from any deposit made with a bank including any losses resulting from a default by the Approved Bank or other credit losses.  In the event the Client fails to provide direction or is otherwise  unresponsive to SSI following a period of nine (9) months from SSI's last communication, in the absence of court-ordered instructions otherwise, Client authorizes SSI to take all reasonable and necessary actions to close the case for which SSI is providing Services hereunder, including but not limited to transferring, returning or otherwise disposing of any remaining funds in a bank account in a manner that is reasonable and appropriate under the circumstances.

**4.    TERMINATION.**  Either party may terminate these Terms and Conditions upon written notice to the other party in the event of any material breach by either party hereto, if the party receiving such notice (i) fails to cure such breach within thirty (30) days after notice by the non-breaching party or (ii) in the case of any breach which requires more than thirty (30) days to effect a cure, fails to commence and continue in good faith efforts to cure such breach, provided that such cure shall be effected no later than ninety (90) days after receipt of such notice of such breach.  Any such termination shall be effective at the end of such thirty (30) days or ninety (90) days, as the case may be.  Waiver of any such material breach by either party hereto shall not be construed as limiting any right of termination for a subsequent default or material breach.  Termination of these Terms and Conditions shall in no event relieve the Client of its obligation to make any payments due and payable to SSI in respect of Services rendered prior to termination.  In the event that Services are terminated, and upon Client's written request, SSI shall work with Client to facilitate the transfer of data, files or other materials furnished by Client to SSI or received by SSI in connection with the Services.  Client agrees to pay for such transfer in accordance with SSI's then existing rates for such services.

**5.    INDEPENDENT CONTRACTOR.**  SSI shall perform the Services as an independent contractor of Client and nothing herein shall be construed, either directly or indirectly, to create a joint venture partnership, agency or employment relationship between SSI and client.

**6.    CONFIDENTIAL INFORMATION.**  In connection with the provision of Services, each of the Client and SSI on behalf of themselves and their respective employees, agents and representatives, agree to keep confidential all information received from the disclosing party that is marked or otherwise identified in writing as confidential or proprietary, or which the receiving party should reasonably recognize from the circumstances surrounding the disclosure to be confidential or proprietary ("Confidential Information"); provided however that in the event of a request to disclose Confidential Information in connection with a legal, governmental or administrative proceeding, prompt notice of such request shall be given to the disclosing party so that the disclosing party may seek an appropriate protective order or other remedy, or waive compliance with this Section.  If the Client seeks a protective order or other remedy, SSI, at the expense of the Client, will cooperate with and assist the Client in such efforts.  If the Client fails to obtain a protective order or waives compliance with this Section, or SSI reasonably believes that it is legally required to produce any such confidential information, SSI will disclose only that portion of the material that its legal counsel determines it is required to disclose, at the expense of the Client.  Confidential Information shall not include: (a) information that is or becomes generally known or available to the public by publication, commercial use or otherwise through no fault of the receiving party; (b) information that is known by the receiving party prior to the time of disclosure to the receiving party; (c) information that is obtained from a third party who, to the receiving party's knowledge, has the right to make such disclosure without restriction; or (d) information independently developed by the receiving party.  This provision shall survive expiration or termination of these Terms and Conditions.

**7.    OWNERSHIP RIGHTS.**  The Client and SSI each understand that the software programs and other materials furnished by SSI or developed, used, or enhanced by SSI during the performance of the Services are the sole property of SSI.  The term "program" shall include, without limitation, data and claim processing programs, check printing programs, specifications, applications, routines, sub-routines, procedural manuals, and documentation.  The Client agrees that any ideas, concepts, know-how or techniques relating to data processing or the claims management software used, developed, or enhanced by SSI during the performance of the Services shall be the exclusive property of SSI.  Client further agrees not to disclose, copy, reveal, decompile, or reverse engineer, in whole or in part, the software programs or any other programs or materials furnished to Client by SSI.  Fees and expenses paid by the Client to SSI do not vest in the Client any rights in any of material or property furnished by SSI as such material is only being made available for the Client's use during and in connection with the Services provided by SSI hereunder. This provision shall survive expiration or termination of these Terms and Conditions.

**8.    LIMITATION ON DAMAGES.**  Under no circumstances will SSI be liable to the Client for any special, consequential or incidental damages incurred by the Client relating the performance of Services hereunder, regardless of whether the Client's claim is for breach of warranty, contract, tort (including negligence), strict liability or otherwise.  In no event shall SSI's liability to the Client for any claims, losses, costs, fines, penalties or damages, including court costs and reasonable attorney's fees (collectively, "Losses"), whether direct or indirect, arising out of or in connection with the performance of Services hereunder, exceed the total amount billed or billable to the Client for the portion of the particular Services which gave rise to the Losses.  This provision shall survive expiration or termination of these Terms and Conditions.

**9.    INDEMNIFICATION.**  Client shall indemnify and hold harmless SSI, its parent company, and their directors, officers, employees, affiliates and agents against any Losses incurred by SSI arising out of or in connection with or related to (a) any gross negligence or willful misconduct by the Client, its employees, agents or representatives, or any misrepresentations made by such persons to third parties in connection with the Services provided hereunder; (b) any breach of these Terms and Conditions by the Client; (c) the handling or processing of any claim, data or payment by SSI in accordance with the Client's instructions, or applicable court order, law and/or regulation; (d) the transfer by or on behalf of Client of any data (including personal information) to SSI; or (e) SSI following any instructions and/or directions from Client in providing the Services. This provision shall survive expiration or termination of these Terms and Conditions.

**10.    FORCE MAJEURE.**  To the extent performance by SSI of any of its obligations hereunder is substantially prevented by reason of any act of God, strike, lock-out or other industrial or transportation disturbance, fire, lack of materials, law, regulation or ordinance, terrorism, war or war conditions, or by reason of any other matter beyond SSI's reasonable control, then such performance shall be excused and at SSI's option, be deemed suspended during the continuation of such prevention and for a reasonable time thereafter.

**11.    NOTICE.**  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, or sent by registered mail, postage prepaid, or overnight courier.  Any such notice shall be deemed given when so delivered personally, or, if mailed, five (5) days after the date of deposit in the United States mail, or, if sent by overnight courier, one (1) business day after delivery to such courier.  Notice should be provided to a responsible officer or principal of the Client and SSI, as the case may be.

**12.    RETURN/DESTRUCTION OF DOCUMENTS.**  Upon the conclusion of the case and in the absence of court-ordered retention instructions, SSI will return or destroy all documents and information received by SSI in connection with the Services provided hereunder in accordance with its internal corporate records and information management policies.  SSI shall bill the Client for storage in accordance with the Proposal or otherwise at SSI's then standard rates.  This provision shall not pertain to routine data back-ups.

**13.    GOVERNING LAW; DISPUTE RESOLUTION; JURISIDICION.**  These Terms and Conditions will be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of law provisions).  In the event there is a dispute arising out of, relating to or in connection with these Terms and Conditions, the parties agree to attempt in good faith to resolve the dispute through negotiations between senior officers of each of the parties' respective organizations with the authority to settle the relevant dispute.  If the dispute cannot be resolved amicably in a timely manner, the parties agree to submit to the jurisdiction of the court supervising the underlying case for which the Services are being provided.  In the event the underlying case is not being adjudicated by a court, or the court in the underlying case declines to exercise jurisdiction, the parties agree that the dispute shall be conclusively determined by arbitration as provided by the rules of JAMS, or its successor, located in New York, New York.  The parties agree to cooperate with JAMS and with one another in selecting an arbitrator from the JAMS panel of neutrals and in scheduling the arbitration proceedings.  The arbitrator's decision and authority shall be controlled by the terms of these Terms and Conditions.  The parties agree that they will share equally in the costs of arbitration.  This provision shall survive expiration or termination of these Terms and Conditions.

**14.    CLIENT DATA.**  Client represents and warrants that prior to the transfer by or on behalf of Client of any data to SSI, Client has provided all notices and/or obtained all necessary consents and approvals from all persons, entities and/or authorities in accordance with all applicable laws, regulations and/or court orders.  Client further represents and warrants that in order to provide the Services, SSI is permitted to process any such data it receives by or on behalf of Client in accordance with Client's instructions, or applicable court order, law and/or regulation.

**15.    SEVERABILITY.**  Any term or provision in these Terms and Conditions held to be invalid or unenforceable by any court, such term or provision shall be severed here from and shall not affect the legality or enforceability of the remaining terms and provisions.

**16.    ASSIGNMENT.**  These Terms and Conditions and the rights and obligations of SSI and the Client hereunder shall bind and inure to the benefit of their respective successors and assigns.

**17.    GENERAL.**  These Terms and Conditions, together with the Proposal, contain the entire agreement between the parties with respect to the subject matter hereof, and supersede and replace any existing agreement entered into by SSI and the Client relating generally to the subject matter hereof.  These Terms and Conditions may be modified only in a writing signed by SSI and the Client.  The paragraph headings herein are included only for convenience, do not in any manner modify or limit any of the provisions herein and may not be used in the interpretation of these Terms and Conditions.

Rev. 10/17




**Settlement Services Inc.**

supported by Epiq

**Settlement Services, Inc. (SSI), a wholly-owned subsidiary of Epiq Systems (Epiq), is the class action settlement administrator clients trust to take their project to the next level. With a team of highly experienced professionals well-versed in the practical and legal aspects of class actions, labor, employment, ERISA, human rights and discrimination class actions, SSI has the insight to anticipate challenges before they arise, and the proven expertise to provide efficient, effective solutions in even the most complex project scenarios.**

## The SSI Advantage

SSI has handled hundreds of matters, involving more than a million class members and the distribution of over $1 billion in settlement funds. Our success is based on our unwavering commitment to exceed expectations while addressing the needs of counsel and class members diligently, efficiently and responsively.

## Case Experience

- Silverstein v. AllianceBernstein L.P. (FLSA, NYLL)

- Munoz v. Central Parking System, Inc. (CA State Law)

- Siewharack v. Queens Long Island Medical Group P.C. (FLSA, NY State Law)

- Cogdell v. The Wet Seal, Inc. (U.S.C. §1981, Title VII)

- Pittman v. U.S.P.S. (Rehabilitation Act of 1973, 29 U.S.C. §§ 791 et seq.,)

- United States of America (DOJ) v. Plaza Home Mortgage, Inc. (FHA, ECOA)

- Hernandez v. ASG Staffing (FCRA, 15 U.S.C. §1681(b))

- Alvarado v. Aerotek (IL State Law)

- Kiefer v. Save-A-Lot, LTD. (CT State Law)

- Womack v. Dollar General, and Wood v. Dollar General (Title VII, ERISA)

- EEOC v. Wal-Mart Stores, Inc. (Title VII)

- Romero v. Mountaire Farms, Inc. (FLSA, NC State Law)

## What Clients Are Saying

"SSI administered our class settlement with efficiency and accuracy for a very reasonable price. We would highly recommend them for future administrations." – GARY SINISCALCO, PARTNER, ORRICK, HERRINGTON & SUTCLIFFE LLP, SAN FRANCISCO, CA

"SSI's unique experience means efficiency and less cost Their work quality is superb." – BARRY GOLDSTEIN, OF COUNSEL, GOLDSTEIN, BORGEN, DARDARIAN & HO, OAKLAND, CA

"I have used SSI for class and collective action wage and hour cases to handle all aspects of settlement administration - from notice through final settlement check distribution and tax reporting. They provide all the services that much larger settlement administration companies provide, but they price their services very competitively. They are very responsive. – JAMES M. COLEMAN, PARTNER, OFFICE HEAD, WAGE AND HOUR PRACTICE GROUP CO-CHAIR, CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

"SSI's professionalism, experience and attention to detail is a great help to counsel, and simplifies the complications that can arise during the administration phase of class settlements." – JUSTIN SWARTZ, PARTNER, OUTTEN & GOLDEN LLP, NEW YORK, NY

"SSI brings superior and practical know-how, outstanding responsiveness, a compulsion for accuracy, and fair pricing to even the most complex matters." – DONALD LIVINGSTON, PARTNER, AKIN GUMP STRAUSS HAUER & FELD LLP, WASHINGTON, DC

**Settlement Services Inc.**

supported by Epiq

## Pre-Settlement Consultation

Involving SSI early in the settlement process saves time and money. SSI can review draft settlement agreements and help draft documents relating to the settlement administration process (including notice and claim forms), while focusing on low-cost and efficient administration solutions. SSI is also available to assist you in establishing a streamlined claim review process for cases in which a more complicated, in-depth claim form is required.

## Notice Services

SSI offers a variety of notice-related services. Whether your case calls for notice via mail, email, the Internet, media publication, or a combination thereof, SSI's experienced case managers will ensure your needs are met every step of the way.

## Phone Support

SSI provides a variety of phone support options to suit the needs of your case and your claims administration budget. We have the ability to handle thousands of calls on a daily basis, and can meet the phone support needs of every case. We offer fully-staffed multi-lingual phone support by experienced, well-trained and professional Customer Service Representatives working off of a script reviewed and approved by you. We have the capability to provide 24/7 access to an automated menu of frequently asked questions, ensuring class members have constant access to up-to-date information about each settlement.

## Special Master Services

Certain projects call for a Special Master. SSI's President, Thomas A. Warren, has been appointed as a Special Master in several cases, and his 45 years of experience as a practicing attorney make him uniquely qualified for that role.

## Claims Processing Services

SSI processes all types of claims, from simple postcard-style claim forms to multi-page claim forms requiring

application of legal standards in order to review, score, and determine class member awards. Our highly-skilled and experienced data entry staff ensure all claims received are entered into our database accurately. Our sophisticated systems give us the ability to generate up-to-the minute reports regarding any relevant claim filing statistics.

## Qualified Settlement Fund Administration

SSI has extensive experience administering Qualified Settlement Funds under Treasury Regulation 1.468B-1 et seq. There are a variety of tax implications associated with establishing and disseminating a Qualified Settlement Fund. Involving SSI in this process early on can ensure settlement monies are paid to the class in the most efficient manner, and at the lowest cost to you. We can also work with you to devise appropriate investment strategies for the settlement funds that address your risk concerns and the time frame of distribution. In addition, we can assist in all aspects of the award process, from calculating the appropriate withholding on awards, to issuing tax forms such as W-2s and 1099s. SSI will also ensure all tax reporting is made to the appropriate federal, state, and local tax authorities.

*"SSI's experienced and knowledgeable staff is particularly impressive in diagnosing administration issues and recommending solutions before problems arise."* – BILL LANN LEE, LEWIS, FEINBERG, LEE, RENAKER, & JACKSON, P.C., OAKLAND, CA

### About Epiq

Epiq brings clarity and confidence to the often-complex challenges of class action and mass tort administration. We accomplish that with an unmatched combination of experience and expertise, backed by superior performance, support, and transparency.

Our reputation as the global leader in class action administration and mass tort managed services has been reinforced through the successful management of some of history's largest and most complex settlements. With Epiq, you can focus on successful litigation outcomes, while we handle the rest.

## CONTACT:

Robert Hyte or Aisha Lange at +1 850-385-6216 or visit our website: www.settlementservicesinc.com

EXHIBIT 4

## SAMPLE COMPLAINTS TO BETTER BUSINESS BUREAU – RE LACK OF COMMUNICATION
## April and May, 2023



**Initial Complaint**
05/11/2023

**Complaint Type:** Billing/Collection Issues
**Status:** Resolved

JND legal administration ******* **. supposed to issue me a settlement check 5 months ago for equifax settlement. My claim number is: P2RVAHQWZN. Never received check, repeatedly email them, takes days to get canned email reply. Did as they asked and gave them all my info and asked that check be reissued, gave them my past and current address, still NO check. Terrible administration of settlement



**Business response**
05/12/2023

***************** Settlement payment was mailed in January, but it was returned as undeliverable by the ***** Her mailing address has been updated to the address she provided in her request, and her Equifax Data Breach Settlement check reissue request is in process. Check reissues are sent in batches and mailed monthly. Although we cant control postal delivery, we estimate she will receive the check reissue in the next few weeks.



**Customer response**
05/12/2023

Complaint: 20049437

I am rejecting this response because: This has been going on for 4 months since I originally contacted them and updated my address. If they issue checks monthly than I should have received one by now. I have contacted them monthly for the past 4 months. I do not trust their response. I doubt their reply was specific to me and my claim.

Sincerely,

***********************



**Initial Complaint**
05/04/2023

**Complaint Type:** Problems with Product/Service
**Status:** Answered ❓

JND is a lawfirm representing the class members over the apple keyboard settlement issue.
************************************************* has gone radio silence since they won the case, and they refuse to update class members. When you contact them, they refuse to follow up or answer the phone. They have an information phone number where you can get information about the case and status of payments. The phone line has had outdated information for 3 months. This case is closed and shut and approved by the judge, and the phone line tells you there is a pending court case set for a date that has already passed, and its been 2-3 months since the final judgement. Why is the information wrong, and why don't I have my check in the mail yet? I was told I would receive the check in ****** and since the case was closed, radio silence, and missed promises. Send me my money or I will take you to small claims for it.



**Business response**
05/10/2023

JND Legal Administration ("JND") is the third-party Settlement Administrator in the In re MacBook Keyboard Litigation, No.5:18-cv-02813-EJD  class action settlement in ************* District Court for the Northern District of California.  The Court has not issued an Order or a judgment either approving or denying the Settlement. Therefore, no settlement payments have been issued yet.

