## SETTLEMENT AGREEMENT

This Settlement Agreement (Agreement) is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS), the Defense Health Agency (DHA), acting on behalf of the TRICARE Program; the Office of Personnel Management (OPM), which administers the Federal Employees Health Benefits Program (FEHBP), the U.S. Department of Veterans Affairs (VA), which administers the VA Community Care Program (collectively, the "United States"); the State of Washington, acting through the Washington Office of the Attorney General and on behalf of the Washington Health Care Authority (HCA) (collectively the "State"); and Jason A. Dreyer, D.O. (hereafter "Dr. Dreyer"); through their authorized representatives. The United States and the State are collectively referred to herein as the "Government", and the Government and Dr. Dreyer are collectively referred to herein as the "Parties."

## FACTUAL RECITALS

A. Between May 3, 2019 and November 18, 2021 (hereafter "the relevant time period"), MultiCare Health Systems (hereafter "MultiCare") owned and operated Deaconess Hospital ("Deaconess"), and MultiCare Rockwood Clinic ("Rockwood") located in Spokane, Washington. Deaconess and Rockwood had multiple departments, one of which was the neurosurgery department. During the relevant time period, Dr. Dreyer was employed by MultiCare as a surgeon in the neurosurgery department, with privileges at Deaconess. During the relevant time period, MultiCare, through Deaconess and Rockwood, submitted claims to and accepted reimbursement from Medicare, the FEHBP, TRICARE, VA Community Care, and other federally funded health care programs, as well as from the State of Washington Medicaid program jointly funded by the United States and the State of Washington, for neurosurgery and

other services performed by Dr. Dreyer. Dr. Dreyer caused those claims to be submitted, in part, by completing billing records and other medical documentation setting forth the procedures and services for which to be billed.

   B. During the relevant time period, MultiCare paid Dr. Dreyer compensation based on a personal productivity metric known as Work Relative Value Units (wRVUs), which were calculated based on a value assigned under the Medicare Physician Fee Schedule to the services personally furnished by the individual neurosurgeon. Dr. Dreyer was paid compensation for each wRVU that he generated, with no cap on the wRVU-based compensation that could be earned. Generally, the greater the number procedures of higher complexity that the neurosurgeon performed, the greater the compensation the neurosurgeon received. In 2020, based on these metrics, Dr. Dreyer received more than $1.7 million in compensation from MultiCare.

   C. On March 12, 2021, as a result of allegations concerning Dr. Dreyer, the State of Washington, Department of Health, Board of Osteopathic Medicine and Surgery issued an immediate suspension of Dr. Dreyer's ability to perform spinal surgeries. On November 18, 2021, Dr. Dreyer resigned his employment from MultiCare.

   D. The Government contends that it has certain civil claims against Dr. Dreyer arising from allegedly false claims for payment caused to be submitted by MultiCare to Medicare, Washington State Medicaid, TRICARE, VA Community Care, and FEHBP (hereinafter "the Federal Health Programs") during the relevant time period for neurosurgery services performed by Dr. Dreyer that did not meet the criteria for reimbursement under the Federal Health Programs, were medically unnecessary, or were otherwise improper. The conduct described in this paragraph, together with the agreed-upon facts and conduct set forth

above in Recitals A through C as they relate to the Federal Health Programs is hereinafter referred to as the "Covered Conduct."

      E.      The Government contends that it has certain civil claims against Dr. Dreyer under the False Claims Act, codified at 31 U.S.C. §§ 3729-3733, the Medicaid Fraud False Claims Act, codified at RCW 74.66, the Fraudulent Practices Act, codified at RCW 74.09.210, and the common law for allegedly engaging in the Covered Conduct.