****************** contacted JND multiple times on 05/04/23 and we responded to him via email on the same day.  We have not received a response to our email from him.  As a Group 1 Settlement Class Member, ****************** will receive a payment if the Settlement is approved by the Court and becomes effective.  Updates regarding the Settlement and when payments will be made will be posted at www.KeyboardSettlement.com.



**Initial Complaint** 04/28/2023

**Complaint Type:** Problems with Product/Service
**Status:** Answered

This is a complaint against JND holding as the class admin for ****** v. ********** Casino settlement My claim id for the ********************** is PjWX4- 7ABZ2 I tried to reach the class administrator for my settlement payment by mail on POBOX provided but have not heard back from them about the status of my settlement check. Requesting the class admin to provide the details on the same at the earliest

> 
>
> **Business response** 05/01/2023
>
> *** confirms receipt of ****************** claim but has no record of receiving ****************** address update request. However, **************** did not meet the criteria for eligible Settlement claimants and was thus not sent a Settlement check. If **************** passed through and his face was visible to certain security cameras at ********** Hotel Casinos Sportsbook in ***********, ******** at any time between September 2020 through June 2021 he may mail a letter to us at the address below stating the same and provide documentation to indicate that he was present at ********** Hotel Casinos Sportsbook during the relevant time period.
>
> ****** v. PAD Settlement Administrator
> c/o JND Legal Administration
> PO Box 91344
> ******* ** *****
> ,



**Initial Complaint**
04/14/2023

**Complaint Type:** Problems with Product/Service
**Status:** Answered

The ******* Strip Search Settlement continues to get pushed back. First date end of January, the second date, the end of March, the third date, the end of April, and now until the end of May. I have been patiently waiting and have been understanding. These people have used the situation to get a very nice payout and now they have set aside the true victims, while they have their full payment. I am now frustrated because they are aware of the financial place the victims are in. Many depend on this money, especially during these hard times.



**Business response**
04/20/2023

JND Legal Administration (JND) is the third-party Settlement Administrator in the ******, et al. v. Sheriff ************, etc., et al. ***** No. 10-cv-1649-SVW) class action settlement in the United States District Court for the Central District of California.  Under the terms of the Settlement Agreement, eligible Class Members will receive their award over the course of three rounds of payment (occurring in 2022, 2023, and ****).  JND issued first-round payments to all eligible Class Members, including ***********************,  in January of 2022. We can confirm that *********************** will be included in the second round payments as well.

Class Counsel and their expert vendor are in the process of calculating the second round payments.  Once that information is provided, JND will issue the second round payments. While we do not have an exact payment date, it is estimated they will be issued by the end of May 2023.  JND has continued to keep Class Members updated on payment timing, including postings on the Settlement Website at www.LynwoodStripSearch.com.



**Customer response**
04/21/2023

Complaint: 19938806

I am rejecting this response because:
they are not giving a concise explanation as to the reason those payment are being pushed every month since January, I received one explanation that stated that it was due to all class members not cashing those checks, okay, I understood, but now the dates keep changing. Ive also sent two emails and no response. The lack of respect that is shown to the people that make them this money is absurd! Again, January 2023 to the end of March, then April, and now May.

Sincerely,

***********************************



**Initial Complaint** 04/07/2023

**Complaint Type:** Problems with Product/Service
**Status:** Resolved

Im filing this complaint because I have yet to have my issue resolved. Starting back from the beginning I filed a claim due to the Equifax Data Breach. After finding out that my promised to be secured information was not so secured. My information was leaked and as well as posted to the Dark Web and other sources because of the breach I was informed to contact JND Legal Administration Team. Shortly after doing so, months later go by & then I received an email stating that the settlement had came to a resolution. After filing my claim during the timeframe of July 22, 2019 and January 22, 2020. A check would be mailed out to me. I went to their site to check the status of my claim and it indicated that I was paid on 12/19/22 which is incorrect. From there I proceed to contact the company to figure out what happened exactly and I was told by their representatives that the wrong apartment number was file. Therefore, I was instructed to send out an email on 02/22/23 to their billing team to have the correct apt # listed. Once doing so, I never heard back from the company. I provide them all this information as they requested and still havent received a check or a response back. Fast forward to now I am fearful that Ive been scammed for my identity and if so then I am currently seeking out my own personal attorney to take legal action. But I wanted to give them a chance to make things right before I proceed. I would like to receive what I am owed in the correct amount due my information leaking & they instructed that they can help, as well as pain & suffering for the impact this has caused me, and lastly for my time being accosted waiting this long when I couldve found a better legal counsel to represent my claim.



**Business response** 04/14/2023

We received ************ mailing address update and his Equifax Data Breach Settlement check reissue request is in process. Check reissues are sent in batches and mail monthly. Although we cant control postal delivery, we estimate he will receive the check reissue in the next few weeks.

**Customer response** 04/15/2023

Better Business Bureau:

I have reviewed the response made by the business in reference to complaint ID ********, and find that this resolution is satisfactory to me. As stated from the company the check will be sent out to me in the next few weeks therefore, I will wait for my compensation check. Thank

Sincerely,

Tristdon ****

 **Initial Complaint** 04/03/2023

**Complaint Type:** Problems with Product/Service
**Status:** Resolved ?

This contact is for ****** v ********* Settlement (Claim ID is PQYMV- ******* contacted the class admin in the beginning of Feb to reissue my check for the settlement by end of March as i was going to travel internationally and time and time again they failed to respond to me about the reissue of check status SO im filing this complaint to understand if the check has been sent out and when ?I did not received anything till i moved from there at end of March so if the check has not been issued i will need the class admin to send it to my family address so they can receive it and deposit in my account

 **Business response** 04/10/2023

We have received a change of address from ************************* and updated and confirmed the correct address. We advised that the check will be reissued.

 **Customer response** 04/13/2023

Complaint: 19891046

I am rejecting this response because:  In my commur back on Feb 2, 2023 i had very clearly informed the administrator that i am only at that location temp till 3 March because of job reasons so to reissue my chec that. I did several follow-*** but my check was never r although they sent a batch in March. I am now reque that my check  be sent to my family address at the ea since i will be travelling for work
Please send check to
************************************************************

Also please provide date of reissue as this has been for 2 months now already



Back to 2050
Meeting 1.5°C - it's not about the destination, it's about the speed.
Explore report now

**PERSONAL FINANCE**

# Some Equifax settlement checks bounced due to 'clerical error' at failed Signature Bank

PUBLISHED FRI, MAR 17 2023•3:21 PM EDT   UPDATED FRI, MAR 17 2023•5:58 PM EDT



**Sarah O'Brien**
**@SARAHTGOBRIEN**

WATCH LIVE

## KEY POINTS

The checks, which consumers are receiving due to a legal settlement over Equifax's 2017 data breach, were written against an account at Signature Bank.

The number of affected consumers is fewer than 5,000, according to the settlement administrator.

If you're among the people whose check bounced, here's what you need to know.

Follow your favorite stocks   **CREATE FREE ACCOUNT**

**In this article**

| SBNY +0.0016 (+1.2268%) | EFX -1.97 (-0.86%) |
| --- | --- |



  



Some consumers who tried to deposit an Equifax settlement check in recent days got a surprise: It bounced.

The checks, a result of a legal settlement over the credit-reporting firm's 2017 data breach, were written against an account at Signature Bank. The bank was taken over by regulators on Sunday after account holders — spooked by the failure of Silicon Valley Bank last week — began withdrawing their money en masse.

However, the checks that were returned unpaid are not related to the bank's failure, said Jennifer Keough, CEO of JND Legal Administration, which is handling the Equifax settlement.

"What happened here, due to a Signature Bank clerical error, certain checks that should have cleared were rejected by other banks," Keough said.

**More from Personal Finance:**
Consumers lost $8.8 billion to fraud in 2022, FTC says
Here are debts that cannot be eliminated in bankruptcy
Some newlyweds can face a 'marriage tax penalty'

Fewer than 5,000 consumers are affected, Keough said. Roughly 18 million consumers were part of the class-action lawsuit that led to the settlement, she said.



In the wake of Equifax's 2017 data breach, which compromised the personal information of more than 147 million consumers — including names, birth dates and Social Security numbers — the company became the target of multiple lawsuits and reached a settlement in 2019 with the Federal Trade Commission, the Consumer Financial Protection Bureau and all U.S. states and territories.

As a result, consumers who were affected by the breach had the option of signing up for either up to $125 or free credit monitoring at all three of the largest credit reporting firms: Equifax    , Experian and TransUnion.



**VIDEO**  02:50
FDIC insurance: Safeguarding your cash

After implementation was delayed due to legal challenges, the settlement received final court approval in early 2022.

The cash payments — which may be far less than $125, such as $5 or $21 — began going out in mid-December either as a check, payment to a PayPal account or prepaid card via email from the settlement administrator, depending on how the consumer chose to receive it.

## Here's what to do if your settlement check bounced



If you are among those whose check bounced, you will be contacted by the administrator, Keough said.

"We'll be notifying those individuals and reissuing their check," she said.

### Read more of CNBC's coverage of the bank crisis

- Sens. Booker, Warnock press big bank CEOs to pause overdraft fees after SVB failure

- Republicans request Fed and FDIC oversight records for failed Silicon Valley Bank and Signature Bank

- What the UBS rescue of Credit Suisse means for global markets

- How years of turbulence at Credit Suisse came to a head

- Biden calls on Congress to tighten laws to claw back executive pay in bank failures

- Wall Street rides to the rescue as 11 banks pledge First

**View More** ⌄

Additionally, if your bank charged you a fee for the incident, you should reach out to the administrator. You can do that via email (info@EquifaxBreachSettlement.com) or phone (1-833-759-2982).

"When they provide us with proof of [the charge], the money will be sent to them," Keough said.

Follow your favorite stocks    **CREATE FREE ACCOUNT**

**In this article**

| SBNY **+0.0016 (+1.2268%)** | EFX **-1.97 (-0.86%)** |

---

## Closing Bell

**WATCH IN THE APP**

UP NEXT | **Closing Bell** 04:00 pm ET



EXHIBIT 5



Washington State
# Confidentiality Toolkit for Providers



Washington State
Health Care Authority

# Contents

Table of Contents ................................................. 2

Disclaimer ........................................................ 3

Introduction ...................................................... 4

Federal Confidentiality Laws ...................................... 5

    **Privacy Rule** ................................................ 5

        PHI............................................................ 5

        Covered Entities.............................................. 5

        Business Associates.......................................... 5

        Business Associate Agreements ............................... 6

        HIPAA Defined Identifiers .................................... 6

        Minimum Necessary Standard................................... 6

        Permitted Uses and Disclosures .............................. 7

        Authorization................................................ 8

        Uses and Disclosures Where Authorization is Required ......... 8

        Uses and Disclosures with Opportunity to Agree or Object...... 9

        Uses and Disclosures where Opportunity to Agree or Object is Not Required ......................... 9

        Notice of Privacy Practices .................................. 11

        Individual Rights under HIPAA................................ 11

    **Security Rule**.............................................. 12

        Administrative Safeguards ................................... 12

        Physical Safeguards.......................................... 12

        Technical Safeguards ........................................ 12

        Organizational Requirements.................................. 13

**Breach Notification Rule** ................................. 13

    What is a breach?............................................. 13

    Notification Requirements.................................... 13

**42 CFR Part 2** ................................................ 14

**Washington State Health Care Privacy Laws** ......... 15

**Uniform Health Care Information Act (RCW 70.02)**.............................................. 15

    Health Care Information ...................................... 15

    Allowable Uses & Disclosures ................................ 15

    Confidentiality Laws for Minors in Washington... 15

**WA minor consent laws** ................................... 16

    Authorization Elements ...................................... 17

    Mental Health and Sexually Transmitted Disease (STD) records in Washington ................... 17

    STDs – Permitted and Mandatory Disclosures (RCW 70.02.220) .............................. 17

    Mental Health – Permitted and Mandatory Disclosures (RCW 70.02.230) ......................... 18

**Breach Notification under Washington State Law (RCW 42.56.590 & 19.255.010)** ........................ 19

    What is Personal Information? ................................ 19

    Notification Obligation...................................... 19

    Attorney General Notification................................ 20

    Timing of Notification ....................................... 20

    When also subject to HIPAA .................................. 20

# Federal Confidentiality Laws

In 1996, Congress passed the Health Insurance Portability and Accountability Act (HIPAA) to encourage the development of the health information system and tasked the U.S. Department of Health and Human Services (HHS) with providing recommendations on standards for protected health information. In 2000, HHS issued a final rule, known as the Privacy Rule, and later published the Security Rule. In 2009, Congress passed the Health Information for Economic and Clinical Health Act in response to the growth of distinct digital record formats and storage systems, which significantly revised HIPAA. In 2013, HHS amended the Privacy Rule as part of a broad set of new regulations, referred to as the Omnibus Rule.

## Privacy Rule

The Privacy Rule provides federal protections for individually identifiable health information held by covered entities (defined below) and gives patients an array of rights with respect to that information. At the same time, the Privacy Rule is balanced so that it permits the disclosure of individually identifiable health information with the patient's consent, or without consent in certain circumstances.

The Privacy Rule establishes a foundation of federal protections for the privacy of protected health information. In cases where multiple laws apply, the most restrictive law must be followed.

### PHI

Protected Health Information (PHI) is health information collected from an individual, created or received by a covered entity that:

- Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; **and**
- Identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.

PHI can be maintained in an electronic or any other form. Certain records, like some educational records and employment records, are excluded from the definition of PHI.

### Covered Entities

HIPAA establishes standards to protect PHI held by covered entities and their business associates. Covered entities are the following:

- Health Plan – A plan that provides or pays the cost of medical care. Includes Medicaid, Medicare, and self-funded plans.
- Health Care Provider – A provider of medical or health services (e.g., home health, hospitals, clinics) that transmits any health information in electronic form in connection with a HIPAA-covered transaction.
- Health Care Clearinghouses – Organizations that process health information on behalf of other organizations from a non-standard content into standard data elements or to a standard transaction (e.g., billing services, health information systems).

### Business Associates

A business associate is a person or entity that performs certain functions or activities that involve the use or disclosure of PHI on behalf of, or provides services to, a covered entity. A member of the covered entity's workforce is not a business associate. A covered entity can be a business associate of another covered entity. The Privacy Rule lists some of the services, functions, and activities that make a person or entity a business associate. Business associate functions and activities can include:

- Claims processing or administration
- Data analysis
- Processing or administration
- Utilization review
- Quality assurance
- Billing
- Benefit management
- Practice management
- Repricing.

Business associate services can include:

- Legal
- Actuarial
- Accounting
- Consulting
- Data aggregation
- Management
- Administrative
- Accreditation
- Financial
- See the definition of "business associate" at 45 CFR 160.103.

Examples of business associates:

- A third-party administrator that assists a health plan with claims processing
- A CPA firm whose accounting services to a health care provider involve access to PHI
- An attorney whose legal services to a health plan involve access to PHI
- A consultant that performs utilization reviews for a hospital
- A health care clearinghouse that translates a claim from a non-standard format into a standard transaction on behalf of a health care provider and forwards the processed transaction to a payer
- An independent medical transcriptionist that provides transcription services to a physician
- A pharmacy benefits manager that manages a health plan's pharmacist network

HHS guidance on business associates can be found **here** ↗.

## Business Associate Agreements

When a covered entity uses a contractor or other non-workforce member to perform "certain" services or activities, the Privacy Rule requires that the covered entity include certain protections for the information in a business associate agreement (BAA). In the BAA, a covered entity must impose specified written safeguards on the individually identifiable health information used or disclosed by its business associates. Moreover, a covered entity may not contractually authorize its business associate to make any use or disclosure of PHI that would violate the Rule.

Sample BAA language is available on the OCR website **here** ↗.

## HIPAA Defined Identifiers

Many common identifiers can be considered PHI, including:

1. Names
2. All geographic subdivisions smaller than a state, including street address, city, county, precinct, ZIP code, and their equivalent geocodes, except for the initial three digits of the ZIP code if, according to the current publicly available data from the U.S. Census Bureau:
   a. The geographic unit formed by combining all ZIP codes with the same three initial digits contains more than 20,000 people; and
   b. The initial three digits of a ZIP code for all such geographic units containing 20,000 or fewer people is changed to 000
3. All elements of dates (except year) for dates that are directly related to an individual, including birth date, admission date, discharge date, death date, and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older
4. Telephone numbers
5. Vehicle identifiers and serial numbers, including license plate numbers
6. Fax numbers
7. Device identifiers and serial numbers
8. Email addresses
9. Web Universal Resource Locators (URLs)
10. Social security numbers
11. Internet Protocol (IP) addresses
12. Medical record numbers
13. Biometric identifiers, including finger and voice prints
14. Health plan beneficiary numbers
15. Full-face photographs and any comparable images
16. Account numbers
17. Any other unique identifying number, characteristic, or code, except as permitted
18. Certificate/license numbers

HHS guidance on these identifiers and methods for de-identification can be found **here** ↗.

## Minimum Necessary Standard

As described below, a covered entity may disclose PHI under certain circumstances. These disclosures are typically subject to the "minimum necessary standard." The minimum necessary standard, a key protection of the Privacy Rule, is derived from confidentiality codes and practices in common use today. It is based on sound current practice that PHI should not be used or disclosed when it is not necessary to satisfy a particular purpose or carry out a function. Put another way, only the minimum amount of PHI necessary to carry out a function should be used or disclosed.