      F.      While Dr. Dreyer agrees to and admits the factual recitations in Paragraphs A through C above, this Settlement Agreement is not an admission of liability or fault by Dr. Dreyer, who disputes the merits of the Government's claims and allegations, nor is it an admission by the Government that its claims are not well-founded.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

      1.      Dr. Dreyer shall pay to the Government $1,174,849 (herein "the Settlement Amount"), of which $587,424 is restitution (for purposes of the Tax Cut and Jobs Act of 2017, Pub. L. 115-97). Of the Settlement Amount, $1,125,323 is owed to the United States, which shall be paid within thirty (30) days of the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the Eastern District of Washington. The total federal and state Medicaid share of the Settlement Amount is $89,397, with $49,526 of that amount to be paid directly to the State of Washington within thirty (30) days of the Effective Date of this Agreement pursuant to written instructions from the Washington State Attorney General's Office. $39,871 of the Medicaid share is owed to the United States, which is already included in its share of the Settlement Amount above. Of the

3

Settlement Amount, the total restitution due to Washington State Medicaid is $44,699 with $24,763 of that amount owed to the State of Washington, and $19,936 of that amount owed to the United States, which amounts are already included in their respective shares of the Settlement Amount above.

      2.      Subject to the exceptions in Paragraph 4 (concerning reserved claims) below, and conditioned upon Dr. Dreyer's full payment of the Settlement Amount, the Government releases Dreyer, together with his heirs, successors, and assigns, from any civil or administrative monetary claim the Government has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Medicaid Fraud False Claims Act, RCW 74.66; the False Practices Act, RCW 74.09.210, or the common law theories of payment by mistake, unjust enrichment, negligent misrepresentation, and fraud.

      3.      In compromise and settlement of the rights of OIG-HHS to exclude Dr. Dreyer pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7(b)(6)(B), based upon the Covered Conduct, Dr. Dreyer agrees to be excluded under this statutory provision from Medicare, Medicaid, and all other Federal health care programs, as defined in 42 U.S.C. § 1320a-7b(f), for a period of 9 (nine) years. The exclusion shall be effective upon the Effective Date of this Agreement.

      b.      Such exclusion shall have national effect. Federal health care programs shall not pay anyone for items or services, including administrative and management services, furnished, ordered, or prescribed by Dr. Dreyer in any capacity while Dr. Dreyer is excluded. This payment prohibition applies to Dr. Dreyer and all other individuals and entities (including, for example, anyone who employs or contracts with Dr. Dreyer, and any hospital or other provider where Dr. Dreyer provides services). The exclusion applies regardless of who submits the claim or other request for payment. Violation of the conditions of the exclusion may result in criminal

prosecution, the imposition of civil monetary penalties and assessments, and an additional period of exclusion. Dr. Dreyer further agrees to hold the Federal health care programs, and all federal beneficiaries and/or sponsors, harmless from any financial responsibility for items or services furnished, ordered, or prescribed to such beneficiaries or sponsors after the effective date of the exclusion.  Dr. Dreyer waives any further notice of the exclusion and agrees not to contest such exclusion either administratively or in any state or federal court.

       c.       Reinstatement to program participation is not automatic.  If Dr. Dreyer wishes to be reinstated, Dr. Dreyer must submit a written request for reinstatement to the OIG in accordance with the provisions of 42 C.F.R. §§ 1001.3001-.3005.  Such request may be made to the OIG no earlier than 90 days prior to the expiration of the 9-year period of exclusion.  Reinstatement becomes effective upon application by Dr. Dreyer, approval of the application by the OIG, and notice of reinstatement by the OIG.  Obtaining another license, moving to another state, or obtaining a provider number from a Medicare contractor, a state agency, or a Federal health care program does not reinstate Dr. Dreyer's eligibility to participate in these programs.

    4. Notwithstanding the releases given in Paragraphs 2 and 3 of this Agreement, or any other term of this Agreement, the following claims of the Government are specifically reserved and are not released:

       a.       Any criminal, civil, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code) or state revenue codes;

       b.       Any criminal liability;

       c.       Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory or permissive exclusion from Federal or State health care programs;

      d.      Any liability to the Government (or its agencies) for any conduct other than the Covered Conduct;

      e.      Any liability based upon obligations created by this Agreement;

      f.      Any civil or administrative liability that any person or entity, including MultiCare, have or may have to the Federal, State or individual consumers or government program payers under any statute, regulation or rule not expressly covered by the release in this Agreement, including but not limited to, any and all of the following claims: (i) antitrust violations; (ii) claims involving unfair and/or deceptive acts and practices and/or violations of consumer protection laws; and

      g.      Any liability which may be asserted on behalf of any other payers or insurers, including those that are paid by the Government programs on a capitated basis.