The Privacy Rule generally requires covered entities to take reasonable steps to limit the use or disclosure of, and requests for, PHI to the minimum necessary to accomplish the intended purpose. The minimum necessary standard does not apply to the following:

- Disclosures to or requests by a health care provider for treatment purposes



An official website of the United States government   Here's how you know

**U.S. Department of**
**Health and Human Services**  </>
Enhancing the health and well-being
of all Americans

MENU

**Navigate to:**



    

# Business Associates

45 CFR 164.502(e), 164.504(e), 164.532(d) and (e)   (Download a copy in PDF - PDF </sites
/default/files/ocr/privacy/hipaa/understanding/coveredentities/businessassociates.pdf>)

New HHS Fact Sheet On Direct Liability of Business Associates under HIPAA </hipaa/for-
professionals/privacy/guidance/business-associates/factsheet/index.html>

**Background**

By law, the HIPAA Privacy Rule applies only to covered entities – health plans, health care
clearinghouses, and certain health care providers. However, most health care providers
and health plans do not carry out all of their health care activities and functions by
themselves. Instead, they often use the services of a variety of other persons or
businesses. The Privacy Rule allows covered providers and health plans to disclose
protected health information to these "business associates" if the providers or plans
obtain satisfactory assurances that the business associate will use the information only
for the purposes for which it was engaged by the covered entity, will safeguard the
information from misuse, and will help the covered entity comply with some of the
covered entity's duties under the Privacy Rule. Covered entities may disclose protected
health information to an entity in its role as a business associate only to help the covered
entity carry out its health care functions – not for the business associate's independent
use or purposes, except as needed for the proper management and administration of the

business associate.

## How the Rule Works

**General Provision**. The Privacy Rule requires that a covered entity obtain satisfactory assurances from its business associate that the business associate will appropriately safeguard the protected health information it receives or creates on behalf of the covered entity. The satisfactory assurances must be in writing, whether in the form of a contract or other agreement between the covered entity and the business associate.

**What Is a "Business Associate?"** A "business associate" is a person or entity that performs certain functions or activities that involve the use or disclosure of protected health information on behalf of, or provides services to, a covered entity.  A member of the covered entity's workforce is not a business associate.  A covered health care provider, health plan, or health care clearinghouse can be a business associate of another covered entity.  The Privacy Rule lists some of the functions or activities, as well as the particular services, that make a person or entity a business associate, if the activity or service involves the use or disclosure of protected health information. The types of functions or activities that may make a person or entity a business associate include payment or health care operations activities, as well as other functions or activities regulated by the Administrative Simplification Rules.

Business associate functions and activities include: claims processing or administration; data analysis, processing or administration; utilization review; quality assurance; billing; benefit management; practice management; and repricing.  Business associate services are: legal; actuarial; accounting; consulting; data aggregation; management; administrative; accreditation; and financial. See the definition of "business associate" at 45 CFR 160.103.

## Examples of Business Associates.

- A third party administrator that assists a health plan with claims processing.
- A CPA firm whose accounting services to a health care provider involve access to protected health information.
- An attorney whose legal services to a health plan involve access to protected health information.
- A consultant that performs utilization reviews for a hospital.

- A health care clearinghouse that translates a claim from a non-standard format into a standard transaction on behalf of a health care provider and forwards the processed transaction to a payer.
- An independent medical transcriptionist that provides transcription services to a physician.
- A pharmacy benefits manager that manages a health plan's pharmacist network.

**Business Associate Contracts.** A covered entity's contract or other written arrangement with its business associate must contain the elements specified at 45 CFR 164.504(e). For example, the contract must: Describe the permitted and required uses of protected health information by the business associate; Provide that the business associate will not use or further disclose the protected health information other than as permitted or required by the contract or as required by law; and Require the business associate to use appropriate safeguards to prevent a use or disclosure of the protected health information other than as provided for by the contract.  Where a covered entity knows of a material breach or violation by the business associate of the contract or agreement, the covered entity is required to take reasonable steps to cure the breach or end the violation, and if such steps are unsuccessful, to terminate the contract or arrangement. If termination of the contract or agreement is not feasible, a covered entity is required to report the problem to the Department of Health and Human Services (HHS) Office for Civil Rights (OCR).  Please view our Sample Business Associate Contract </ocr/privacy/hipaa/understanding/coveredentities /contractprov.html>.

**Transition Provisions for Existing Contracts.** Covered entities (other than small health plans) that have an existing contract (or other written agreement) with a business associate prior to October 15, 2002, are permitted to continue to operate under that contract for up to one additional year beyond the April 14, 2003 compliance date, provided that the contract is not renewed or modified prior to April 14, 2003. This transition period applies only to written contracts or other written arrangements. Oral contracts or other arrangements are not eligible for the transition period. Covered entities with contracts that qualify are permitted to continue to operate under those contracts with their business associates until April 14, 2004, or until the contract is renewed or modified, whichever is sooner, regardless of whether the contract meets the Rule's applicable contract requirements at 45 CFR 164.502(e) and 164.504(e). A covered entity must otherwise comply with the Privacy Rule, such as making only permissible

disclosures to the business associate and permitting individuals to exercise their rights under the Rule. See 45 CFR 164.532(d) and (e).

**Exceptions to the Business Associate Standard.** The Privacy Rule includes the following exceptions to the business associate standard. See 45 CFR 164.502(e). In these situations, a covered entity is not required to have a business associate contract or other written agreement in place before protected health information may be disclosed to the person or entity.

- Disclosures by a covered entity to a health care provider for treatment of the individual. For example:
  - A hospital is not required to have a business associate contract with the specialist to whom it refers a patient and transmits the patient's medical chart for treatment purposes.
  - A physician is not required to have a business associate contract with a laboratory as a condition of disclosing protected health information for the treatment of an individual.
  - A hospital laboratory is not required to have a business associate contract to disclose protected health information to a reference laboratory for treatment of the individual.
- Disclosures to a health plan sponsor, such as an employer, by a group health plan, or by the health insurance issuer or HMO that provides the health insurance benefits or coverage for the group health plan, provided that the group health plan's documents have been amended to limit the disclosures or one of the exceptions at 45 CFR 164.504(f) have been met.
- The collection and sharing of protected health information by a health plan that is a public benefits program, such as Medicare, and an agency other than the agency administering the health plan, such as the Social Security Administration, that collects protected health information to determine eligibility or enrollment, or determines eligibility or enrollment, for the government program, where the joint activities are authorized by law.

**Other Situations in Which a Business Associate Contract Is NOT Required.**

- When a health care provider discloses protected health information to a health plan for payment purposes, or when the health care provider simply accepts a discounted rate to participate in the health plan's network. A provider that submits a claim to a health plan and a health plan that assesses and pays the claim are each acting on its own behalf as a covered entity, and not as the "business associate" of the other.

- With persons or organizations (e.g., janitorial service or electrician) whose functions or services do not involve the use or disclosure of protected health information, and where any access to protected health information by such persons would be incidental, if at all.

- With a person or organization that acts merely as a conduit for protected health information, for example, the US Postal Service, certain private couriers, and their electronic equivalents.

- Among covered entities who participate in an organized health care arrangement (OHCA) to make disclosures that relate to the joint health care activities of the OHCA.

- Where a group health plan purchases insurance from a health insurance issuer or HMO. The relationship between the group health plan and the health insurance issuer or HMO is defined by the Privacy Rule as an OHCA, with respect to the individuals they jointly serve or have served. Thus, these covered entities are permitted to share protected health information that relates to the joint health care activities of the OHCA.

- Where one covered entity purchases a health plan product or other insurance, for example, reinsurance, from an insurer. Each entity is acting on its own behalf when the covered entity purchases the insurance benefits, and when the covered entity submits a claim to the insurer and the insurer pays the claim.

- To disclose protected health information to a researcher for research purposes, either with patient authorization, pursuant to a waiver under 45 CFR 164.512(i), or as a limited data set pursuant to 45 CFR 164.514(e). Because the researcher is not conducting a function or activity regulated by the Administrative Simplification Rules, such as payment or health care operations, or providing one of the services listed in the definition of "business associate" at 45 CFR 160.103, the researcher is not a business associate of the covered entity, and no business associate agreement is required.

- When a financial institution processes consumer-conducted financial transactions by debit, credit, or other payment card, clears checks, initiates or processes electronic funds transfers, or conducts any other activity that directly facilitates or effects the transfer of funds for payment for health care or health plan premiums. When it conducts these activities, the financial institution is providing its normal banking or other financial transaction services to its customers; it is not performing a function or activity for, or on behalf of, the covered entity.

Please review our Frequently Asked Questions on Business Associates </hipaa/for-professionals/faq/business-associates/> as well as other Frequently Asked Questions about the Privacy Rule </hipaa/for-professionals/faq/privacy-rule%3a-general-topics>.

Learn more about business associate contracts </hipaa/for-professionals/covered-entities/sample-business-associate-agreement-provisions/index.html>

OCR HIPAA Privacy December 3, 2002 Revised April 3, 2003

Back to Top

Content created by Office for Civil Rights (OCR)
Content last reviewed May 24, 2019

## Sign Up for Email Updates

Receive the latest updates from the Secretary, Blogs, and News Releases.

## Sign Up

<https://cloud.connect.hhs.gov /subscriptioncenter>





<https ://w ww.f aceb ook.c om/h hs>

<http s://t witter .com /hhsg ov>

<https://hhs.gov>

## HHS Headquarters

200 Independence Avenue, S.W.
Washington, D.C. 20201
Toll Free Call Center: 1-877-696-6775

EXHIBIT 6

FILED

AUG 1 6 2002

THOMAS R. FALLQUIST
SPOKANE COUNTY CLERK

## SUPERIOR COURT OF WASHINGTON IN AND FOR SPOKANE COUNTY

KAREN WRIGHT, individually, and on behalf )
of all others similarly situated; ROSA LEE )
JOHNSON, individually and on behalf of all )
others similarly situated, and KARLA )
SEASTROM, individually, and on behalf of all )
others similarly situated, )
                              Plaintiffs, )
    v. )
MILAN JECKLE, individually, and JANE DOE )
JECKLE, individually, and on behalf of their )
marital community, D/B/A ALL VALLEY )
MEDICAL, )
                         Defendants. )

No. 98-2-07410-2

(~~Proposed~~) ORDER APPROVING
PLAINTIFFS' CLASS NOTICE
PLAN

## I. BASIS

THIS MATTER came before the Court for hearing on April 19, 2002, May 10, 2002, May 31, 2002, and July 26, 2002, on Plaintiffs' Motion in Support of Proposed Notice Plan. In deciding the Motion, the Court considered the pleadings filed in this action: Plaintiffs' Motion in Support of Proposed Notice Plan, with supporting pleadings; Defendants' responsive pleadings; the motion to intervene by Plaintiffs Marcy Fisher, et al., with supporting pleadings; Plaintiffs' responsive pleadings, and the oral arguments of counsel for Plaintiffs, Defendants, and for Marcy Fisher.

## II. FINDINGS AND CONCLUSIONS

Based on the above, the Court expressly finds as follows:

ORDER APPROVING PLAINTIFFS' CLASS NOTICE
PLAN - 1

LAW OFFICES
LUKINS & ANNIS
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\FEN-PHEN\JECKLE\PLDGS\ORDER APPROVING CLASS NTC PLAN 7-30-02.DOC

a.    The Court has reviewed the proposed Class Action Notice and Class Action Summary Notice attached to this Order as **Exhibits A and B,** respectively.

b.    The proposed Class Action Notice and Class Action Summary Notice advises class members that (a) the Court will exclude them from the Class if they so request by a specified date; (b) the judgment, whether favorable or not, will include all members who do not request exclusion; and (c) all members who do not request exclusion may, if they desire, enter an appearance through their counsel. CR 23(c)(2).

c.    The proposed Class Action Notice and Class Action Summary Notice also provide class members with sufficient information about the case to enable them to make an informed decision about their participation. The Notices succinctly and simply describe the substance of the action and the positions of the parties. They identify the opposing parties, class representatives, and counsel. They indicate the relief sought. They explain the risks to the class members, such as being bound by the judgment. They emphasize that the Court has not ruled on the merits of any claims or defenses. Finally, they clearly describe the procedures and deadlines for opting out.

d.    Dr. Jeckle possesses the names and last known addresses of the class members in his patient records and has asserted the physician-patient privilege to prevent the discovery of the identity and known addresses of those patients. The best notice practicable to the Class under the circumstances of this case requires individual notice to the Class by mailing the Class Action Notice via first-class mail to the last known address of all class members, as obtained from Dr. Jeckle's patient records. CR 23(c)(2).

e.    In consideration of the fact that Dr. Jeckle has asserted the physician-patient privilege to prevent plaintiffs' counsels' discovery of putative class member names and addresses, the best notice practicable requires that Dr. Jeckle provide the names and last known addresses of all class members to the third-party notice provider appointed by this Court. Dr. Jeckle will provide nothing other than the names and addresses. He will not associate this list of names and addresses with medical care of any type or suggest that these individuals are patients of his. The Court-appointed third-party notice provider will be responsible for keeping the names and addresses provided by Dr. Jeckle confidential, mailing the Class Action Notice to the class members, and filing the list of names and addresses

ORDER APPROVING PLAINTIFFS' CLASS NOTICE
PLAN - 2

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\Fen-Phen\Jeckle\Pldgs\ORDER APPROVING CLASS NTC PLAN 7-30-02.DOC

provided by Dr. Jeckle *in camera* with the Court upon mailing the Class Action Notice to the class members.

   f.  The companies of Comet Press of Spokane, Washington, and Walt's Mailing Service of Spokane, Washington, have indicated that they stand ready, willing, and able to act as third-party notice providers in this case, and have the means to keep the class member names and addresses confidential. The Court hereby finds that Comet Press and Walt's Mailing Service are appropriate third-party notice providers in this case. Plaintiffs are required to bear the cost of the providing the Class Action Notice to the Class. *Eisen v. Carlisle & Jaquelin*, 417 U.S. 156, 177 (1974).

   g.  Due to the passage of time, all class members are unlikely to be identified through the last known address contained in Dr. Jeckle's patient records. Dr. Jeckle advertised his Fen-Phen program in the Spokesman-Review and the Nickle Nik. Pursuant to CR 23(c)(2), the best notice practicable to the Class requires that the Class Action Summary Notice be published in each of the following publications:

| Newspaper | Counties Covered | Notice Circulation |
| --- | --- | --- |
| Spokesman Review | WA: Spokane, Ferry, Stevens, Pend Oreille, Lincoln, Grant, Adams, Whitman<br>ID: Boundary, Bonner, Kootenai, Benewah, Latah, Shoshone | 105,00 (Weekday)<br>133,000 (Sunday) |
| Spokesman Review Food Ads | Spokane | Most non-subscribers in Spokane County |
| Nickel Nik | N. to Canadian border; S. to Pullman; E. to Davenport; all of N. Idaho to Lewiston | 34,000 |
| Coeur d'Alene Press | Kootenai, Bonner, Shoshone | 20,200 (Weekday)<br>30,000 (Sunday) |
| Okanogan Valley Gazette-Tribune | Okanogan | 27,000 |
| Columbia Basin Herald | Grant, Adams | 9,400 |

ORDER APPROVING PLAINTIFFS' CLASS NOTICE
PLAN - 3

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

| Newspaper | Counties Covered | Notice Circulation |
|---|---|---|
| Lewiston Morning Tribune | Nez Perce, Clearwater, Idaho, Latah, Lewis, Benewah, Asotin, Garfield, Whitman | 27,000 |
| Wenatchee World | Douglas, Chelan, Grant, Okanogan | 30,000 |
| Bonner County Daily Bee | Bonner | 6,000 Daily 30,500 Sunday |
| Moscow-Pullman Daily News | Latah, Whitman | 7,500 |
| Shoshone News Press | Shoshone, eastern end of Kootenai | 3,500 |
| Tri-City Herald | Benton, Franklin | 47,000 |

The Summary Notice is to be published in one weekday edition in the above publications. In addition, the Summary Notice is to be published in one Sunday edition of the Spokesman Review, Coeur d'Alene Press, and Bonner County Daily Bee. Plaintiffs are required to bear the cost of publishing the Class Action Summary Notice. *Eisen v. Carlisle & Jaquelin*, 417 U.S. at 177 (1974).

       h.    Because the Court has certified a Class pursuant to CR 23(b)(3), class members have the opportunity to opt out of the Class. In consideration of the fact that Dr. Jeckle has asserted the physician-patient privilege to prevent Class Counsel's discovery of putative class member names and addresses, this Court finds that all Requests for Exclusion from the Class should be mailed to this Court's Judicial Assistant, Ron Gibb, who will keep these Requests for Exclusion under seal.

       This Court finds that the reasonable time period for class members to exclude themselves from the Class is 60 days. All class members are members of the Class unless they timely exclude themselves from the Class with a completed Request for Exclusion postmarked on or before 60 days from the day that the Court-appointed third-party notice provider mails the Class Action Notice to the Class. Class Counsel are entitled to the names and addresses of all class members who fail to timely exclude themselves from the Class.

ORDER APPROVING PLAINTIFFS' CLASS NOTICE
PLAN - 4

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\FEN-PHEN\JECKLE\PLDGS\ORDER APPROVING CLASS NTC PLAN 7-30-02.DOC

i.      The law firm of Keller, Rohrback, L.L.P., will maintain a list of individuals, including their names and addresses, who telephone or e-mail with questions as a result of the publication of the Class Action Summary Notice and this list will be shared with counsel for Dr. Jeckle.

j.      These methods of providing notice to the class satisfy the due process requirements.

k.      These methods of providing notice do not violate the physician-patient privilege.