5.      Except as expressly stated herein, this agreement is not intended to affect the terms of any provider agreement(s), contracts or other agreements that Dr. Dreyer has or may have with HCA or any State of Washington agency.

6.      Dr. Dreyer fully and finally releases the Government, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Dr. Dreyer has asserted, could have asserted, or may assert in the future against the Government and its agencies, officers, agents, employees, and servants related to the Covered Conduct and the Government's investigation and prosecution thereof.

7.      The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare or Medicaid contractor (e.g.,

6

Medicare Administrative Contractor, fiscal intermediary, carrier) or any state payer, related to the Covered Conduct; and Dr. Dreyer agrees not to resubmit to any Medicare or Medicaid contractor or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

8. Dr. Dreyer agrees to the following:

   a. <u>Unallowable Costs Defined</u>: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Dr. Dreyer or their Companies, their present or former officers, directors, employees, shareholders, and agents in connection with:

   (1) the matters covered by this Agreement;

   (2) the Government's audits and civil and criminal investigations of the matters covered by this Agreement;

   (3) Dr. Dreyer's investigation, defense, and corrective actions undertaken in response to the Government's audits and civil and any criminal investigations in connection with the matters covered by this Agreement (including attorney's fees);

   (4) the negotiation and performance of this Agreement;

   (5) the payment Dr. Dreyer makes to the Government pursuant to this Agreement;

are unallowable costs for government contracting purposes and under the Medicare Program, and Medicaid Program (hereinafter referred to as Unallowable Costs).

7

    b.  <u>Future Treatment of Unallowable Costs</u>:  Unallowable Costs shall be separately determined and accounted for, and Dr. Dreyer shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Dr. Dreyer, or any of their subsidiaries or affiliates to Medicare, and Medicaid Programs.

    c.  <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Dr. Dreyer further agrees that within 90 days of the Effective Date of this Agreement they shall identify to applicable Medicare fiscal intermediaries, carriers, and/or contractors, and Medicaid fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the Government, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Dr. Dreyer, or any of their subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Dr. Dreyer agrees that the Government, at a minimum, shall be entitled to recoup from Dr. Dreyer any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

 Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, Medicaid Fraud Control Unit, and/or the affected agencies.  The Government reserves its rights to disagree with any calculations submitted by Dr. Dreyer, or any of their subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Dr. Dreyer, or any of their subsidiaries or affiliates' cost reports, cost statements, or information reports.

  d. Nothing in this Agreement shall constitute a waiver of the rights of the Government to audit, examine, or re-examine Dr. Dreyer's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

 9. This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 10, below.

 10. Dr. Dreyer agrees that he waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or his patients, sponsors, legally responsible individuals, or third party payers based upon the claims defined as Covered Conduct.

 11. Except as otherwise expressly provided in this Agreement, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

 12. Dr. Dreyer represents that he freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

 13. This Agreement is governed by the laws of the United States and the State of Washington.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Eastern District of Washington.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

 14. This Agreement constitutes the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties.

15. The undersigned counsel and agency representatives represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

16. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

17. This Agreement is binding on Dr. Dreyer's successors, transferees, heirs, and assigns.

18. All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

19. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: 4/20/2023     BY: _____
Dan Fruchter
Assistant United States Attorney
Eastern District of Washington

DATED: 4/20/2023     BY: _____
Tyler H.L. Tornabene
Assistant United States Attorney
Eastern District of Washington

DATED: 4/20/2023     BY: _____
Lisa M. Re
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
U.S. Department of Health and Human Services

**STATE OF WASHINGTON**

Dated: 4/20/23    By: _____
Larissa Payne, Director
Medicaid Fraud Control Division
Office of the Attorney General

Dated: 4/17/23    By: _____
Charissa Fotinos, MD, MSc
Medicaid and Behavioral Health Medical
Director, Health Care Authority
State of Washington Medicaid Program

11

## JASON A. DREYER, D.O.

DATED: 4/14/23    BY:   _[signature]_
                       Jason A. Dreyer, D.O.

DATED: 4/14/23    BY:   _[signature]_
                       Patty Eakes
                       Morgan Lewis & Bockius LLP
                       Counsel for Dr. Dreyer