### III. ORDER

THEREFORE, IT IS HEREBY ORDERED pursuant to CR 23(c)(2) that plaintiffs' motion for order approving class notice plan is GRANTED:

1.      The Court hereby approves the Class Action Notice attached hereto as **Exhibit A**.

2.      The Court hereby approves the Class Action Summary Notice attached hereto as **Exhibit B**.

3.      Comet Press, 401 West First Avenue, Spokane, WA 99201, (509) 838-4407, and Walt's Mailing Service, 9610 East First Avenue, Spokane, WA 99206, (509) 924-5939, are hereby appointed as the Court-appointed third-party notice providers.

4.      Class Counsel shall provide Court-appointed third-party notice provider, Comet Press, 401 West First Avenue, Spokane, WA 99201, (509) 838-4407, with a 3 x 5" diskette, a CD, or an email attachment containing the Court-approved Class Action Notice and the return address to be printed on the Class Action Notice envelopes within 7 days of the date of this Order.  Within 14 days of the date of this Order, Class Counsel shall file a declaration indicating the date that the diskette, CD, or email attachment containing the Class Action Notice and the return address to be printed on the envelopes was provided to Comet Press.

5.      Comet Press shall then, within 14 days of the date of this Order, duplicate the Class Action Notice, fold it, stuff it in an envelope, seal the envelope, print the return address of the Court on the envelope, and forward the sealed envelopes containing the Class Action

ORDER APPROVING PLAINTIFFS' CLASS NOTICE
PLAN - 5

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

Notice to another court-appointed agent, Walt's Mailing Service. The return address that Comet Press shall print on the sealed envelopes shall be: Spokane County Superior Court, Attn: Ron Gibb, Department 5, Room 405, 1116 West Broadway Avenue, Spokane, WA 99260, followed by the following text box:

> OFFICIAL COURT NOTICE: TO BE OPENED ONLY BY NAMED ADDRESSEE

Within **30** days of the date of this Order, Comet Press shall complete and return to this Court's Judicial Assistant, Ron Gibb, Spokane County Superior Court, Department 5, Room 405, 1116 West Broadway Avenue, Spokane, WA 99260, (509) 477-4766, the declaration attached hereto as **Exhibit C**, indicating the date that the sealed envelopes containing the Class Action Notice was provided to Walt's Mailing Service.

6.      Meanwhile, within **30** days of the date of this Order, unless otherwise ordered by the Court, Dr. Jeckle, by and through his counsel, shall hand-carry a 3.5" diskette or CD containing the names and addresses only of all patients to whom he sold the diet drugs Pondimin, Redux, and/or phentermine, as obtained from his patient records, in an Excel spreadsheet format, to Court-appointed third-party notice provider, Lorri Kilduff, at Walt's Mailing Service, 9610 East First Avenue, Spokane, WA 99206, (509) 924-5939. Specifically, Dr. Jeckle, by and through his counsel, shall provide court-appointed agent, Walt's Mailing Service, with the names and addresses of all persons to whom he sold the diet drugs Pondimin, Redux, and/or phentermine. Dr. Jeckle's counsel will assure that Walt' Mailing Service is only provided with unprotected directory information. Within **45** days of the date of this Order, Dr. Jeckle's counsel shall file a declaration indicating the date that the diskette or CD containing this non-protected directory information was provided to Court-appointed third-party notice provider, Walt's Mailing Service.

7.      Within **45** days of the date of this Order, Walt's Mailing Service, Walt's Mailing Service shall then address, affix postage, and mail the sealed envelopes containing the Class Action Notice. In providing this service, Walt's Mailing Service shall only use the directory information provided by Dr. Jeckle, by and through his counsel, for the purpose of mailing the Class Action Notice to the Class member, and shall not disclose this information

ORDER APPROVING PLAINTIFFS' CLASS NOTICE
PLAN - 6

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\FEN-PHEN\JECKLE\PLDGS\ORDER APPROVING CLASS NTC PLAN 7-30-02.DOC

to any person or entity, except to the extent necessary for mailing the Class Action notice to the Class members. Within **60** days of the date of this Order, Walt's Mailing Service shall delete any copies made of the information contained on the diskette or CD provided by Dr. Jeckle's counsel and mail the original unaltered diskette or CD containing the names and addresses of the class members to this Court's Judicial Assistant, Ron Gibb, Spokane County Superior Court, Department 5, Room 405, 1116 West Broadway Avenue, Spokane, WA 99260, (509) 477-4766, who will keep this diskette or CD under seal. In addition, within **60** days of the date of this Order, Walt's Mailing Service, shall complete and return to Ron Gibb the declaration attached hereto as **Exhibit D**, indicating the date that the Class Action Notice was mailed to the members of the Class.

8.      The plaintiffs shall pay all services provided by the Court-appointed third-party notice providers.

9.      Plaintiffs, by and through their counsel, shall publish the Class Action Summary Notice in the Spokesman Review, Spokesman Review Food Etc., Nickel Nik, Coeur d'Alene Press, Okanogan Valley Gazette-Tribune, Columbia Basin Herald, Wenatchee World, Lewiston Morning Tribune, Bonner County Daily Bee, Moscow-Pullman Daily News, Shoshone News Press, and Tri-City Herald. Plaintiffs shall bear the cost of publishing the Class Action Summary Notice.

10.     Within **60** days of the date of this Order, Class Counsel shall file a declaration indicating the dates that the Class Action Summary Notice was published in the Spokesman Review, Spokesman Review Food Etc., Nickel Nik, Coeur d'Alene Press, Okanogan Valley Gazette-Tribune, Columbia Basin Herald, Wenatchee World, Lewiston Morning Tribune, Bonner County Daily Bee, Moscow-Pullman Daily News, Shoshone News Press, and Tri-City Herald.

11.     Class members wishing to exclude themselves from the Settlement shall return a completed Request for Exclusion (which is included in the Class Action Notice) that is postmarked on or before **60** days from the day that the Court-appointed third-party notice provider is required to mail the Class Action Notice to the Class. The Exclusion should be mailed to this Court's Judicial Assistant, Ron Gibb, who will keep these Requests for Exclusion under seal.

ORDER APPROVING PLAINTIFFS' CLASS NOTICE
PLAN - 7

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\FEN-PHEN\JECKLE\PLDGS\ORDER APPROVING CLASS NTC PLAN 7-30-02.DOC

DATED this *16* day of *August*, 2002.

_____
THE HONORABLE RICHARD J. SCHROEDER

RICHARD J. SCHROEDER

Presented by:

LUKINS & ANNIS, P.S.

By _____
   ROBERT J. CROTTY, WSBA #09113
   DARRELL W. SCOTT, WSBA#20241
   TAMI J. WILCOX, WSBA #28367

KELLER ROHRBACK, L.L.P.
   Lynn Lincoln Sarko, WSBA # 16569
   Britt L. Tinglum, WSBA #19090
   Amy N.L. Hanson, WSBA #28589
   1201 Third Avenue, Suite 3200
   Seattle, WA 98101
   Telephone:  (206) 623-1900
   Facsimile:  (206) 623-3384

STANISLAW ASHBAUGH
   David Ashbaugh, WSBA #00462
   4400 Columbia Center, 701 Fifth Avenue
   Seattle, WA  98104-7012
   Telephone:  (206) 386-5900
   Facsimile:  (206) 344-7400

Attorneys for the Plaintiffs

**Approved as to form;** *subject to prior objections ruled on by the court*
~~Notice of Presentment waived~~ *BTR*

WITHERSPOON, KELLEY, DAVENPORT & TOOLE

By _____
   BRIAN T. REKOFKE, WSBA #13260
   **Attorney for Defendants**

ORDER APPROVING PLAINTIFFS' CLASS NOTICE
PLAN - 8

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA  99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\Fen-Phen\Jeckle\Pldgs\ORDER APPROVING CLASS NTC PLAN 7-30-02.DOC

SUPERIOR COURT OF WASHINGTON IN AND FOR SPOKANE COUNTY

KAREN WRIGHT, et al.,                )
                        Plaintiffs,  )    No. 98-2-07410-2
        v.                           )
                                     )
MILAN JECKLE, et al.,                )
                        Defendants.  )
_____)

## CLASS ACTION NOTICE

TO:    ALL PERSONS WHO PURCHASED THE DIET DRUGS PONDIMIN,®
       PHENTERMINE, OR REDUX® FROM DR. MILAN JECKLE OR ALL
       VALLEY MEDICAL OF SPOKANE, WASHINGTON

If you purchased the diet drugs Pondimin,® phentermine, or Redux® from
Dr. Milan Jeckle or All Valley Medical of Spokane, Washington, this Notice may affect
your rights.  Please read this Court-ordered Class Action Notice carefully.

A class action lawsuit is currently pending in Spokane County Superior Court,
Washington, entitled *Karen Wright, et al. v. Milan Jeckle, et al.*, Case No. 98-2-07410-2. This
Notice is directed to all members of the plaintiff Class. The Class is defined as:

> All patients of Dr. Milan Jeckle who purchased the diet drugs Pondimin,®
> phentermine, or Redux® from January 1, 1995, through the present from
> Dr. Jeckle or All Valley Medical and who have not filed a separate lawsuit
> against Dr. Jeckle for damages arising out of the prescribing and
> dispensing of said pharmaceuticals.

Notice of this lawsuit is given pursuant to Washington Superior Court Civil Rule 23 and
by Order of the Court to inform members of the Class of the Court's decision to certify the Class,
the nature of the claims and defenses, and Class members' rights with respect to this action.

## NATURE OF THE CLASS ACTION CLAIMS

In this lawsuit, plaintiffs Karen Wright, Rosa Lee Johnson, and Karla Seastrom claim that
Dr. Milan Jeckle breached fiduciary duties and violated the Washington Consumer Protection
Act, RCW 19.86, by his common course of conduct in marketing and selling fen-phen for a
profit. Plaintiffs seek monetary relief from defendants Milan Jeckle, Jane Doe Jeckle, and All
Valley Medical on behalf of the certified Class. Plaintiffs do not seek monetary damages for any
bodily injuries persons may have actually sustained as a result of ingesting these drugs, and have
expressly reserved Class members' rights to pursue those claims in separate, individual suits.

The defendants in this lawsuit deny any wrongdoing. They contend that Dr. Milan Jeckle
has the right to sell pharmaceuticals to patients at a profit. Defendants, further, claim that
plaintiffs' claims are barred by various defenses.



In certifying this matter as a class action, the Court did not decide the merits of the parties' claims or defenses. Plaintiffs will be required to prove their allegations a trial on the merits in order to obtain the relief requested.

## CLASS MEMBERSHIP

If you fit within the Class definition set out above, you are automatically a Class member, without doing more. As a member of the Class, you will benefit from any favorable outcome in this action and will be bound by any unfavorable judgment.

If you are a member of the class action lawsuit and wish to remain a member of the class action lawsuit, you need do nothing at this time. You will receive additional notices updating you on the case and informing you of your rights.

The Court certified the Class under Washington Superior Court Civil Rule 23(b)(3). That Rule provides that if a Class member does not wish to participate in the class action lawsuit, the Class member has the right to take himself or herself out of the Class. If you do exclude yourself from the class action lawsuit, you have the right to bring your own lawsuit against defendants Milan Jeckle, M.D., Jane Doe Jeckle, and All Valley Medical of Spokane, Washington, or to do nothing at all. If you exclude yourself from the class action lawsuit, you will not be entitled to share in any potential recovery obtained by the class action lawsuit.

If you are a member of the class action lawsuit and wish to exclude yourself from the class action lawsuit, you must complete the attached Request for Exclusion on or before _____*November*___ *29*, 2002.

To be valid, a Request for Exclusion must include the following: (1) the name of the person who wishes to be excluded, (2) that person's address; and (3) a statement that the person desires to be excluded from the class action lawsuit in this matter. You need not state your reason for asking to be excluded from the class action lawsuit.

The Request for Exclusion must be mailed by first class mail, postage prepaid, and postmarked on or before _____*November*___ *29*, 2002, to:

All Valley Medical Class Action Litigation
Attn: Ron Gibb
Spokane County Superior Court
Department 5, Room 405
1116 West Broadway Avenue
Spokane, WA 99260

The postmark will determine the time of mailing. **NOTE:** If you are a member of the class action lawsuit, you will continue to be a member of the class action lawsuit unless you submit a completed Request for Exclusion from the class action lawsuit by first class mail, postage prepaid, and postmarked on or before _____*November*___ *29*, 2002.

## CLASS REPRESENTATION AND CLASS COUNSEL

The Court appointed Plaintiffs Karen Wright, Rosa Lee Johnson, and Karla Seastrom to serve as representatives of the Class. The Court appointed the following Class counsel to represent the interests of the Class: Robert J. Crotty, Darrell W. Scott, and Angel D. Rains of Lukins & Annis, P.S.; Lynn Lincoln Sarko, Britt L. Tinglum, and Amy N. L. Hanson of Keller Rohrback, L.L.P.; and David Ashbaugh of Stanislaw Ashbaugh, L.L.P.

Members of the Class will not be charged for Class counsel's services or costs of litigation. Class counsel will apply to the Court for the entirety of their compensation. Class members may hire separate counsel to represent them in this class action litigation, but they will be responsible for paying that attorney's fees.

## FURTHER INFORMATION REGARDING THIS CLASS ACTION LITIGATION

If you have any questions regarding the information in this Notice, you may call or write:

Ms. Amy N. L. Hanson (Co-counsel for the Class)
Keller Rohrback, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
1 (800) 776-6044
ahanson@kellerrohrback.com

Should you choose to contact Class counsel, you may provide your name and current mailing address so that you can be added to the class member list for future notifications regarding this class action lawsuit.

**PLEASE DO NOT CONTACT THE COURT OR THE
COURT CLERK FOR INFORMATION.**

DATED:   **8-16-02**

R. J. Schroeder   RICHARD J. SCHROEDER
THE HONORABLE RICHARD J. SCHROEDER

**Notice of Class Action Litigation**

# REQUEST FOR EXCLUSION

I have read the Notice of Class Action Litigation, and I wish to exclude myself from the class action lawsuit.

Name: _____

Address: _____

Signature: _____  Date: _____

_ _ _ F O L D

**If you wish to exclude yourself from the class action lawsuit, complete this form, fold it in half, seal it with tape or a staple, and return by first class mail by affixing a 34 cent stamp and having it postmarked on or before [INSERT]. You do not need an envelope.**

*BEFORE MAILING: DETACH HERE, FOLD IN HALF SO THAT THE PRE-PRINTED ADDRESS IS SHOWING, AND SEAL WITH TAPE OR STAPLE*

SEAL WITH TAPE OR STAPLE

PLACE
STAMP
HERE

**All Valley Medical Class Action Litigation**
**Attn:  Ron Gibb**
**Spokane County Superior Court**
**Department 5, Room 405**
**1116 West Broadway Avenue**
**Spokane, WA  99260**

SUPERIOR COURT OF WASHINGTON IN AND FOR SPOKANE COUNTY

| | |
|---|---|
| KAREN WRIGHT, et al.,<br><br>                      Plaintiffs,<br><br>v.<br><br>MILAN JECKLE, et al.,<br><br>                      Defendants. | No. 98-2-07410-2<br><br>CLASS ACTION SUMMARY NOTICE |

---

**LEGAL NOTICE TO "FEN-PHEN" DIET DRUG PURCHASERS**
**WHO PURCHASED "FEN-PHEN" FROM MILAN JECKLE, M.D., OR ALL VALLEY MEDICAL:**

---

**If you have purchased the diet drugs Fenfluramine®, phentermine, or Redux® after January 1, 1995, from Milan Jeckle, M.D. or All Valley Medical, Spokane, Washington, a class action lawsuit seeks monetary relief on your behalf.**

This Notice is given pursuant to CR 23 of the Washington State Superior Court Rules and by order of the Spokane County Superior Court.

The purpose of this Notice is to inform you that the Court has certified a lawsuit to proceed as a class action. If you are a member of the Class, your rights are affected by this litigation. You have the choice to continue as a member of this litigation or exclude yourself from it.

In this lawsuit, Plaintiffs claim that Dr. Milan Jeckle breached fiduciary duties and violated the Washington Consumer Protection Act, RCW 19.86, by his common course of conduct in marketing and selling fen-phen for a profit. Plaintiffs seek monetary relief from defendants Milan Jeckle, M.D., Jane Doe Jeckle, and All Valley Medical on behalf of a certified Class defined as:

> All patients of Dr. Milan Jeckle who purchased the diet drugs Pondimin,® phentermine, or Redux® from January 1, 1995, through the present from Dr. Jeckle or All Valley Medical and who have not filed a separate lawsuit against Dr. Jeckle for damages arising out of the prescribing and dispensing of said pharmaceuticals.

Plaintiffs do not seek monetary damages for any bodily injuries persons may have actually sustained as a result of ingesting these drugs, and have expressly reserved Class members' rights to pursue those claims in separate, individual suits.

The Court appointed Plaintiffs Karen Wright, Rosa Lee Johnson, and Karla Seastrom to serve as Class Representatives, and their counsel, Robert Crotty, Darrell Scott, and Angel Rains of Lukins & Annis, P.S., Lynn Lincoln Sarko, Britt Tinglum, and Amy Hanson of Keller Rohrback, L.L.P., and David Ashbaugh of Stanislaw Ashbaugh, L.L.P., to serve as Class Counsel.

You are a member of the Class if you fall within the Class definition set out above. Class Counsel, who will be compensated, if at all, only from the proceeds of any recovery, will represent your interests. If you wish, however, you may enter an appearance through your own lawyer. If the class action lawsuit results in a favorable verdict, you will be entitled to share in the benefits of that verdict. Note, too, that if there is an unfavorable verdict, you will be bound by that decision.

The defendants in this lawsuit deny any wrongdoing. The Court has not decided the issue of liability, which will be determined at trial.

**If you are a Class member and wish to remain a Class member, you need do nothing at this time. To receive notices updating you on the case and informing you of your rights, you may contact Class Counsel.**

If you are a member of the Class and you do not wish to participate in this class action lawsuit, you have the right to take yourself out of the class. If you exclude yourself from this lawsuit, you will not be entitled to share any potential recovery obtained by the class action lawsuit.

**To be valid, a Request for Exclusion must be mailed by first class mail, postage prepaid, postmarked on or before _November 29_, 2002 to:**

> All Valley Medical Class Action Litigation
> Attn: Ron Gibb
> Spokane County Superior Court, Dept. 5, Room 405
> 1116 West Broadway Avenue
> Spokane, WA 99260

If you would like a copy of the Class Action Notice mailed to you free of charge, or you have any questions regarding the information in this Notice you may call or write: Keller Rohrback, L.L.P., Attn: Amy Hanson, 1201 Third Avenue, Suite 3200, Seattle, WA 98101, ahanson@kellerrohrback.com, 1 (800) 776-6044.

**PLEASE DO NOT TELEPHONE OR WRITE THE COURT OR THE CLERK OF COURT SEEKING ADDITIONAL INFORMATION.**

By order of the Honorable Richard J. Schroeder, Spokane County Superior Court. Dated: _Aug 16, 2002_

EXHIBIT B

1
2
3
4
5
6
7
8

SUPERIOR COURT OF WASHINGTON IN AND FOR SPOKANE COUNTY

9   KAREN WRIGHT, individually, and on behalf )
    of all others similarly situated; ROSA LEE )
10  JOHNSON, individually and on behalf of all )    No. 98-2-07410-2
    others similarly situated, and KARLA )
11  SEASTROM, individually, and on behalf of all )   DECLARATION OF COMET
    others similarly situated, )                     PRESS REGARDING
12                                             )      COMPLETION OF DUTIES
                              Plaintiffs,      )
13                                             )
                                               )
14           v.                                )
                                               )
15  MILAN JECKLE, individually, and JANE DOE  )
    JECKLE, individually, and on behalf of their )
16  marital community, D/B/A ALL VALLEY       )
    MEDICAL,                                   )
17                                             )
                              Defendants.      )
18                                             )

19

20   I, _____ declare and state:

21       1.  I am an employee of Comet Press, who is a court-appointed class notice provider

22   in this case.  I am over the age of eighteen years, have personal knowledge of the facts stated

23   herein, and would so testify if called as a witness at trial.  I submit this Declaration regarding

24   Comet Press' completion of duties as a court-appointed class notice provider.

25                            EXHIBIT C

26

DECLARATION OF COMET PRESS - 1

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\FEN-PHEN\JECKLE\PLDGS\DEC OF COMET PRESS RE CLASS NTC 7-30-02.DOC

2. On _____, 2002, Comet Press received email attachments containing the Court-approved Class Action Notice and the return address to be printed on the Class Action Notice envelopes from the law firm of Keller Rohrback, L.L.P.

3. Comet Press then duplicated the Class Action Notice, folded it, stuffed it in an envelope, sealed the envelope, printed the return address of the Court on the envelope, and forwarded the sealed envelopes containing the Class Action Notice to another court-appointed agent, Walt's Mailing Service.

4. The return address that Comet Press printed on the sealed envelopes was: All Valley Medical Class Action Litigation, Attn: Ron Gibb, Spokane County Superior Court, Department 5, Room 405, 1116 West Broadway Avenue, Spokane, WA 99260, followed by a text box stating the following:

OFFICIAL COURT NOTICE: TO BE OPENED ONLY BY NAMED ADDRESSEE

5. On _____, 2002, Comet Press provided the sealed envelopes containing the Class Action Notice was provided to Walt's Mailing Service to address, affix postage and mail.

6. As such, Comet Press has completed its duties as a court-appointed notice provider.

I certify under penalty of perjury of the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this ____ day of _____ 2002, at Spokane, Washington.


_____
(Signature_


_____
(Printed name)


DECLARATION OF COMET PRESS - 2

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\FEN-PHEN\JECKLE\PLDGS\DEC OF COMET PRESS RE CLASS NTC 7-30-02.DOC

1

2

3

4

5

6

7

8

SUPERIOR COURT OF WASHINGTON IN AND FOR SPOKANE COUNTY

9

| | |
|---|---|
| KAREN WRIGHT, individually, and on behalf of all others similarly situated; ROSA LEE JOHNSON, individually and on behalf of all others similarly situated, and KARLA SEASTROM, individually, and on behalf of all others similarly situated, | No. 98-2-07410-2 |
| | DECLARATION OF LORRI KILDUFF REGARDING COMPLETION OF MAILING OF THE CLASS ACTION NOTICE TO CLASS MEMBERS |

10

11

12

13                                Plaintiffs,

14      v.

15  MILAN JECKLE, individually, and JANE DOE
    JECKLE, individually, and on behalf of their
16  marital community, D/B/A ALL VALLEY
    MEDICAL,
17
                                Defendants.
18  _____

19      Lorri Kilduff declares and states:

20      1.  I am an employee of Walt's Mailing Service, who is a court-appointed third-party

21  Class notice provider in this case.  I am over the age of eighteen years, have personal

22  knowledge of the facts stated herein, and would so testify if called as a witness at trial.  I

23  submit this Declaration regarding Walt's Mailing Service's completion of mailing of the

24  Class Action Notice to Class members.

25

26

# EXHIBIT D

DECLARATION OF LORRI KILDUFF - 1

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

\\SPOKANE1\VOL2\RJC\FEN-PHEN\JECKLE\PLDGS\DEC OF KILDUFF RE CLASS NTC.DOC

1    2.  On _____, 2002, Walt's Mailing Service received a diskette

2    containing names and addresses of Class members from the law firm of Witherspoon, Kelley,

3    Davenport & Toole.

4    3.  On _____, 2002, Walt's Mailing Service mailed the Class

5    Action Notice to all persons whose names and addresses were contained in the diskette

6    supplied by the law firm of Witherspoon, Kelley, Davenport & Toole.

7    4.  The names and addresses of the Class members have only been used for the

8    purpose of mailing the Class Action Notice to the Class members, and have not been

9    disclosed to any person or entity, except to the extent necessary for mailing the Class Action

10   notice to the Class members.

11   5.  Attached hereto in a sealed envelope marked Exhibit A is the diskette supplied by

12   the law firm of Witherspoon, Kelley, Davenport & Toole.  Any copies made of this diskette

13   have been deleted.

14   I certify under penalty of perjury of the laws of the State of Washington and the

15   United States that the foregoing is true and correct.

16   DATED this _____ day of _____ 2002, at Spokane, Washington.

17

18

19                                          _____
                                            Lorri Kilduff

20

21

22

23

24

25

26

DECLARATION OF LORRI KILDUFF - 2

LAW OFFICES
**LUKINS & ANNIS**
A PROFESSIONAL SERVICE CORPORATION
1600 WASHINGTON TRUST FINANCIAL CENTER
717 W SPRAGUE AVE.
SPOKANE, WA 99201-0466
(509) 455-9555

EXHIBIT 7

**Notice of Class Action Litigation**

# REQUEST FOR EXCLUSION

I have read the Notice of Class Action Litigation, and I wish to exclude myself from the class action lawsuit.

Name: _____

Address: _____

Signature:_____   Date:_____

*__FOLD*

**If you wish to exclude yourself from the class action lawsuit, complete this form, fold it in half, seal it with tape or a staple, and return by first class mail by affixing a 34 cent stamp and having it postmarked on or before [INSERT]. You do not need an envelope.**

*BEFORE MAILING: DETACH HERE, FOLD IN HALF S.SO THAT THE PRE-PRINTED ADDRESS IS SHOWING, AND SEAL WITH TAPE OR STAPLE*

SEAL WITH TAPE OR STAPLE

PLACE
STAMP
HERE

All Valley Medical Class Action Litigation
Attn: Ron Gibb
Spokane County Superior Court
Department 5, Room 405
1116 West Broadway Avenue
Spokane, WA 99260

EXHIBIT 8

COMPLAINT INTAKE
SUMMARY WORKSHEET

## RESPONDENT INFORMATION

| Name & Address | PROVIDENCE ST MARY MEDICAL CENTER 401 W POPLAR ST WALLA WALLA, WA 99362-2846 | | | Case # | 2022-4668 (FS) HAC | | |
|---|---|---|---|---|---|---|---|
| | | | | Allegation | • Fraud - Unspecified<br>• Health and Safety<br>• Improper or Abusive Billing Practices<br>• Patient Care | | |
| | | | | License # | HAC.FS.00000050 | | |
| | | | | Issued | | | |
| | | | | Expires | 12/31/2022 | | |
| Phone # | | | | Status | ACTIVE | | |
| Legal Action | Yes ☐ | No ☐ | Compliance | Yes ☐ | No ☐ | Cases | Open: | Closed: |

## COMPLAINANT INFORMATION

| Name & Address | UNITED STATES DEPARTMENT OF JUSTICE | | |
|---|---|---|---|
| Phone # | | E-Mail | |

## SUMMARY OF COMPLAINT

Settlement Date: 03/17/2022
Settlement Amount: $22,690,458

A settlement agreement has been reached between the Respondent and the complainant.  It is alleged that the neurosurgery staff:
*  falsified, exaggerated and/or made inaccurate diagnoses in order to obtain reimbursement for surgical procedures
*  performed surgical procedures that did not meet medical necessity guidelines set forth by Medicare
*  performed a surgery of greater complexity than was medically appropriate
*  jeopardized patient safety by attempting to perform an excessive number of complex surgeries
*  created excessive level of complications/negative outcomes as a result of their surgeries
*  performed surgical procedures on patients that were not appropriate candidates for surgery
*  failed to adequately and accurately document procedures, diagnoses and complications
*  failed to implement safeguards to prevent, deter and cease the medically unnecessary procedures


Companion Case:
2022-XXXXMD1
2022-XXXXMD2



**Case View Screen**  update

| | |
|---|---|
| Case | 2022-4668 |
| Status | OPENED |
| Respondent ID | 851671 |
| Respondent | **Providence Health and Services - Washington** HAC.FS.00000050 |
| Credential | Providence St Mary Medical Center |
| Address | ● Public ○ Mail |

Providence St Mary Medical
Center
401 W Poplar St
Walla Walla, WA 99362-
2846

| | |
|---|---|
| Complainant ID | 1662925 |
| Complainant | **United States Department of Justice** |

| | |
|---|---|
| Date Created | 04/15/2022 |
| Date Received | 04/13/2022 |
| How Received | Email |
| Receiving Board | FACILITIES AND SERVICES |
| Receiving Profession | Hospital Acute Care License |
| Receiving Department | Case Intake |
| Received By | Danielle Corbin |

Alleged Issues
   Fraud - Unspecified
   Health and Safety
   Improper or Abusive Billing Practices
   Patient Care
Case Nature
   Billing
   Fraud
   Standard of Care/Services

Audit
Entry Items
Documents
Notes
Master Cases
**Participants**
Add Master Case
**Timeline History**

**Comments:**

- Action Items
- Resolution
- Participants
- Priority History
- HIPDB Reports

Action Items  add  add group

| Type | Assigned To | Activity | Track Time | Due | Effective | Completed | Order Signed | Created ▼ |
|---|---|---|---|---|---|---|---|---|
| | No action items found | | | | | | | |

## Credential View Screen    entity tree

### Providence Health and Services - Washington

**Address:**

○ Public  ● Mail

Providence St Mary Medical Center
PO Box 1477
Walla Walla, WA 99362-0312

| | |
|---|---|
| ID | 851671 |
| Warnings | |
| SSN/FEIN | |
| Federal ID | 911491167 |
| Secretary Of StateNumber | 313007977 |
| Contact Standing | In-Business |
| Contact Type | NON PROFIT CORPORATION |
| Public File | YES |
| Mailing List | |
| US Citizen | |
| E-mail | dovie.brilton@providence.org |
| Web Address | www.providence.org |

Comments: Previous Federal Tax ID listed as 91-1576519; 51-0216586; 91-1491167, 20-0093280;51-0216586; 91-1491167; 35-2369417, 91-0573108; 91-1512886; 910567732; 32-0261234; 352347032, 300502262

### Hospital Acute Care License    form letter

| | | | |
|---|---|---|---|
| Credential # | HAC.FS.00000050 | Credential Status | ACTIVE (12/13/2019) |
| Legacy License # | 000079 | Status Reason | ACTIVE |
| Application Date | | Amount Due | $0.00 |
| Effective Date | 01/01/2020 | Date Last Activity | 4/7/2022 10:37:24 AM |
| Expiration Date | 12/31/2022 | Last Updated by | Vann, Robert |
| First Issuance Date | | Certificate Sent Date | 12/13/2019 |
| Last Date Of Contact | | | |
| Next Examinations Date | 10/01/2022 | | |

Comments:

- Supervises
- User Defined License Data
- Workflow
- Legacy

### Supervises    update Show All

Facility Name: Providence St. Mary Medical Center
Case/Intake Number: 2022-4668/121707

## Investigative Report
### On-site State Investigation

**Facility Address:** 401 W. Poplar Street Walla Walla, WA 99362
**Laboratory Director:** N/A
**CLIA Number:** N/A
**Credential Number:** HAC.FS.00000050
**Medicare Number:** N/A
**Shell Number:** CMY111
**Date(s) of Investigation:** 09/20/22- 11/14/22
**State Licensing Priority:** B
**Federal Certification Priority:** N/A

## Intake Details: (*List of concerns reported in the original complaint.*)

A settlement agreement was reached between the respondent and the complainant. It was alleged that the neurosurgery staff:

- Falsified, exaggerated, and/or made inaccurate diagnoses to obtain reimbursement for surgical procedures
- Performed surgical procedures that did not meet medical necessity guidelines set forth by Medicare
- Performed a surgery of greater complexity than was medically appropriate
- Jeopardized patient safety by attempting to perform an excessive number of complex surgeries
- Created excessive level of complications/negative outcomes because of their surgeries
- Performed surgical procedures on patients that were not appropriate candidates for surgery
- Failed to adequately and accurately document procedures, diagnoses, and complications
- Failed to implement safeguards to prevent, deter and cease the medically unnecessary procedures

## Allegation/s: (*The allegation/s listed below is what the department has jurisdiction and authorization to investigate. An allegation is considered an assertion of improper practice or condition that could result in a violation of facility law or rule.*)

1. Allegation: The hospital failed to implement safeguards to prevent, deter, and cease the medically unnecessary procedures as required under WAC 246-320-131 Governance which requires that the governing body establish and review governing authority policies including requirements for reporting practitioners according to RCW 70.41.210 and to establish and review governing authority policies including requirements for providing communication and conflict resolution between the medical staff and the governing authority.

2. Allegation: The hospital failed to adopt bylaws, rules, regulations, and organizational structure that address:
   - Assessment of credentialed practitioner's performance, reporting practitioners according to RCW 70.41.210

1

Facility Name: Providence St. Mary Medical Center
Case/Intake Number: 2022-4668/121707

- Provide for medical staff communication and conflict resolution with the governing authority as required under WAC 246-320-161.

## Investigative Process Included: (*This is what the investigator did in terms of methods employed to conduct inquiry.*)

1. There was no complainant to contact because the complaint was generated by the WA Department of Health related to a hospital court settlement.

2. The investigator conducted an onsite investigation that included the following:

    A. Observation: The investigator observed the daily safety huddle on 09/20/22.

    B. Document Review: The investigator reviewed the following hospital documents and records during the investigation.

        1) Hospital policies and procedures including:
            a) Focused Professional Performance Evaluation, no number, no date
            b) Management of Complaints and Grievances, number 11214135, effective date 02/22
            c) Sentinel/Adverse Event, number 8740392, effective date 02/22
            d) Code of Conduct, number 7842079, effective date 03/20
            e) Hospital Practitioner Reporting Requirements to the Department of Health, number 8343063, effective date 08/20
            f) Medical Staff Peer Review-Professional Practice Evaluation and Proctoring, number 5574650, effective date 04/21

        2) Medical Staff Credentialing files for 7 current medical staff members

        3) Medical Staff Credentialing files for 2 medical staff members who resigned

        4) Adverse Event Log for the period 01/01/21 to 09/20/22

        5) Incident Report Log for the period 01/01/21 to 09/20/22

        6) Return to the Operating Room Log for the period 12/17/14 to 11/23/17 and 01/01/20 to 12/31/21

        7) Organizational Chart

        8) Medical Staff Organizational Chart

        9) Hospital Bylaws approved 06/17/22

        10) Medical Staff Rules and Regulations approved 02/20

2

Facility Name: Providence St. Mary Medical Center
Case/Intake Number: 2022-4668/121707

        11) Settlement Agreement between United States, Washington State, Providence, and Relator dated 03/17/22

C. The investigator conducted the following interviews during the investigation:

    1) Chief Nursing Officer
    2) Accreditation Manager
    3) Director of Quality and Risk Management
    4) Interim Chief Medical Officer
    5) Administrative Assistant for Medical Staff Services
    6) Regional Director of Medical Staff Services

## Summary of Findings (*Narrative overview of the results of investigation.*)

1. On 09/20/22 at 9:45 AM during an interview with the investigator, the Director of Quality and Risk Management (Staff #1) stated that following the Attorney General's investigation, a Corporate Integrity Agreement (CIA) was implemented and included on-site personnel to monitor and oversee performance improvement for the next 5 years. The CIA personnel found that the hospital had good quality oversight with the quality committee reporting to the Governing Body (Community Mission Board or CMB). The policies were found to be good, but not necessarily followed quickly enough or firmly enough. The two surgeons were reported to the National Provider Data Base (NPDB) through the legal process with the Attorney General. The Department of Justice reviewed 10 cases. They were reviewed by the hospital, but the Department of Justice found the hospital to not be fast enough or definitive enough. The hospital hesitated to report to the National Provider Data Base. Reporting is now part of the discussion in Peer Review. Peer Review is now under Quality. They are not in the business to protect providers. Recently a provider was asked to voluntarily suspend practice during an investigation. The provider agreed, and because there was a change in their privileges (voluntary suspension of practice) the provider was reported to the NPDB and Department of Health (DOH), the change in privileges pending investigation. The current process for serious safety events includes an SBAR Report (Situation, Background, Assessment, Recommendation) is sent to leadership within 72 hours, then root cause analysis meetings are held to fact find, develop root causes, and to develop action plans to prevent reoccurrence.  Providence implemented a regional peer review system called Provider Professional Evaluation Committee (PPEC).

2. On 09/20/22 at 1:05 PM during an interview with the investigator, the Interim Chief Medical Officer (Staff #2) stated that they had been invited to participate in the PPEC process that included an imbedded professionalism policy. The PPEC process shares review among a larger group of providers which reduces conflicts when there are only a couple of providers for a specialty. That makes them either partners or competitors so spreading the breadth of reviewers is helpful. There has been a culture shift to clear communication of expectations and consequences. There is all new leadership at the facility since the neurosurgeon issues were being investigated. There is a new Chief Executive Officer, a new Chief Nursing Officer, a new Director of Quality and Risk Management and a new Chief Medical Officer (Interim). The CMB members attend the Medical Executive Committee and Credentialing Committee, so they are aware of issues and actions taken by the Committee. The hospital reboot of the High Reliability Organization (HRO) program has made improvements in

3

Facility Name: Providence St. Mary Medical Center
Case/Intake Number: 2022-4668/121707

awareness to speak up if staff see or hear anything unsafe or untoward. Many of the improvements were made before the attorney general got involved. The Quality Improvement Organization (QIO) that is doing the oversight for the Corporate Integrity Agreement hasn't yet made any recommendations for changes to the current policies and procedures.

3. Review of the hospital's Medical Staff Bylaws/Rules and Regulations in effect 01/19/18 showed that the purpose of the staff is to serve as the primary means for accountability to the Community Mission Board regarding appropriateness of the professional performance and ethical conduct of its members, and to strive toward assuring that the quality of patient care in the hospital is consistently maintained by the resources locally available. The staff responsibilities include quality assessment and improvement program establishing mechanisms for continuous monitoring of patient care practices, and for reviewing and evaluating the quality and appropriateness of patient care, and to initiate and pursue investigations with respect to physicians and allied health professionals, when warranted. Medical staff leaders and hospital administration encourage collegial and educational efforts to resolve questions related to clinical practice or professional conduct. Documentation of collegial intervention may or may not be included in the provider's confidential file based on the determination of the relevant medical staff leader. An initial review is initiated whenever a serious question has been raised or collegial interventions have failed. The issue is then referred to the Chief of Staff, Chief Executive Officer, Chief Medical Officer, or Chairperson of the Board. If the issue is deemed credible, it is forwarded in writing to the Medical Executive Committee. Initiation of an investigation is made by the Medical Executive Committee. The investigation committee makes a reasonable effort to complete the investigation and issue its report within 30 days. The Medical Executive Committee may accept, modify, or reject any recommendation received from the investigation committee. The Chief of Staff, the Chief Medical Officer, the Chief Executive Officer, or the Board Chairperson hav ethe authority to suspend all or any portion of an individual's clinical privileges. The individual may be given an opportunity to refrain voluntarily from exercising privileges pending an investigation. The Medical Executive Committee shall review the matter resulting in a precautionary suspension within a reasonable period and determine whether there is sufficient information to warrant a recommendation or proceed under the investigative procedure.

4. Review of the hospital's Medical Staff Bylaws/Rules and Regulations approved 02/21/20 showed that medical staff peer review process included the addition of the PPEC process. The Community Mission Board (CMB) approved the policy for medical staff credentialing and the PPEC process at the meeting held on 06/17/22. The CMB requested additional training regarding the PPEC process.

Review of the Medical Staff Bylaws/Rules and Regulations, approved by the CMB on 02/21/20 showed that when a concern is raised about a medical staff provider, the concern is reviewed to evaluate if the concern is valid or not valid. If deemed valid with highest concern, the Medical Executive Committee could suspend the provider. If a provider resigns while under investigation, a report would be made to the Department of Health and NPDB. The process for a provider to give and receive communication and resolve conflict was outlined in the document.

4

Facility Name: Providence St. Mary Medical Center
Case/Intake Number: 2022-4668/121707

5.  On 09/22/22 at 10:50 AM during an interview with the investigator, the Regional Director of Medical Staff Services (Staff #3) stated that the two surgeons were not reported to the National Provider Data Base or Department of Health by the hospital. Peer review looked at cases and concerns were raised. Further review was recommended.  The original reviews did not show highest concern, and the facility was working through the process. The medical staff was still under fact finding. This was viewed as a collegial effort looking for opportunities for improving and they were working through due diligence.  There was discussion that this was moving toward suspension, but they had not gotten that far. They would need a final finding of peer review action, then it would be reported to the NPDB. The Regional Director of Medical Staff Services stated that in hindsight, they could have moved faster. Peer review was done on some cases and there were still some concerns, but they were trying to validate the concerns. More cases came to light after the two neurosurgeons resigned.

    The facility cannot submit complaints to the NPDB once a provider is no longer employed. They cannot even look up a provider after they are no longer on staff at the hospital. There are serious fines and potential loss of peer review protection for up to 3 years.

6.  Review of the Settlement Agreement between the United States, Washington, Providence, and the relator, showed that on February 23, 2017, as a result of concerns articulated by medical staff, Providence, as the employer, placed Dr. B. on administrative leave, and shortly thereafter, initiated an independent analysis of certain concerns articulated as to Dr. B with regard to certain specific patients. On May 8, 2017, Providence accepted Dr. B's resignation. Providence, as the employer, did not report Dr. B to the National Practitioner Data Bank or the Washington State Department of Health.

    On May 22, 2018, as a result of concerns articulated by medical staff, Providence, as the employer, placed Dr. A on administrative leave and initiated an independent analysis of certain concerns articulated as to Dr. A with regard to certain specific patients. On November 13, 2018, Dr. A submitted his letter of resignation to Providence, which Providence accepted. Providence, as the employer, did not report Dr. A. to the National Practitioner Data Bank or the Washington State Department of Health.

7.  Review of the hospital's policy titled, "Medical Staff Peer Review-Professional Practice Evaluation and Proctoring," number 5574650, last revised 04/13, and last reviewed 04/21, showed that all hospital based clinical activities related to practitioners who hold clinical privileges at Providence St. Mary Medical Center will be reviewed as part of the ongoing medical staff and organizational performance improvement program. Duties and functions of the peer review process include evaluating the competency and qualifications of physicians and allied health professionals, both retrospectively and prospectively, in order to improve the quality of medical care of patients. All reports, recommendations, actions, and minutes made or taken in the peer review process are confidential and covered by the provisions of applicable federal and state law.

    The Medical Staff Department subcommittees have primary oversight of the professional practice evaluation process and review and approve the methods and criteria for conducting performance monitoring. The subcommittees report to the Credentials & Bylaws Committee which investigates and verifies the credentials for medical staff membership and granting of

Facility Name: Providence St. Mary Medical Center
Case/Intake Number: 2022-4668/121707

privileges and reports/recommends to the Executive Committee. The Executive Committee receives and acts upon reports and recommendations from the medical staff subcommittees and reports/recommends to the CMB on all matters relating to appointment, reappointments, clinical privileges, and investigations.

Identification of Occurrences for Peer review showed that a case may be identified for peer review through one or more of the following avenues that included physician or employee expressed issues of concern, or patient or family complaints.

8. Review of the hospital's return to surgery logs for 12/17/14 through 11/23/16 showed that there were 26 cases of patients returning to surgery. Ten of those cases were cases of Dr. Dreyer's.

9. Review of the medical staff services files for the two neurosurgeons showed that there was one case review in Dr. Dreyer's file. The files showed that there were no actions taken against the privileges such as suspension for either neurosurgeon. The files did not include resignation letters.

10. During an interview with the investigator on 09/22/22 at 3:40 PM, the Administrative Assistant for Medical Staff services (Staff #4) reviewed the medical staff files for the two neurosurgeons. Hospital documents showed that Dr. A. submitted a letter of resignation on 04/22/19 that was acknowledged by the Medical Executive Committee on 07/19/19 and accepted by the Community Mission Board on 08/05/19. The hospital records did not include any record of suspension. Medical staff files for Dr. B showed that there was one case review from 11/16/16 that was included in the file. The doctor submitted a letter of resignation on 03/28/17 that was accepted by the Community Mission Board at the meeting on 05/19/17. The hospital records did not include any record of suspension.

11. In an email to the investigator dated 10/31/22 from the Vice President, Division Senior Corporate Counsel-Central (Staff #5), showed that the St. Mary Medical Center medical staff did not suspend, terminate, or allow Dr. Dreyer to resign his medical staff privileges. In May 2018, Providence Medical Group, Dr. Dreyer's employer, placed him on administrative leave. With that employment action, Dr. Dreyer could not exercise his privileges as he didn't have the reason or resources to do so. From an employment standpoint, he didn't have patients to see or treat. There wasn't any medical staff action that prohibited him from exercising his privileges. In fact, if Dr. Dreyer wasn't placed on administrative leave by his employer, Dr. Dreyer was free to exercise his medical staff privileges.

## Conclusion/ Results of Investigation

1. Allegation: The hospital failed to implement safeguards to prevent, deter, and cease the medically unnecessary procedures as required under WAC 246-320-131 Governance which requires that the governing body establish and review governing authority policies including requirements for reporting practitioners according to RCW 70.41.210 and to establish and review governing authority policies including requirements for providing communication and conflict resolution between the medical staff and the governing authority was substantiated based on interview, document review, and  review of  court settlement documents.

Facility Name: Providence St. Mary Medical Center
Case/Intake Number: 2022-4668/121707

2. Allegation: The hospital failed to adopt bylaws, rules, regulations, and organizational structure that address:
   - Assessment of credentialed practitioner's performance, reporting practitioners according to RCW 70.41.210
   - Provide for medical staff communication and conflict resolution with the governing authority as required under WAC 246-320-161.

   These allegations were substantiated based on interview, review of documents, and review of court settlement documents.


## Actions:

Statement of Deficiency, Plan of Correction Reviewed
No Additional Referrals Needed

**Blanchard-Edwards, Barbara (DOH)**

| | |
|---|---|
| **From:** | Blanchard-Edwards, Barbara (DOH) |
| **Sent:** | Monday, November 14, 2022 10:48 AM |
| **To:** | Vo, Betsy M |
| **Cc:** | Milleson, Jenn (she/her) |
| **Subject:** | RE: Providence St. Mary Medical Center &  DOH Follow-Up |

November 14, 2022

Betsy,

I am sorry that your husband was in the hospital. I am not able to delay the report to the state beyond November 30 (10 business days from today). Have you received notice from NPDB yet?
Are there any additional documents that demonstrate the hospital was actively pursuing an investigation into the physicians? I saw one case review in a file, but it wasn't dated or signed and there was nothing included that showed where the information was shared.

Again, I'm sorry for your family's medical issues and I hope your husband is better.

Barbara

**Barbara Blanchard-Edwards, MS, RN**
Nurse Consultant
Office of Health Systems Oversight
Washington State Department of Health
barbara.blanchard-edwards@doh.wa.gov
360-489-5697
www.doh.wa.gov

**From:** Vo, Betsy M <Betsy.Vo@providence.org>
**Sent:** Monday, October 31, 2022 7:38 AM
**To:** Milleson, Jenn (they/she) <jennifer.milleson@providence.org>; Shear, Russell A <Russell.Shear@providence.org>; Klein, Shannon <Shannon.Klein@providence.org>; Kvern, Susan C <Susan.Kvern@providence.org>; Dumser, Bruce T <Bruce.Dumser@providence.org>; Blanchard-Edwards, Barbara (DOH) <barbara.blanchard-edwards@doh.wa.gov>
**Cc:** Bayersdorfer, Jennifer A <Jennifer.Bayersdorfer@providence.org>; Lane, David (He/Him) <David.Lane@providence.org>
**Subject:** Providence St. Mary Medical Center & DOH Follow-Up

---

**External Email**

---

Hi Barbara,

My apologies for not making last week's call regarding the DOH survey at Providence St. Mary Medical Center ("PSMMC").  Thank you for your understanding as I was with my husband in the hospital.

1

The reason I wanted to meet with you was to discuss your preliminary finding that PSMMC's Medical Staff failed to report the departure of Dr. Jason Dreyer to the National Practitioner Databank. The Medical Staff did not suspend, terminate, or allow Dr. Dreyer to resign his medical staff privileges. In May 2018, Providence Medical Group, Dr. Dreyer's employer, placed him on administrative leave. With that employment action, Dr. Dreyer could not exercise his privileges as he didn't have the reason or resources to do so. From an employment standpoint, he didn't have patients to see or treat. There wasn't any medical staff action that prohibited him from exercising his privileges. In fact, if Dr. Dreyer wasn't placed on administrative leave by his employer, Dr. Dreyer was free to exercise his medical staff privileges.

I'd be happy to chat further with you on this, or alternatively, can you defer this finding until PSMMC hears back from the NPDB? Back in June, NPDB sent to PSMMC a similar inquiry as to why Dr. Jason Dreyer's departure from PSMMC was not reported to NPDB. We submitted a timely response and are still waiting for a response.

Thank you,
Betsy

**Betsy M. Vo** | VP, Division Senior Corporate Counsel - Central | Department of Legal Affairs | Providence
Tel: (425) 943-9907 | Cell: (206) 388-6755 | Fax: (206) 215-5903 | Mail: 1730 Minor Avenue, Suite 400, Seattle, WA 98101
Executive Assistant:  Terry Shahrivar | Tel: (425) 780-5976 | Email: Terry.Shahrivar@providence.org

 Providence

This message is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the addressee, nor authorized to receive for the addressee, you are hereby notified that you may not use, copy, disclose, or distribute to anyone the message or any information contained in the message. If you have received this message in error, please immediately advise the sender by reply email and delete the message. Thank you.

-----Original Appointment-----
**From:** Milleson, Jenn (they/she) <jennifer.milleson@providence.org>
**Sent:** Thursday, October 13, 2022 3:23 PM
**To:** Milleson, Jenn (they/she); Vo, Betsy M; Shear, Russell A; Klein, Shannon; Kvern, Susan C; Dumser, Bruce T; Blanchard-Edwards, Barbara (DOH)
**Cc:** Bayersdorfer, Jennifer A; Lane, David (He/Him)
**Subject:** CONFIRMED: DOH Follow-Up
**When:** Monday, October 24, 2022 9:30 AM-10:30 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

This meeting has been accepted by DOH Investigator.

# Microsoft Teams meeting

### Join on your computer, mobile app or room device
Click here to join the meeting

Meeting ID: 231 696 508 294
Passcode: vsErfb
Download Teams | Join on the web

**Join with a video conferencing device**

571147130@t.plcm.vc

Video Conference ID: 119 380 846 5

Alternate VTC instructions

**Or call in (audio only)**

+1 509-904-0815,,566916469#   United States, Spokane

Phone Conference ID: 566 916 469#

Find a local number | Reset PIN

Learn More | Meeting options

---

This message is intended for the sole use of the addressee, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee you are hereby notified that you may not use, copy, disclose, or distribute to anyone the message or any information contained in the message. If you have received this message in error, please immediately advise the sender by reply email and delete this message.

PRINTED: 11/28/2022
FORM APPROVED

State of Washington

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  000070 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING: _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/14/2022 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  PROVIDENCE ST MARY MEDICAL CENTER | STREET ADDRESS, CITY, STATE, ZIP CODE  401 W POPLAR ST  WALLA WALLA, WA 99362 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETE DATE |
|---|---|---|---|---|
| B 000 | Initial Comments  STATE COMPLAINT INVESTIGATION  The Washington State Department of Health (DOH) in accordance with Washington Administrative Code (WAC), Chapter 246-320, Hospital Licensing regulations, conducted this health and safety investigation.  Onsite date: 09/20/22-09/23/22 Additional information received: 10/13/22, 10/31/22, 11/14/22  Case Number: 2022-4668  Intake Number: 121707  The investigation was conducted by; Investigator #13  There were violations found pertinent to this complaint investigation. | B 000 | 1. A written PLAN OF CORRECTION is required for each deficiency listed on the Statement of Deficiencies.  2. EACH plan of correction statement must include the following:  The regulation number and/or the tag number HOW the deficiency will be corrected WHO is responsible for making the correction WHAT will be done to prevent reoccurrence and how you will monitor for continued compliance and WHEN the correction will be completed.  3. Your PLANS OF CORRECTION must be returned within 10 calendar days from the date you receive the Statement of Deficiencies. Your Plans of Correction must be postmarked by 12/08/22.  4. Return the ORIGINAL REPORT with the required signatures. | |
| B 700 | WAC 246-320-161(1)(i) Medical Staff-Reporting Practitioners  The medical staff must: (1) Adopt bylaws, rules, regulations, and organizational structure that address: (i) Reporting practitioners according to RCW 70.41.210; | B 700 | | |

State Form 2597

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE  Director, Quality/Risk | (X6) DATE  12/8/22 |
|---|---|---|

STATE FORM                                  6499                    CMY111                    If continuation sheet  1 of 3

PRINTED: 12/08/2022
FORM APPROVED

State of Washington

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 000079 | A. BUILDING: _____<br>B. WING _____ | 11/14/2022 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROVIDENCE ST MARY MEDICAL CENTER | 401 W POPLAR ST<br>WALLA WALLA, WA 99362 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETE DATE |
|---|---|---|---|---|
| B 700 | Continued From page 1<br><br>This Washington Administrative Code is not met as evidenced by:<br><br>Based on interview, document review, and record review, the hospital failed to report health care practitioners to the Department of Health as required according to RCW 70.41.210. Practitioners are to be reported within 15 days of the date of the voluntary restriction or termination, his or her voluntary resignation while under investigation, or the subject of proceedings regarding unprofessional conduct under RCW 18.130.180, is accepted by the hospital.<br><br>Failure to report unprofessional conduct in health care practitioners to the Washington Department of Health risks poor healthcare coutcomes, patient harm, injury, and death.<br><br>Findings included:<br><br>1. Review of the hospital document titled, "Medical Staff Bylaws/Rules and Regulations," approved 02/21/20, showed that when a concern is raised about a medical staff provider, the concern is reviewed to evaluate if the concern is valid or not valid. If deemed valid with highest concern, the Medical Executive Committee could suspend the provider. If a provider resigns while under investigation, a report would be made to the Department of Health and the National Practitioner Data Base.<br><br>2. Review of the Settlement Agreement between the United States, Washington, Providence, and the relator, showed that on February 23, 2017, | B 700 | | |

State Form 2567
STATE FORM                                    6899          CMY111                         If continuation sheet 2 of 3

PRINTED: 12/08/2022
FORM APPROVED

State of Washington

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  000079 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING: _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  **11/14/2022** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **PROVIDENCE ST MARY MEDICAL CENTER** | STREET ADDRESS, CITY, STATE, ZIP CODE  **401 W POPLAR ST**  **WALLA WALLA, WA  99362** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETE DATE |
|---|---|---|---|---|
| B 700 | Continued From page 2 | B 700 | | |
| | as a result of concerns articulated by medical staff, Providence, as the employer, placed Dr. B. on administrative leave, and shortly thereafter, initiated an independent analysis of certain concerns articulated as to Dr. B with regard to certain specific patients. On May 8, 2017, Providence accepted Dr. B's resignation. Providence, as the employer, did not report Dr. B to the National Practitioner Data Bank or the Washington State Department of Health. | | | |
| | On May 22, 2018, as a result of concerns articulated by medical staff, Providence, as the employer, placed Dr. A on administrative leave and initiated an independent analysis of certain concerns articulated as to Dr. A with regard to certain specific patients. On November 13, 2018, Dr. A submitted his letter of resignation to Providence, which Providence accepted. Providence, as the employer, did not report Dr. A. to the National Practitioner Data Bank or the Washington State Department of Health. | | | |
| | 3. On 09/22/22 at 10:50 AM during an interview with the investigator, the Regional Director of Medical Staff Services (Staff #3) stated that the two surgeons were not reported to the National Provider Data Base or Department of Health by the hospital. | | | |

State Form 2567
STATE FORM                                    6899          CMY111                      If continuation sheet  3 of 3

Received 12/9/22 11:54 Am
Approved 12/09/22 12:05 Pm
Leslie Wendur Edwards

**✝ Providence**
St Mary
Medical Center

Plan of Correction for State Licensing Investigation OST2567

November 14, 2022

| Tag # | How the Deficiency Will Be Corrected | Responsible Individual | Estimated Date of Correction | Monitoring Procedure | Target for Compliance |
|---|---|---|---|---|---|
| B-007 | PSMMC will contract with independent consulting group for a period of no less than 5 years to identify and work through processes of medical staff quality control to include timely and thorough reporting. | Director of Medical Staff Services | Completed 9/27/2022 | Validation of presence of contract by email notification to Medical Staff.* | 100% |
| | Education on management of provider issues and appropriate reporting will be completed by Medical Staff Leadership. | Director of Medical Staff Services | 01/31/2023 | Completion Rate where N=number of medical staff leaders who have completed training and D=total number of medical staff leaders* | 90% |
| | A document summarizing definitions of unprofessional conduct requiring reporting as defined by RCW 18.310.180 will be included in all Medical Staff Committee Attendee Packets for a minimum of 12 months. | Medical Staff Office Coordinator | 01/31/2023 | Monthly audit of attendee packets where N=number of packets observed with document included and D=number of packets audited* | 95% |

*Completion and ongoing monitoring of these corrections will be reported to the Quality Council monthly and cascaded to Community Mission Board at least annually.

EXHIBIT 9

**Bright, Pam (DOH)**

| | |
|---|---|
| From: | Online Complaint Submission <hsqacomplaintintake@doh.wa.gov> |
| Sent: | Monday, March 4, 2019 8:28 PM |
| To: | DOH HSQA Complaint Intake |
| Subject: | Survey Response: HSQA Healthcare Provider & Facility Complaint Form |

The following survey response is submitted:

1. **Please select the statement that best applies to you.**
   1. I am filing a complaint on a healthcare provider or healthcare facility.

2. **Healthcare Provider Information – Please complete this section if you are filing a complaint against an individual healthcare provider. Please note we do not have authority to process complaints against a provider's administrative staff (receptionist, customer service and office managers).**

   **What type of healthcare provider are you reporting? If the profession type is not listed, please contact us at 360-236-2620 or by email.**

   **Osteopathic Physician and Surgeon**

   **What is the name and address of the individual healthcare provider(s) you are filing a complaint about (if applicable)? If you have more than three, please submit an additional complaint.**

| | |
|---|---|
| First Name | Jason |
| Middle Name (optional) | (no answer) |
| Last Name | Dreyer |
| Address | 301 W. Poplar Street |
| City | Walla Walla |
| State | WA |
| Zip Code | 99362 |
| Provider's credential number(optional) | OP60323732  Lookup a provider's credential number |

**RECEIVED**

**MAR 05 2019**

Office of Investigative
and Legal Services
Complaint Intake

| | |
|---|---|
| First Name | (no answer) |
| Middle Name (optional) | (no answer) |
| Last Name | (no answer) |
| Address | (no answer) |
| City | (no answer) |
| State | (no answer) |
| Zip Code | (no answer) |
| Provider's credential number(optional) | (no answer)  Lookup a provider's credential number |

| | |
|---|---|
| First Name | (no answer) |
| Middle Name (optional) | (no answer) |
| Last Name | (no answer) |
| Address | (no answer) |
| City | (no answer) |

1

Exhibit A  Page 001            DREYER, OST

| State | (no answer) |
| Zip Code | (no answer) |
| Provider's credential number(optional) | (no answer) Lookup a provider's credential number |

**3. Healthcare Facility Information – Please complete this section if you are filing a complaint against a healthcare facility. Please note we do not have authority to process complaints against a facility's administrative staff (receptionist, customer service and office managers).**

**If this is a doctor's office, provider's office, clinic, adult family home, assisted living facility, boarding home, nursing home, or skilled nursing facility, we may be able process a complaint against individual providers working there. To do so, please complete the previous question of this form about the healthcare provider.**

**However, if you wish to file a complaint against an assisted living facility, boarding home, adult family home, nursing home, or skilled nursing facility, and not against an individual provider working at one of these facilities, please contact the Department of Social and Health Services at 800-562-6078.**

**If this is a complaint on a hotel or motel, please contact the Housing Program at 360-236-3393 or by email.**

**Please select the healthcare facility type you would like to file a complaint against. If the facility you want to file a complaint against is not listed, please contact us at 360-236-2620 or by email. You may need to contact another agency or file a complaint on an individual.**

**(no answer)**

| What is the name of the facility you are filing a complaint about? | (no answer) |
| Facility Physical Address (not a mailing address): | (no answer) |
| City | (no answer) |
| State | (no answer) |
| Zip Code | (no answer) |
| What is your employment status with this facility? Please select below. | (no answer) |

At the facility, in what department, unit, room number or floor did the incidents(s) or problem(s) occur? What was the admission date and discharge date?

| Department | (no answer) |
| Unit | (no answer) |
| Room Number | (no answer) |
| Floor | (no answer) |
| Date of Admission | (no answer) |
| Date of Discharge | (no answer) |
| Is the patient still in the facility or still receiving services? | (no answer) |

**4. Unlicensed Provider or Facility – Please complete this section if you are filing a complaint against an unlicensed healthcare provider or an unlicensed healthcare facility. We can process unlicensed facility complaints only against these types of facilities we regulate. If this is a complaint on an unlicensed hotel or motel, please contact the Housing Program at housingcomplaint@doh.wa.gov. If we determine the individual or facility holds a credential, we will not process your unlicensed complaint. If you provide your contact information, we will attempt to notify you of the individual or facilities license status.**

2

000002

DREYER, OST
Inv 00024

What is the name and address of the unlicensed healthcare provider or facility you are filing a complaint about (if applicable)?

Provider First Name                                                                   (no answer)
Provider Middle Name (optional)                                                       (no answer)
Provider Last Name                                                                    (no answer)
Facility Name (if this is an unlicensed facility complaint)                           (no answer)
Address                                                                               (no answer)
City                                                                                  (no answer)
State                                                                                 (no answer)
Zip Code                                                                              (no answer)

What type of profession are you alleging is being practiced without a credential?

(no answer)

What type of facility are you alleging is operating without a credential? If the facility type is not listed contact us at 360-236-2620 or by email. We only regulate the facilities types listed below and you may have to contact another agency if the facility type is not listed.

(no answer)

5. Self-Report – I am a healthcare provider or healthcare facility self- reporting an incident, below is my contact information. Note: this report will be processed against your credential. If you are completing a mandatory report on another provider or facility credential, you may need to go back and select that you want to file a complaint on a provider or facility. The Department of Social and Health Services (DSHS) process reports against Adult Family Homes, Assisted Living Facilities, Boarding Homes or Skilled Nursing / Nursing Homes. Contact DSHS at 1-800-562-6078 or online.

Are you filing this complaint on behalf of a business or facility? If so, please provide the name of the business or facility.

(no answer)

First Name                                                                            (no answer)
Middle Name (optional)                                                                (no answer)
Last Name                                                                             (no answer)
Facility Name – if you are self-reporting on behalf of a facility                     (no answer)
Address                                                                               (no answer)
City                                                                                  (no answer)
State                                                                                 (no answer)
Zip Code                                                                              (no answer)

Your credential number(optional) : (no answer) Lookup your provider number

Phone (no answer) Type(no answer)

6. Under public records laws, we cannot withhold the names of people who complain unless they qualify for "whistleblower exemption."

RCW 43.70.075 and WAC 246-15-010 determine your whistleblower status which is not necessarily based on your request to be considered a whistleblower. Please review the FAQs

3

009003

about filing an anonymous complaint and who may qualify for whistleblower exemption. For additional information about whistleblower exemption, you may need to consult your attorney; the department cannot provide legal advice to you.

If you provide your name, your complaint will not be considered anonymous, even if you request anonymity. If we receive a complaint that only partially identifies you, you will be treated as an unknown complainant. Anonymous and unknown complainants may not receive any follow-up from the department.

By selecting that you want to file an anonymous complaint, you acknowledge and understand that the Department of Health will not be able to provide you with any updates about the status of your complaint. Any inquiries we receive about the status of an anonymous complaint will be treated as a public disclosure request and sent to the Public Disclosure Unit. Additionally, if an investigation is authorized and we are not able to fully identify and contact you, we may not be able to complete the investigation.

1. I do not want to file an anonymous complaint

**7. Your Information** - Please provide your contact information. If you are filing this complaint on behalf of a business or facility, please indicate that in this section. Please provide a way for us to contact you, a mailing address is preferred. You may not receive follow up from the department if you do not provide a contact method.

What is your name, mailing address, telephone number, and email address?

**First Name**

25

**Middle Name**

25

**Last Name**

25

Please provide us with a way to contact you. Please provide one or all of the following types of contact information. Mailing addresses are helpful so we can send follow up correspondence to you.

Mailing Address - including city, state and zip code

Phone number and/or email address

Are you filing this complaint on behalf of a business or facility? If so, please provide the name of the business or facility.

**No**

Are you the patient, client, resident or guest? If yes, please enter your date of birth.

1. No

**8. Patient, Client, Resident or Guest Information**- Please complete this section if you are not the patient.

What is the name and date of birth of the affected patient or client?

4

000004

DREYER, OST
Inv 00026

First Name

(no answer)

Middle Name

(no answer)

Last Name

(no answer)

Date of Birth

(no answer)

What is your relationship to the patient or client? Please select below.

(no answer)

If other, please specify.

(no answer)

9. Complaint Information - Please complete all questions in this section to the best of your ability. Please provide as much detail as possible for the disciplining authority to review.

What are the dates(s) and time(s) that the incident(s) or problem(s) occurred?

Multiple incidents over past several years

Have you reported this to, or filed a complaint or action with any other agency or organization? Examples include law enforcement, Adult Protective Services, or professional licensing boards? If so, which agencies, when and what were the actions or findings?

Not yet.

Specific details to include about an individual healthcare provider.

Specific details to include about a healthcare facility.

If you have additional documents you would like to submit, please contact the Complaint Intake Unit at 360-236-2620 or by email so we can match your document(s) to your complaint form.

I have a 118 page Word document that will be emailed detailing the complaint.

5

000005

**Bright, Pam (DOH)**

| | |
|---|---|
| **From:** | 25 |
| **Sent:** | Monday, March 4, 2019 8:30 PM |
| **To:** | DOH HSQA Complaint Intake |
| **Subject:** | Match documents to complaint submitted by online complaint form |
| **Attachments:** | DrDreyerMQAC.docx |

I filed an online complaint and the attached Word document is the supporting information.

Sincerely,

25 Whistleblower MD
Neurosurgeon

cell

**RECEIVED**

MAR 0 5 2019

Office of Investigative
and Legal Services
Complaint Intake

1

000006

DREYER, OST
Inv 00028



25 Whistleblower  MD

cell

**RECEIVED**

MAR 0 5 2019

Office of Investigative
and Legal Services
Complaint Intake

March 4, 2019

To whom it may concern:

Re: Dr. Dreyer, Walla Walla St. Mary's neurosurgical cases

I have been a neurosurgeon at Kadlec Regional Medical Center in Richland, Washington for the past 14 years. I am writing this document to summarize a number of patient care concerns that have come to my attention regarding the neurosurgery group at Providence St. Mary's in Walla Walla and Dr. Jason Dreyer in particular. These issues have become evident to me primarily from patients seeking a second opinion following spinal surgical procedures that were done at St. Mary's, as well as patients being transferred to Kadlec Regional Medical Center from St. Mary's. After it became clear to me that this was not an isolated occurrence, I began to keep a record of the patients I encountered from St. Mary's and this is my summary and review of the most troubling cases. The majority of these cases involve Dr. Jason Dreyer, DO and I have limited this document to 11 of the most egregious cases.

000007

**REVIEW OF CASE:**

As will become evident in subsequent cases, the main issue with this case is what I would call Intentional overstatement of the imaging findings to describe Instability when none exists. The preop H&P radiographic review section and Indications section of the operative note both describe spondylolisthesis when I see absolutely none on the preop Images.

The preoperative lumbar spine xray and MRI radiology reports are copied here as well:



01 Healthcare Info

000018

Exhibit A  Page 018

DREYER, OST
Inv.00040



01 Healthcare Info

**REVIEW OF CASE CONTINUED:**

This will be a recurring theme with Dr. Dreyer's cases, where instability is described by him, but none or very little actually exists either in my review of the imaging or even in the actual radiology reports. Presumably, this is being done to justify a fusion procedure. This case certainly has some stenosis (most severe at L3-4) but I would have proposed a decompression alone (laminectomy and foraminotomies without fusion) in this case. The patient has now been seen in my office for adjacent level stenosis that has already developed at L2-3 above the fusion and he has CT evidence of ankylosing spondylitis and autofusion of the thoracic spine.

000020

**Patient#2:**

Patient:  Patient B.

DOB:

This patient underwent a 2 level lumbar fusion and decompression L4-S1 on 7-29-15 by Dr. Dreyer.

The pre-op H&P and operative note are as follows:

01 Healthcare Info

000021



01 Healthcare Info

**REVIEW OF CASE:**

I have several problems with this case. First, my review of her 6-16-15 lumbar MRI revealed what I would call very minor disc abnormalities (mild left L4-5 lateral recess narrowing), with otherwise minimal or no spinal stenosis. Certainly, there would be nothing in my opinion that would warrant a 2 level interbody fusion. I do not see any instability at L4-5 or L5-S1 that would necessitate fusion in a younger patient. The second problem I have is that she is a smoker and the likelihood of a non-union or pseudorthrosis would be increased. In fact, this patient came to see me for this exact problem and her postop imaging demonstrates a probable pseudoarthrosis. She had returned to see Dr. Dreyer who was now proposing a revision anterior fusion that would also include L3-4 for what he described as spondylolisthesis. Fortunately, she has not done that yet. My interpretation of the flexion/extension post-op x-rays of 4-20-17 is that there is no instability at L3-4 (though the radiologist describes minimal retrolisthesis which I cannot really appreciate).

The following is the last Dr. Dreyer clinic note and proposed surgical plan for the revision fusion surgery as well as the 4-20-17 postop x-ray report:

000028



01 Healthcare Info

**REVIEW OF CASE:**

I believe this is an L&I case and a 3 level fusion would be unusual in the absence of a fracture or multilevel instability. I am not really sure how it was approved. Notably, the preoperative MRI 11-27-13 showed a small disc protrusion at L5-S1 with some DDD and a small central disc bulge at L4-5 without dynamic instability at any level to my interpretation of the flex/ext L-spine x-rays from 3-3-14 (reported 3mm retrolisthesis at L3-4 on xray). There is no anterolisthesis at all on the flexion x-ray and a few mm of physiologic retrolisthesis on the extension xray but I would essentially consider it to be a normal flexion/extension x-ray. This was reported by Dr. Dreyer as "dynamic instability" at L3-4 and L4-5. There is some congenital narrowing to his lumbar canal and some facet arthropathy, but overall no significant

000036

Exhibit A  Page 036                              DREYER, OST

nerve root compression at any level. I cannot see an indication for a one level fusion let alone 3 levels. This young person is now likely to have adjacent segment problems in the future, especially given his somewhat short pedicles or congenital spinal narrowing.

The operative note describes a decompression or laminectomy done at L3-4. This was not indicated. Even in the operative note, Dr. Dreyer mentions there is no stenosis and the fusion at that level is being done for "instability". The planned interbody cage placement was apparently aborted at L3-4 because of blood loss from the prior 2 levels. This has now led to a pseudoarthrosis at this level.

The pedicle screws are quite long in this case with 70mm at L3, 65mm at L4, 60mm at L5, and 55mm S1. In many of his cases, I have seen the goal seemingly to be to place the very longest screws possible with the tips of the screws bicortical, but often the L5 or S1 screws are anterior to the vertebral body in close proximity to the great vessels or sometimes displacing them. This strategy of bicortical placement can be useful especially in poor bone quality patients but I do not believe that he understands or respects the great vessel anatomy as he should. The left S1 screw in this case, for example, is in the retroperitoneal space adjacent to the left iliac vein. I would be surprised if there have not been major complications in his patients from this screw placement strategy, which seems unnecessary in the majority of cases. The more likely reason for a fusion failure in his cases would be poor disc space preparation, poor posterolateral bone fusion technique or patient selection.

The postop CT on 9-7-16 demonstrates a pseudoarthrosis (non-union) at the L3-4 level with haloing around the S1 screws and now a broken left S1 pedicle screw. He was recommended for follow-up CT and to quit tobacco prior to any revision.

000037

Exhibit A  Page 037                                    DREYER, OST

**Patient#5:**

Patient: Patient D:

DOB: ████████

01 Healthcare Info

**REVIEW OF CASE:**

This is a 57 year old prison guard who came to see me for a second opinion on July 11, 2017 when a second surgery was being proposed by Dr. Dreyer. He apparently sustained a work related injury lifting a plastic barrel weighing about 55 pounds in 2015. He says he had immediate onset of weakness in the right leg. Subsequent to this he underwent conservative care and then ended up having an L2-3 spinal fusion by Dr. Dreyer. The way he describes it, he was told that the surgery would not be approved by labor and industries (SAIF) and so he ended up doing the surgery under his regular insurance.

My review of his preoperative lumbar MRI April 20, 2016 shows diffuse degenerative disc disease with L2-3 circumferential disc bulging and an extruded fragment at L2-3 in the right lateral recess. L4-5 disc bulging eccentric to the left with foraminal narrowing. Multilevel facet arthropathy. Mild L4-5 retrolisthesis without dynamic instability.

000045

DREYER, OST

Dr. Dreyer's note of 4-12-16 is reviewed:



01 Healthcare Info

000046

Exhibit A  Page 046                                    DREYER. OST

The patient apparently continued with pain issues postoperatively. By his report, another fusion surgery was later being contemplated by Dr. Dreyer. A preop H&P note for surgery (now an L3-4, L4-5 fusion) to be scheduled on 4-17-17 is charted by his PA on 3-21-17 and indicates that he had some improvement in his back pain but that he was having persistent leg pain. The note states:

"RADIOGRAPHIC REVIEW:
The patient's imaging was reviewed in detail with the patient today during the visit. The MRI of the lumbar spine from 11/22/16 demonstrates postoperative changes at L2-3. There is interval improvement of the stenosis at that level. There is persistent spondylolisthesis L3-4 and L4-5 with moderate to severe lateral recess and foraminal stenosis L3-5.

X-ray of the lumbar spine demonstrates postoperative change L2-3 with good evidence of arthrodesis at that level. There is spondylolisthesis L3-4 and L4-5."

Again, I dispute the conclusion of instability at L3-4, L4-5. This is not described in any report I could find and my review of his postop x-ray of 1-3-17 shows the L2-3 pedicle screws and the lateral interbody cage without complications or other areas of instability. The radiologist's interpretation is as follows:



01 Healthcare Info

000047

DREYER, OST
Inv 00069

I can only assume that he is now reported by Dr. Dreyer to have spondylolisthesis for the purposes of securing approval of the two level fusion.

His postop lumbar MRI 11-22-16 was also reviewed and shows similar degenerative changes throughout the lumbar spine, status post L2-3 spinal fusion and resolution of the disc protrusion. There are no areas of high grade central stenosis, but with varying levels of foraminal stenosis from disc bugling/facet arthropathy.

My impression now at his lone clinic visit with me was that he had primarily diffuse lumbar degenerative changes without significant instability noted. I was not optimistic about another fusion surgery helping him and I did not personally understand the rationale for the fusion that was done already at L2-3, nor the surgery being proposed at L3-4, L4-5. This patient was quite taken aback by my opinion and I believe planned to proceed with the next fusion surgery, although I do not know whether it has been done there to date.

**Patient#6:**

Patient: Patient E

DOB:

This patient has undergone both cervical and lumbar fusion procedures by Dr. Dreyer, something which I have found to be very common among his patients.



01 Healthcare Info

**REVIEW OF CASE:**

Dr. Dreyer sees this patient on 12-10-2014 and his note indicates his radiology review:

000049

One could make an argument I suppose for a one level fusion of L5-S1, but as I have often seen in his cases, the L4-5 level is just added on. A laminectomy is described in the procedure of L4, L5 and S1, but the only decompression done that I can see are the facetectomies to insert the cages for the TLIF. I do not know if this is billed or not as a separate laminectomy or included for the purposes of increasing the RVUs. Again, the radiology assessment by Dr. Dreyer is exaggerated to include the words dynamic instability, presumably for the purposes of securing approval for a two level fusion. I also do not believe there is any central stenosis at these levels which he describes.

**Surgery #2**



01 Healthcare Info

000052

DREYER, OST

**Review of case:**

I have reviewed the preoperative notes and radiology assessment from Dr. Dreyer. The radiology report from the MRI Cspine from the radiologist is below:



01 Healthcare Info

000053



01 Healthcare Info

There is no kyphosis noted on his C-spine MRI, although there is some straightening of the spine.  There are no pre-op cervical spine x-rays that I could find that were reviewed to support this either.  There are disc/osteophyte complexes at C5-6 and C6-7 and in the setting of concordant radicular pain, surgery could be considered.   I do not see a good reason to include C4-5, however.  I have seen a number of patients from this surgeon with C4-7 anterior cervical discectomy and fusions for unclear reasons.  I

000054

DREYER, OST
Inv.00076

believe the radiology assessment is exaggerated to promote approval of a 3 level ACDF, again primarily for the purposes of increasing RVUs and his reimbursement.

I have seen this patient in clinic for second opinion following both of his surgeries, and not surprisingly, he is no better if not worse when asked.

000055

DREYER, OST

**Patient#7:**

Patient:  Patient F.

DOB:

This patient was seen for neck and arm pain and underwent a C5-6, C6-7 anterior cervical discectomy and fusion on 11-6-14 by Dr. Dreyer.  Dr. Dreyer's operative note is copied from the chart below:

01 Healthcare Info

000056



01 Healthcare Info



01 Healthcare Info

Dr. Dreyer's assessment of the imaging studies preoperatively in his note from 10-29-14 is as follows:

01 Healthcare Info

000058

Exhibit A  Page 058                              DREYER, OST

01 Healthcare Info

**REVIEW OF CASE:**

There are several serious issues with this case. First, my review of the imaging demonstrates only a small central disc bulge at C6-7 with no central or foraminal stenosis. Second, the C5-6 level appears essentially unremarkable with only a small annular high signal zone. I believe a 2 level ACDF in this 42 year old patient is unjustifiable. The chance of this helping her reported arm symptoms seems very remote. Lastly, he then proceeded during surgery to describe pushing on the C5-6 level to check for instability since this was not an approved level by her insurance and then went ahead and included it in the surgery. I find this particular technique unprecedented in the absence of trauma and very likely to be unreliable in assessing instability which was already assessed on the flexion/extension xrays preoperatively. I would not have recommended surgery at all to this patient, but I certainly cannot support including the C5-6 level in the surgical construct.

000060

**Patient#10:**

Patient:  Patient G

DOB:

This 43 year old patient underwent a 2 level posterior lumbar fusion L4-S1 by Dr. Dreyer on 9-24-15.

The preop clinic note from Dr. Dreyer and the operative note are as follows:

01 Healthcare Info

000089



01 Healthcare Info

**REVIEW OF CASE:**

This case has several troubling issues.  Dr. Dreyer describes spondylolisthesis and dynamic instability when none are present.

The following are the independent radiology x-ray and lumbar MRI report which describe no instability and no significant neural compression;

01 Healthcare Info

000096



01 Healthcare Info

**REVIEW OF CASE CONTINUED:**

The patient does have sacralization of the left L5 vertebrae with transitional anatomy but I believe this is yet another example of exaggerated or made up imaging interpretation in his radiology review to justify a spine fusion or at least get it approved by insurance. The patient ended up with a posterior instrumented fusion of L4 and S1 (he skipped L5 pedicle screws for some reason) that was probably unnecessary. I question in most of his cases whether the minimally invasive laminectomies described in the operative note were really done and, even so, what is the purpose if there is no thecal sac compression? I would submit that this is another line item for additional billing in many instances.

In addition, the patient now has a non-union with fractured L4 screw and is looking at more revision surgery by myself.

**SUMMARY:**

In reviewing these 11 cases, several themes become obvious and should to you as well.

The first is that, repeatedly, imaging studies are reported as showing dynamic instability when in fact they do not. Why would someone do this? The reason, of course, is to secure insurance approval and justification for fusion surgery and to generate large numbers of RVUs. I would suspect that a review of all of the fusion cases done at St. Mary's in the past 5 years would show many more similar cases than just those that happened to come across my desk. I would also suspect that there were a very high percentage of instrumented fusion cases among those neurosurgical cases being done there. This embellishment of the radiographic findings to indicate instability is easy to prove with independent film review, but also simply looking at the radiology reports. I must say, however, that it is not uncommon for me to see instability on flexion/extension x-rays that is not reported by the radiologists, but in these cases I believe no such instability of significance exists.

The second theme that comes to my attention is the general overstatement of what was actually carried out in the procedure. For example, nearly every operative record for the minimally invasive fusions lists laminectomies of all of the levels. These are often described in the reports as bilateral tubular decompressions of both the ipsilateral and contralateral sides above and beyond what is typically done by the facetectomy for the interbody cage placement. This is much more difficult to prove as we were not present at these cases, however, there were multiple cases where I did not see significant laminectomy decompression on the postop CTs or MRIs. Whether or not these additional laminectomies are billed and paid for I could not say. But, they most likely do get added into the RVU total for the case which would increase the compensation for a surgeon who is paid on RVU production as I know the Walla Walla surgeons are. Speaking from experience, if this bilateral tubular decompression were actually done at multiple levels of stenosis, this would add significant time to the procedure. I am not under the impression that these cases typically lasted very long. From what I have gathered, the goal would seem to be to do as many fusion cases as possible in the shortest amount of time possible. This could be determined from the operative times reported from these cases. The other part of the procedure which often seems overstated is the posterolateral fusion. Again, my review of the postoperative CTs in the these cases shows very little, if any, bone packed in the facets or posterolateral gutters as is described in these operative notes where tube decortication and packing of bone is supposedly done of each facet. I suspect this is more about billing than actual surgical time to do an adequate posterolateral fusion.

A third feature that stands out to me in reading all of the clinic notes, H&Ps, and operative notes from Dr. Dreyer, is that they are all very similar. This templated, nearly identical format and wording to the

000122

notes raises serious questions in my mind as to what was actually found on exam, reviewed or performed.

As I now finish writing this, it is my understanding that Dr. Dreyer has left Providence St. Mary's. The other neurosurgeon there, Dr. David Yam, has apparently given his resignation last week as well and is moving on to OHSU. It has been common knowledge for some time that Dr. Dreyer was on leave (we were told family leave) with no return date, but I understand he is not coming back. We have not been informed as to the reason why despite efforts to find out at the system level what happened. For what it's worth, one of his former patients who is now being seen at Kadlec told me he left to go to Hollywood to make movies. I hope that is actually the case as I don't believe Dr. Dreyer should be allowed to continue as a neurosurgeon. I have recently checked to see if his license was still active in Washington and it was at last look. One of the main reasons I am still reporting this information even though he has apparently left town is that I don't want this can just kicked down the road as is often done by hospitals who fear litigation by the provider. I am not certain whether or not any of these concerns have been raised by others or not, but I suggest a full investigation of all of his cases is warranted. If these issues are already being brought to your attention, then I can be a corroborating voice.

It has taken some time for me to get to the point of reporting these formally. I have confidentially brought my concerns up with several administrators in the system in the hopes that something might change and perhaps this is what led up to these neurosurgeons departing, I don't know. I am fairly certain with Dr. Dreyer that these cases are a "tip of the iceberg" problem and there are likely hundreds of similar cases. There were other cases that I encountered early on that I felt were done for poor indications, but I did not start collecting them until the trends became obvious. I would like to believe that I am a fairly conservative spine surgeon compared to many so I also let some go without saving a record on the basis of what might be considered a reasonable spectrum of surgical indications. Any spine surgeon will be humbled over the course of a career and I certainly would hate to be judged by my worst decisions or outcomes, but these cases go beyond simply being surgically aggressive or mere coincidences. Many of these cases represent fraud, deception, and a blatant disregard for the truth. The patients are the ones to suffer as a result. Is it any wonder that insurance companies are making it more and more difficult to get imaging or spine surgeries approved?

The motivating factor here in these cases, in my opinion, is pure and simple greed. The contracts of the neurosurgeons in Walla Walla are well known to be RVU based incentive contracts with high reimbursement per RVU (>80). I have been a salaried employee since 2008 with no production incentives for RVUs so I would also like to believe that my decisions are based on what the patient really needs or doesn't need. This situation is not unique to Walla Walla and has obviously been reported upon in the Seattle Times regarding Swedish and other places. It is my understanding that many of these pure RVU based contracts are being rethought at the system level. The RVU productivity model

000123

DREYER, OST

can, of course, benefit the surgeon financially, but also the facility, and the vendors among others, but often leaves the patient unaware that such an incentive even exists. I have heard various people in the Providence organization boasting that Dr. Yam and Dr. Dreyer were two of the highest producing neurosurgeons in the Providence system. I am confident that a review of the finances and case volume at St. Mary's will indicate a very large increase in the number of spine cases (especially high RVU producing fusions) being done there over the past 5+ years.

Another issue which is separate, but overall related to the RVU production problem in Walla Walla, and one that we have faced repeatedly at Kadlec, is the unavailability of the neurosurgeons in Walla Walla to care for patients who present there with neurosurgical problems or emergencies. On several occasions, the ER physician at St. Mary's has requested transfer of a patient to Kadlec who had recently been operated on at St. Mary's by one of their neurosurgeons, but who was now not available. I know of several patients who were actually transferred to Kadlec because the operative neurosurgeon of record could not be located and several other patients who were not transferred when I noted to the ER physician there that it was an EMTALA violation not to have appropriate call coverage plans for neurosurgical post-op patients. Because we have full-time neurosurgical ER coverage at Kadlec, it is not uncommon to have patients transferred to Kadlec because there is no one "on call" for neurosurgery at St. Mary's even though when I inquire where they are I have been told repeatedly they are in elective spine cases. The transfer center at Kadlec is now the same for both Providence St. Mary's and Kadlec since Providence acquired Kadlec Regional Medical Center and I have had repeated discussions with them about this issue.

My other hesitation in coming forward is the possibility of retribution which is a legitimate concern in smaller communities. I suspect this will be less likely now that it seems Dr. Dreyer is not coming back to St. Mary's. I have been a witness to what I would call the "dueling neurosurgeon" battles in Yakima that have resulted in the departure of multiple neurosurgeons there and various complaints to MQAC, etc. I was honestly hoping that this neurosurgeon would just implode through the medicolegal system and go away. Much of what I see in these cases is not so much malpractice or poor technique, however, as it is exaggerated surgical indications, outright fraud, and the consequences of an RVU production incentive system run amok.

Sincerely,

25 Whistleblower

000124

Exhibit A  Page 124

DREYER, OST
Inv 00146