UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CAROLINE ANGULO, et al.,

     Plaintiffs,

 v.

PROVIDENCE HEALTH &
SERVICES – WASHINGTON, et al.,

     Defendants.

CASE NO. C22-0915JLR

ORDER

## I. INTRODUCTION

Before the court is Plaintiffs Caroline Angulo, Eric Keller, Eben Nesje, Kirk
Summers, Christine Bash, Raymond Sumerlin, Jr., Maryann Sumerlin, Martin Whitney,
and Sherryl Whitney's (collectively, "Plaintiffs") motion for class certification.  (Cert.
Mot. (Dkt. # 132); *see also* Dreyer Cert. Reply (Dkt. # 146); Providence Cert. Reply
(Dkt. # 147).)  Defendant Providence Health & Services – Washington ("Providence")
opposes Plaintiffs' motion and cross-moves to strike Plaintiffs' class allegations.

(X-Mot. (Dkt. # 136); X-Mot. Reply (Dkt. # 149).)  Defendants Dr. Daniel Elskens, D.O., and Jane Doe Elskens oppose Plaintiffs' motion and join in Providence's cross-motion to strike.  (Elskens Resp. (Dkt. # 140).)  Defendants Dr. Jason Dreyer, D.O., and Jane Doe Dreyer oppose Plaintiffs' motion.  (Dreyer Resp. (Dkt. # 135).)  Plaintiffs oppose Providence's cross-motion to strike and ask the court to strike portions of Providence's cross-motion and reply briefs.  (X-Mot Resp. (Dkt. # 145); Surreply (Dkt. # 151); Surreply Resp. (Dkt. # 153).)  The court has carefully considered the motions, the parties' submissions, the relevant portions of the record, and the applicable law.  Being fully advised,[1] the court GRANTS Plaintiffs' motion to strike, GRANTS Providence's motion to strike class allegations, and DENIES Plaintiffs' motion for class certification.

## II.   BACKGROUND

This matter arises from a settlement agreement between Providence, the United States, and the State of Washington, pursuant to which Providence agreed to pay the government millions of dollars to resolve allegations that it fraudulently billed federal and state health care programs for certain neurosurgeries performed by Dr. Dreyer and Dr. Elskens (together, the "Doctor Defendants") at Providence St. Mary Medical Center ("St. Mary") in Walla Walla, Washington.  (*See generally* 3d Am. Compl. (Dkt. # 129); *see also id.*, Ex. 2 ("Settlement Agreement").)

//

//

---

[1] Plaintiffs request oral argument (*see* Cert. Mot. at 1; X-Mot. Resp. at 1), but the court determines that oral argument would not be helpful to its disposition of the motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

1    Plaintiffs allege that "to increase its own profits," Providence "instituted a pattern

2 and practice that encouraged [the Doctor Defendants] to conduct unsupervised spine

3 surgeries at high-volume rates using a productivity metric with no cap on compensation

4 that provided the neurosurgeons financial incentives to perform a high volume of surgical

5 procedures of greater complexity." (3d Am. Compl. ¶ 1.4.)  According to Plaintiffs,

6 Providence's compensation structure resulted in the Doctor Defendants "performing

7 medically unnecessary and otherwise improper spine surgeries and conducting surgical

8 procedures below the standard of care." (*Id.* ¶¶ 1.4-1.6.)  Both surgeons eventually

9 resigned "on the heels of internal and [Washington Department of Health ("DOH")]

10 administrative investigations." (*Id.* ¶ 1.6.)  After he resigned from Providence, Dr.

11 Dreyer worked as a neurosurgeon at a MultiCare Health System ("MultiCare") facility in

12 Spokane, Washington, where, according to Plaintiffs, he "continued the pattern and

13 practice established at [Providence] of conducting high-volume surgeries that did not

14 meet criteria for health care insurance reimbursement, that were medically unnecessary,

15 or that were otherwise improper." (*Id.* ¶ 4.12.)

16    These allegations were originally brought in a whistleblower complaint filed by

17 Dr. David Yam, a colleague of the Doctor Defendants and former medical director of

18 neurosurgery at St. Mary, in a separate, now-dismissed *qui tam* action against Providence

19 in the U.S. District Court for the Eastern District of Washington.  (*See id.* ¶¶ 1.7, 4.13;

20 *see also id.*, Ex. 1 ("*Qui Tam* Compl."); *see generally* Settlement Agreement); *see United*

21 *States ex rel. Yam v. Providence Health & Servs.*, No. 4:20-cv-05004-SMJ (E.D. Wash.).

22 Dr. Yam alleged that Providence and the Doctor Defendants "were committing medical

1   billing fraud with government funded insurance providers."  (3d Am. Compl. ¶ 1.7; *see*

2   *also* Settlement Agreement ¶ G; *Qui Tam* Compl.)  The United States intervened in the

3   *qui tam* action in January 2022.  (3d Am. Compl. ¶ 4.16.)

4       Providence, the United States, and the State of Washington entered into the

5   Settlement Agreement on March 17, 2022.  (*Id.* ¶ 4.18; *see generally* Settlement

6   Agreement.)  The parties stipulated to the following facts:

7   - Between July 1, 2013, and November 13, 2018 (the "relevant time period"),

8     Providence submitted claims to and accepted reimbursement from various

9     federal and state health-care programs "for neurosurgery and other services

10    provided at and by" St. Mary.  (Settlement Agreement ¶ A.)

11  - Providence employed Dr. Dreyer at St. Mary for the entire relevant time

12    period.  (*Id.* ¶ B.[2])  It employed Dr. Elskens between November 2015 and May

13    2017.  (*Id.*)

14  - During the relevant time period, Providence paid neurosurgeons in such a

15    manner that "the greater the number of procedures of higher complexity that

16    the neurosurgeon performed, the greater the compensation the neurosurgeon

17    received."  (*Id.* ¶ C.)  This compensation was not capped.  (*Id.*)

18  - "At various times . . . Providence received both positive and negative

19    information about [the Doctor Defendants]."  (*Id.* ¶ D.)  However, "Providence

20    personnel also had and articulated concerns regarding the quality of care

21

22  [2] The Settlement Agreement refers to Dr. Dreyer as "Dr. A" and Dr. Elskens as "Dr. B."

provided by [the Doctor Defendants], as well as the medical necessity of surgical procedures performed by Dr. [Dreyer]." (*Id.*)  These included concerns that Dr. Dreyer:

> (1) completed medical documentation with falsified, exaggerated, and/or inaccurate diagnoses that did not accurately reflect the patient's true medical condition in order to obtain reimbursement for surgical procedures performed by Dr. [Dreyer]; (2) performed certain surgical procedures that did not meet the medical necessity guidelines and requirements for reimbursement set forth by Medicare and other government health insurance programs; (3) "over-operated", i.e., performed a surgery of greater complexity and scope than was indicated and medically appropriate; and (4) jeopardized patient safety by attempting to perform an excessive number of overly complex surgeries.

(*Id.*)  Concerns were also raised that both Dr. Dreyer and Dr. Elskens had:

> (1) endangered the safety of [St. Mary] patients; (2) created an excessive level of complications, negative outcomes, and necessary additional operations as a result of their surgeries; (3) performed surgical procedures on certain candidates who were not appropriate candidates for surgery given their medical histories, conditions, and contraindications; and (4) failed to adequately and accurately document certain procedures, diagnoses, and complications.

(*Id.*)

- In February 2017, Providence placed Dr. Elskens on administrative leave and "initiated an independent analysis of certain concerns . . . with regard to certain specific patients." (*Id.* ¶ E.)  Dr. Elskens resigned on May 8, 2017. (*Id.*)  In May 2018, Providence placed Dr. Dreyer on administrative leave and, as it did with Dr. Elskens, "initiated an independent analysis of certain concerns . . . with regard to certain specific patients." (*Id.* ¶ F.)  Dr. Dreyer

1    resigned on November 13, 2018.  (*Id.*)  Providence did not report either doctor

2    to the National Practitioner Data Bank ("NPDB") or DOH.  (*Id.* ¶¶ E-F.)

3    Based on these stipulated facts, the United States and the State of Washington

4    asserted that they had claims against Providence "arising from allegedly false claims for

5    payment . . . for neurosurgery services performed by [the Doctor Defendants] that did not

6    meet the criteria for reimbursement under [certain federal health programs], were

7    medically unnecessary, or were otherwise improper."  (*Id.* ¶ H.)  They further contended

8    that Providence had "failed to take appropriate action in response to those concerns" and

9    "failed to have and/or timely implement adequate safeguards and controls with regard to

10   [the Doctor Defendants] to timely prevent, detect, deter, and cease the performance of

11   medically unnecessary neurosurgical procedures."  (*Id.*)  Providence did not admit these

12   allegations and did "not concede that liability arises, under the False Claims Act or any

13   other cause of action," from the agreed facts.  (*Id.* ¶ J.)  Thus, the Settlement Agreement

14   was "not an admission of liability by Providence."  (*Id.*)

15   To resolve the matter, the parties agreed that Providence would pay to the United

16   States and the State of Washington a total of "$22,690,458 . . . of which $10,459,388 is

17   restitution."  (*Id.* at 6.)  The settlement was made public on April 12, 2022.  (*See* 3d Am.

18   Compl. ¶¶ 1.8-1.9.)  Shortly thereafter, DOH initiated an investigation of Providence's

19   failure to implement safeguards to "prevent, deter, and cease" medically unnecessary

20   procedures and failure to adopt governing documents that address assessment of

21   practitioners' performance and provide for medical staff communication and conflict

22   resolution.  (*See* 11/22/23 Bollinger Decl. (Dkt. # 119) ¶ 19, Ex. B (excerpts of

1    documents relating to DOH's investigation).)  In November 2022, DOH concluded that

2    Providence and St. Mary had violated their mandatory reporting requirements under

3    RCW 70.41.210 by failing to report the Doctor Defendants to DOH.  (*Id.* at 16.)  In early

4    2024, the United States and the State of Washington filed a complaint in intervention in

5    which they alleged that MultiCare—like Providence—had submitted false claims to

6    federal health care programs for the costs of surgical procedures performed by Dr.

7    Dreyer.  (*See* 1/31/24 Bollinger Decl. (DKt. # 148) ¶ 6, Ex. K (Compl. in Intervention,

8    *United States v. MultiCare Health Sys.*, No. 2:22-cv-00068-SAB (E.D. Wash. Jan. 26,

9    2024)) ¶ 3.)

10          Plaintiffs filed this putative class action in King County Superior Court on May

11   13, 2022.  (*See* Compl. (Dkt. # 1-4) at 53; *see also* Not. of Removal (Dkt. # 1); 6/5/24

12   Order (Dkt. # 173) (denying Plaintiffs' motion to remand).)  Plaintiffs allege that they or

13   their spouses underwent "medically unnecessary or otherwise improper" spinal surgeries

14   performed by either Dr. Dreyer or Dr. Elskens at St. Mary or by Dr. Dreyer at

15   MultiCare.[3]  (3d Am. Compl. ¶ 5.2; *see also id.* ¶¶ 5.3-5.134 (describing in detail the

16   medical history, treatment, and surgical results of each named Plaintiff).)

17          Plaintiffs ask the court to certify the following classes:

18          **Settlement Class.**  *All patients whose treatments informed the basis of the*
             *settlement between PROVIDENCE and* [the Department of Justice ("DOJ")]
19           *(quantified for settlement purposes as $22,690,458, with $10,459,388*
             *designated as restitution for settlement purposes), who, by definition,*
20

21          _____
            [3]  Plaintiffs do not bring claims against MultiCare in this lawsuit.  (*See generally* 3d Am.
            Compl.)  Instead, they allege that Providence is responsible for injuries suffered by Dr. Dreyer's
22          MultiCare patients because it failed to report Dr. Dreyer to the NPDB and DOH.  (*See, e.g.*, *id.*
            ¶¶ 4.12, 4.24, 4.36.)

*suffered special and/or general damages from medical procedures that were medically unnecessary or otherwise improper for said treatments.*

**Non-Settlement Class/PROVIDENCE.** *All patients who suffered damages as a result of medical procedures at PROVIDENCE, performed by Dr. JASON A. DREYER, DO and/or Dr. DANIEL ELSKENS DO that were medically unnecessary or otherwise improper but whose treatments were not included in the settlement either because DOJ offered to settle for less than full restitution or because their treatment was paid for by private health insurers such as Regence Blue Shield, or was paid privately, for treatments during the relevant time periods.*

**Non-Settlement Class/MULTICARE.** *All patients who suffered damages as a result of medical procedures at MULTICARE performed by Dr. JASON A. DREYER, DO that were medically unnecessary or otherwise improper but whose treatments were not included in the restitution settlement because DOJ sought reimbursement for payments to PROVIDENCE only, for treatments during the relevant time periods.*

(Cert. Mot. at 5; *see also* 3d Am. Compl. ¶¶ 6.2.1-6.2.3.)

Plaintiffs raise the following claims on behalf of themselves and the proposed classes:  (1) criminal profiteering in violation of RCW 9A.82.100 and RCW 9A.82.080, Washington's equivalent to a civil claim under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") (3d Am. Compl. ¶¶ 7.1-7.31; *see* Cert. Mot. at 2, 15 (referring to RCW 9A.82.100 as "little RICO")); (2) failure to report the Doctor Defendants to DOH in violation of RCW 70.41.210 (3d. Am. Compl. ¶¶ 8.1-8.12); (3) violation of the Washington Consumer Protection Act ("WCPA"), ch. 19.86 RCW (*id.* ¶¶ 9.1- 9.6); (4) medical negligence in violation of ch. 7.70 RCW, regarding actions for damages based on injuries resulting from health care (*id.* ¶¶ 10.1-10.4); (5) breach of the duty to provide informed consent (*id.* ¶¶ 11.1-11.2); (6) corporate negligence (*id.* ¶¶ 12.1-12.6); (7) "breach of fiduciary duty / fraud / misrepresentation" (*id.*

¶¶ 14.1-14.11); (8) "negligent infliction of emotional distress and outrage" (*id.* ¶¶ 15.1-15.4); (9) loss of consortium (*id.* ¶¶ 16.1-16.2); (10) "wrongful death / survivor actions" (*id.* ¶¶ 17.1-17.3); and (11) unjust enrichment (*id.* ¶¶ 21.1-21.3).[4]  They seek actual, general, special, and compensatory damages; treble damages under RCW 9A.82.100 and the WCPA; attorneys' fees and costs; "private forfeiture relief"; a "forfeiture money judgment in the amount of no less than $22,690,458"; "disgorgement of ill-gotten gains;" and prejudgment interest.  (*Id.* ¶¶ 24.1-24.20.)  Plaintiffs also seek injunctions (1) "enjoining [Defendants] from utilizing any form of productivity bonus metric scheme that encourages surgeons to engage in high volume patient care, or increased complex surgical procedures"; (2) "requiring [Defendants] to provide open public access to peer review materials and credentialling files for all surgeons"; (3) "requiring [Defendants] to disclose the names and contact information for putative members of all Classes and/or to assist Plaintiffs' counsel in identifying and notifying class members of their rights under this action"; and (4) "divesting and disgorging [Defendants] of the proceeds of their profiteering activity."  (*Id.* ¶¶ 24.21.1-4.)

### III.   ANALYSIS

Plaintiffs move the court to certify their proposed classes under Federal Rules of Civil Procedure 23(b)(3), 23(b)(2), and 23(c)(4).  Providence opposes the motion and moves to strike Plaintiffs' class allegations pursuant to Federal Rules of Civil Procedure

---

[4] Plaintiffs include among their causes of action sections titled "discovery rule," "vicarious liability," "negligence per se," "res ipsa loquitur," "disgorgement," and "waiver of privilege."  (*See* 3d Am. Compl. ¶¶ 13.1-23.2 (capitalization altered).)  In the court's view, these are not stand-alone causes of action and thus the court does not list them here.

23(c)(1)(A), 23(d)(1)(D), and 12(f).[5]  Below, the court begins by addressing Plaintiffs'

motions to strike, then sets forth the relevant legal standards and considers the merits of

the parties' motions.

**A.     Motions to Strike**

Plaintiffs move to strike (1) proffers of evidence that Providence makes in its

cross-motion (X-Mot. Resp. at 14) and (2) portions of Providence's reply in support of its

cross-motion (*see generally* Surreply).  The court considers each in turn.

<u>1.     Providence's Proffers</u>

First, Plaintiffs move to strike proffers of evidence that Providence makes in its

cross-motion.  (X-Mot. Resp. at 14 (citing X-Mot. at 1, 4-5); *see also* Providence Cert.

Reply at 3 n.2, 7 (same).)  Indeed, Providence refers to certain facts that "the evidence will

show" and does not cite any declarations or exhibits that substantiate these assertions.

(*See* X-Mot. at. 1, 4-5.)  The court agrees that these unsubstantiated proffers are

unsuitable for consideration on a motion for class certification.  Therefore, the court

grants Plaintiffs' motion to strike Providence's unsupported proffers.

<u>2.     Providence's Cross-Motion Reply</u>

Second, Plaintiffs move the court to strike Subsection II(E) and all subsequent

sections from Providence's reply in support of its cross-motion to strike.  (Surreply at 3.)

---

[5] The court agrees with Plaintiffs that Providence cannot invoke Rule 12(f) to strike class allegations because it has already answered Plaintiffs' third amended complaint.  (*See* Providence Cert. Reply at 8); Fed. R. Civ. P. 12(f) (providing that a party may file a motion to strike material from a pleading "either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading").

1  Plaintiffs contend that Providence's 4,190-word reply exceeded the 2,100-word limit set

2  by Local Civil Rule 7(e)(4), and thus, all briefing in excess of that limit must be stricken.

3  (*See id.* (citing Local Rules W.D. Wash. LCR 7(e)(4)).)  Providence counters that the

4  longer word limits provided by Local Civil Rule 7(e)(3) "are appropriate for motions to

5  strike class allegations given the complexity of the Rule 12 and Rule 23 analysis for such

6  motions and the dispositive nature for the class allegations" in this case.  (Surreply Resp.

7  at 1.)  It also argues that a 4,200-word reply is appropriate because it noted its motion to

8  strike as a fourth-Friday motion under former Local Civil Rule 7(d)(3) and courts in this

9  District have accepted 4,200-word replies filed in support of motions to strike class

10  allegations in other cases.  (*Id.* at 1-2.)

11       Motions to strike class allegations are not among the handful of motions for which

12  the Local Civil Rules authorize a 4,200-word reply.  *See* Local Rules W.D. Wash. LCR

13  7(e)(3) (allowing a 4,200-word reply in support of "[m]otions for summary judgment,

14  motions to dismiss, motions for class certification, motions for a temporary restraining

15  order, motions for preliminary injunction, and motions aimed at changing the forum").

16  Providence could have moved to file an overlength brief pursuant to Local Civil Rule 7(f)

17  if it needed more words to make its arguments in its reply, but it did not do so.  *See id.*

18  LCR 7(f) (explaining the process for seeking approval to file an overlength brief); *see*

19  *also id.* LCR 7(e) (setting forth word limits that apply "[e]xcept as otherwise provided by

20  court order or rule").[6]  Therefore, the court grants Plaintiffs' motion to strike and does not

21

22       [6] Providence's reliance on this court's purported acceptance of overlength briefs relating
to the motion to strike class allegations filed in *Patrick v. Ramsey*, No. C23-0630JLR (W.D.

1    consider any portion of Providence's reply after the Subsection II(E) header.  *See id.* LCR

2    7(e)(6) ("The court may refuse to consider any text . . . which is not included within the

3    word or page limits").

4    **B.    Legal Standards**

5          Class certification is governed by Federal Rule of Civil Procedure 23.  *See* Fed. R.

6    Civ. P. 23.  The court must undertake a "rigorous analysis" of the Rule 23 requirements

7    to determine whether certification is appropriate.  *Wal-Mart Stores, Inc. v. Dukes*, 564

8    U.S. 338, 350-51 (2011).  Plaintiffs must first demonstrate that their proposed classes

9    meet each of the four prerequisites of Rule 23(a):  (1) numerosity, (2) commonality,

10   (3) typicality, and (4) adequacy of representation.  *See* Fed. R. Civ. P. 23(a).  "A party

11   seeking class certification must affirmatively demonstrate his compliance with the

12   Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous

13   parties, common questions of law or fact, etc."  *Dukes*, 564 U.S. at 350.

14         If Plaintiffs' proposed classes meet the Rule 23(a) requirements, "the proposed

15   class[es] must [also] satisfy at least one of the three requirements listed in Rule 23(b)."

16   *Id.* at 345.  Here, Plaintiffs seek to certify money damages classes under Rule 23(b)(3)

17   and injunctive relief classes under Rule 23(b)(2).  Rule 23(b)(3) requires Plaintiffs to

18   demonstrate "that the questions of law or fact common to class members predominate

19   over any questions affecting only individual members, and that a class action is superior

20

21   Wash.) is misplaced.  In that case, the court denied the motion to strike class allegations "as
     premature" because the matter was "in its earliest stages."  *See Patrick v. Ramsey*, No. C23-
     0630JLR, 2023 WL 6680913, at *2-3 (W.D. Wash. Oct. 12, 2023), *reconsideration denied*, 2023
22   WL 8433202 (W.D. Wash. Dec. 5, 2023).  Thus, it did not consider the parties' briefing.

to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(2), meanwhile, requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs also ask the court to certify issue classes under Rule 23(c)(4), which provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).

"'[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . .' and must carry their burden of proof 'before class certification.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275-76 (2014)). Plaintiffs must "prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence" and may do so using any admissible evidence. *Id.* at 665. The court "consider[s] merits questions at the class certification stage only to the extent they are relevant to whether Rule 23 requirements have been met." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (citing *Stockwell v. City of S.F.*, 749 F.3d 1107, 1113 (9th Cir. 2014)).

An order striking class allegations is the "functional equivalent of denying a motion to certify a case as a class action." *Bates v. Bankers Life & Cas. Co.*, 848 F.3d 1236, 1238 (9th Cir. 2017) (quoting *In re Bemis Co.*, 279 F.3d 419, 421 (7th Cir. 2002)).

1    Courts apply "a very strict standard" to motions to strike class allegations prior to

2    discovery.  *Salaiz v. eHealthIns. Servs., Inc.*, No. 22-cv-04835-BLF, 2023 WL 2622138,

3    at *5 (N.D. Cal. Mar. 22, 2023) (quoting *Ogala v. Chevron Corp.*, No. 14-cv-173-SC,

4    2014 WL 4145408, at *2 (N.D. Cal. Aug. 21, 2014)).  Thus, the court may only grant a

5    motion to strike class allegations in "rare circumstances" where "the complaint

6    demonstrates that a class action cannot be maintained on the facts alleged."  *Tasion*

7    *Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, No. C-13-1803 EMC, 2014 WL 1048710, at

8    *3 (N.D. Cal. Mar. 14, 2014) (citation omitted).

9    **C.    The Parties' Motions**

10   　　　As explained below, the court grants Providence's cross-motion to strike the class

11   allegations and denies Plaintiffs' motion for class certification because (1) Plaintiffs'

12   proposed classes are improper fail safe classes; (2) Plaintiffs have not met their burden to

13   prove that their proposed classes satisfy Rule 23(a); (3) Plaintiffs cannot establish

14   predominance under Rule 23(b)(3); and (4) Plaintiffs' failure to prove the Rule 23(a)

15   factors precludes certification of Rule 23(b)(2) and Rule 23(c)(4) classes.

16   　　　1.    Fail Safe Classes

17   　　　Providence opposes class certification, and moves to strike, on the ground that

18   Plaintiffs seek to certify improper fail safe classes.  (X-Mot. at 13.)  The court agrees that

19   Plaintiffs' proposed classes are fail safe and therefore grants Providence's motion to

20   strike class allegations and denies Plaintiffs' motion for class certification.

21   　　　"A court may not . . . create a 'fail safe' class that is defined to include only those

22   individuals who were injured by the allegedly unlawful conduct."  *Olean*, 31 F.4th at 669

1   n.14 (citing *Ruiz Torres*, 835 F.3d at 1138 n.7); *see also Kamar v. RadioShack Corp.*, 375

2   F. App'x 734, 736 (9th Cir. 2010) (noting that a fail safe class is "defined in a way that

3   precludes membership unless the liability of the defendant is established").  "Such a class

4   definition is improper because a class member either wins or, by virtue of losing, is

5   defined out of the class and is therefore not bound by the judgment."  *Olean*, 31 F.4th at

6   669 n.14 (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 825 (7th Cir.

7   2012)).

8        This court denied certification of a fail safe proposed class in *Cashatt v. Ford*

9   *Motor Company,* No. C19-5886RAJ, 2021 WL 1140227 (W.D. Wash. Mar. 24, 2021).  In

10   that product liability action, the plaintiffs alleged that defective systems in vehicles used

11   by law enforcement officers caused carbon monoxide to leak into the passenger

12   compartments of the vehicles and cause injuries to the officers.  *Id.* at *1.  The plaintiffs

13   sought to certify a class consisting of all "Washington State Patrol employees in the State

14   of Washington who drove or rode in a Class Vehicle and were injured from carbon

15   monoxide between September 2010 and [the] present date."  *Id.* at *2.  The court

16   concluded that a class comprising "individuals who have been 'injured' from carbon

17   [monoxide]" would be impermissibly fail safe "because injury and causation are elements

18   that must be established and which go to the question of liability; they are therefore not

19   appropriate as part of the definition of the class."  *Id.* at *3; *see also Brazil v. Dell Inc.*,

20   585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008) (concluding that a class defined to include

21   persons or entities who purchased products that "Dell falsely advertised" was fail safe

22

1    because "it would be necessary for the court to reach a legal determination that Dell had

2    falsely advertised" to determine class membership).

3         So too here.  Plaintiffs define each of their proposed classes as including patients

4    who "suffered damages" as a result of procedures conducted by the Doctor Defendants

5    that were "medically unnecessary or otherwise improper."  (*See* Cert. Mot. at 5.)  Thus, to

6    determine the membership of Plaintiffs' proposed classes, the court must determine

7    whether each patient was subjected to a "medically unnecessary or otherwise improper"

8    medical procedure that caused the patient to "suffer damages."  As a result, the class

9    definitions run afoul of *Olean*'s prohibition against creating "a 'fail safe' class that is

10   defined to include only those individuals who were injured by the allegedly unlawful

11   conduct."  *Olean*, 31 F.4th at 669 n.14.

12        Plaintiffs do not contend that their proposed class definitions are not fail safe.

13   Instead, they oppose Providence's motion solely on the ground that the Ninth Circuit

14   purportedly disapproves of the "fail safe class defense."  (Providence Cert. Reply at 10.)

15   The court rejects this argument because *Olean* expressly admonishes courts that they

16   must not create fail safe classes.  *See Olean*, 31 F.4th at 669 n.14.

17        For the foregoing reasons, the court concludes that Providence has shown that a

18   class action cannot be maintained based on the class definitions set forth in Plaintiffs'

19   third amended complaint.  Therefore, the court grants Providence's cross-motion to strike

20   class allegations and denies Plaintiffs' motion for class certification.  The court will,

21   however, grant Plaintiffs leave to amend their complaint to allege, if possible, proposed

22   class definitions that are not fail safe.  *See, e.g.*, *Dixon v. Monterey Fin. Servs., Inc.*, No.

15-cv-03298-MMC, 2016 WL 3456680, at *5 (N.D. Cal. June 24, 2016) (granting

defendant's motion to strike class allegations with leave to amend).  Because the court is

granting leave to amend, it will proceed to consider the Rule 23(a) and Rule 23(b)

requirements to provide Plaintiffs guidance as they redefine their proposed classes.

2. Rule 23(a)

As discussed below, Plaintiffs have not demonstrated that their proposed classes

meet the four Rule 23(a) prerequisites.

a.   *Numerosity*

To satisfy the numerosity requirement, Plaintiffs must demonstrate, by a

preponderance of the evidence, that their proposed classes are "so numerous that joinder

of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); *see also Dukes*, 564 U.S. at

350 (noting that at class certification, plaintiff "must be prepared to prove that there are *in

fact* sufficiently numerous parties").  "In general, courts find the numerosity requirement

satisfied when a class includes at least 40 members."  *Rannis v. Recchia*, 380 F. App'x

646, 651 (9th Cir. 2010); *see also Gen.l Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318,

330 (1980) (finding that a class with 15 members did not meet the numerosity

requirement).

Plaintiffs point to the following evidence as supporting their assertion that their

proposed classes are sufficiently numerous:  (1) at least 1,750 patients underwent

surgeries by Dr. Dreyer and Dr. Elskens at Providence and at least 475 patients

underwent surgeries by Dr. Dreyer at MultiCare (Cert. Mot. at 12 (citing Jurisdictional

Discovery JSR (Dkt. # 110) at 2)); (2) approximately 25% of these patients responded to

1   the jurisdictional discovery survey, which, Plaintiffs assert, "is a high number of patients

2   showing interest in this case when no follow-up on contacts occurred" (*id.* at 13 (citing

3   Garr Decl. (Dkt. # 111) ¶ 11)); (3) the $22.7 million settlement paid by Providence

4   supports the conclusion that hundreds of patients "were victims" (*id.* at 13; *see also* 3d

5   Am. Compl. ¶ 1.11); and (4) "the preliminary review of medical files by [Plaintiffs' law

6   firm] has found nearly every file shows issues as alleged in this class action" (Cert. Mot.

7   at 14 (citing Richards Decl. (Dkt. # 122) ¶¶ 10-12)).  Plaintiffs also "submit that every

8   Dreyer/Elskens patient is a claimant in this case" because "Defendants designed and

9   implemented a financial incentive program that put every patient at risk."  (*Id.* at 14; *see*

10  *also* Dreyer Cert. Reply at 5.)[7]  In their replies, Plaintiffs further distance themselves

11  from the language of their class definitions, instead asserting that although class

12  members' "actual surgeries may be relevant to damages," the "dispositive issue" in the

13  case is "the common role of the financial scheme."  (*See, e.g.*, Dreyer Cert. Reply at 6;

14  *see also* Providence Cert. Reply at 7 ("The classes are on [sic] all patients' treatments that

15  'informed' the settlement, and the profiteering financial scheme.  The surgeries were one

16  means to the end—promoting the scheme.").)

17      Plaintiffs, however, cannot escape that they have expressly defined their classes to

18  include *only* those individuals who suffered damages as a result of medically unnecessary

19  or improper surgeries.  (*See* Cert. Mot. at 5.)  Plaintiffs have not directed the court to

20

21      [7] Plaintiffs suspect that Providence has compiled lists of individuals harmed by medically
    unnecessary or otherwise improper surgeries conducted by the Doctor Defendants.  (*See* Cert.
22  Mot. at 13).  Providence, however, denies that it was provided or has compiled any such list (*see*
    X-Mot. at 14 (citing Vo Decl. (Dkt. # 137) ¶¶ 4-5)), and no such list is before the court.

competent evidence of the numbers of such patients, and the court declines Plaintiffs'

invitation to infer, based only on the evidence listed above, that the number of patients

who suffered damages as a result of medically unnecessary or improper surgeries

conducted by the Doctor Defendants is sufficiently numerous to satisfy Rule 23(a)(1) for

each class. *See, e.g.*, *Mays v. Wal-Mart Stores, Inc.*, 804 F. App'x 641, 642 (9th Cir.

2020) (affirming district court's conclusion that plaintiff's "evidence was too thin and her

proposed inferential chain too weak to support a finding of numerosity").  The court is

not persuaded by Plaintiffs' attorney's assertion that "nearly all" of the medical records

she reviewed "demonstrate[d] care by the [D]efendants consistent with the allegations in"

the Settlement Agreement and Plaintiffs' complaint.  (*See* Richards Decl. ¶¶ 10-12.[8])

Despite her experience litigating traumatic brain injury claims and working with medical

professionals regarding the same (*see id.* ¶¶ 3, 5), counsel is not a medical professional

and thus cannot provide expert testimony regarding whether the treatment patients

received was "medically unnecessary or otherwise improper" or whether that treatment

caused the patients' damages.  As a result, the court concludes that Plaintiffs have not

met their burden to prove, by a preponderance of the evidence, that each of their three

proposed classes satisfies Rule 23(a)(1)'s numerosity requirement.[9]

---

[8] Although attorney Ashley Richards has signed Plaintiffs' briefs (*see, e.g.*, Cert. Mot.),
she has not filed a notice of appearance (*see generally* Dkt.)  Accordingly, the court ORDERS
Ms. Richards to file a notice of appearance by no later than August 9, 2024, if she intends to
continue representing Plaintiffs in this matter.

[9] The court notes that Plaintiffs' class definitions contain undefined terms that, in the
court's view, make it difficult to determine the scope of each proposed class.  For example,
Plaintiffs do not explain what it means in the context of this case for a treatment to "inform[] the

1          *b.     Commonality*

2          To satisfy Rule 23(a)(2)'s commonality requirement, Plaintiffs must demonstrate

3  that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

4  "A common question 'must be of such a nature that it is capable of classwide

5  resolution—which means that determination of its truth or falsity will resolve an issue

6  that is central to the validity of each one of the claims in one stroke.'" *Olean*, 31 F.4th at

7  663 (quoting *Dukes*, 564 U.S. at 350). "What matters to class certification . . . is not the

8  raising of common 'questions'—even in droves—but, rather the capacity of a classwide

9  proceeding to generate common answers apt to drive the resolution of the litigation."

10 *Dukes*, 564 U.S. at 350 (citation omitted). Thus, Plaintiffs "must establish that 'essential

11 elements of the cause of action' . . . are capable of being established through a common

12 body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666 (quoting *In re*

13 *Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008)). "[T]he court must

14 make a 'rigorous assessment of the available evidence and the method or methods by

15 which plaintiffs propose to use the [class-wide] evidence to prove' the common question

16 in one stroke." *Id.* (quoting *Hydrogen Peroxide*, 552 F.3d at 312). "In determining

17 whether the 'common question' prerequisite is met," however, the court "is limited to

18 resolving whether the evidence establishes that a common question is capable of class-

19 wide resolution, not whether the evidence in fact establishes that plaintiffs would win at

20 trial." *Id.* at 666-67.

21

22 basis of" the Settlement Agreement or for a procedure to be "medically unnecessary" or
   "improper." (*See* 3d Am. Compl. ¶¶ 6.2.1-6.2.3; *see generally* Cert. Mot.)

1        Plaintiffs focus on common questions relating to their criminal profiteering claims,

2  which they assert "dovetail" with their medical and corporate negligence claims.  (*See*

3  Cert. Mot. at 15-19 (discussing RICO cases); *see id.* at 16 n.6.)  Although Plaintiffs list

4  proposed common questions related to claims other than criminal profiteering in a

5  separate exhibit (*see* 11/22/23 Bollinger Decl. ¶ 23, Ex. F), they neither identify the

6  "essential elements" of those claims nor explain the class-wide evidence that will resolve

7  the issues "in one stroke."  *Olean*, 31 F.4th at 666; (*see also* 11/22/23 Bollinger Decl. Ex.

8  F (listing "common questions" such as "Whether Defendants committed medical

9  negligence in violation of RCW 7.70, or negligence *per se*?", "Whether Defendants failed

10  to obtain informed consent for medical treatment?", and "Whether Defendants

11  negligently inflicted emotional distress upon Plaintiffs?")).  Plaintiffs do not propose any

12  common questions relating to their loss of consortium and "wrongful death / survivor

13  action" claims.  (*See generally* Cert. Mot.; 11/22/23 Bollinger Decl. ¶ 23, Ex. F.)

14        The court agrees that Plaintiffs have established common questions relating to

15  their criminal profiteering claims, such as the existence and scope of Providence's

16  compensation plan and whether that plan was part of a pattern of profiteering.  (*See*

17  11/22/23 Bollinger Decl., Ex. F at 1-3 (listing common questions related to the

18  profiteering claim).)  Because Plaintiffs have not demonstrated that "essential elements"

19  of their remaining claims "are capable of being established through a common body of

20  evidence, applicable to the whole class," however, the court concludes that Plaintiffs

21  //

22  //

ORDER - 21

1    have failed to satisfy Rule 23(a)(2)'s commonality requirement with respect to their

2    remaining claims.[10]  *See Olean*, 31 F.4th at 666.

3           *c.     Typicality*

4           Typicality requires that the "claims or defenses of the representative parties are

5    typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality

6    requirement "serves to ensure that the interest of the named representative aligns with the

7    interests of the class."  *Ruiz Torres*, 835 F.3d at 1141 (cleaned up).  "The test of typicality

8    is whether other [class] members have the same or similar injury, whether the action is

9    based on conduct which is not unique to the named plaintiffs, and whether other class

10   members have been injured by the same course of conduct."  *B.K. ex rel. Tinsley v.*

11   *Snyder*, 922 F.3d 957, 970 (9th Cir. 2019) (quotation marks and citation omitted).

12          Plaintiffs argue that typicality is satisfied because their claims "are based upon the

13   same defendant policy as those of class members"—that is, Providence's incentive

14   compensation structure.  (Cert. Mot. at 20.)  Again, they focus on their criminal

15   profiteering claim and assert that injury from the "same scheme" and "allegation of harm

16   based on some of the activities comprising the RICO violation is sufficient" to establish

17   typicality.  (*Id.* (quoting *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116-17 (9th Cir.

18

19          [10] The court agrees with Plaintiffs that Providence's assertion that all of Plaintiffs' claims
     are governed by chapter 7.70 RCW raises a common question of law.  (*See* Providence Cert.

20   Reply at 10; *see also* X-Mot. at 8 (arguing that chapter 7.70 RCW governs all of Plaintiffs'
     claims), 12 (arguing that the statute of limitations applicable to claims under chapter 7.70 RCW

21   raises individual issues).)  Because district courts should not resolve common questions at class
     certification, *see Olean*, 31 F.4th at 666-67, the court does not address the merits of Providence's

22   chapter 7.70 RCW arguments in this order.  Providence may raise the issue in a suitable motion
     at a later time.

2017)).)  They also point to the declaration of their expert witness, Dr. Michael Landi, as proof that their "claims of medically unnecessary, overly complex, and/or otherwise improper surgeries are accurate and typical." (*Id.* (citing 11/22/23 Bollinger Decl. ¶ 22, Ex. E ("Landi Decl.")).)

The court concludes that Plaintiffs have not proven by a preponderance of the evidence that their claims or defenses are typical of the claims or defenses of their proposed classes.  Indeed, the only evidence Plaintiffs identify that relates to typicality is Dr. Landi's declaration, in which he states,

> After reviewing the medical records and imaging of [six] plaintiff representatives and prospective plaintiff representatives . . . , it is my opinion that each of these patients received medically unnecessary and/or overly complex surgeries that were not indicated, in violation of the standard of care, and that their substandard care was reflective and typical of the concerns identified in paragraph 11 above.

(Landi Decl. ¶ 14.)  Paragraph 11 of Dr. Landi's declaration lists the "concerns" that Providence acknowledged it received about the Doctor Defendants.  (*Compare* Landi Decl. ¶ 11, *with* Settlement Agreement ¶ D.)  In the court's view, although Dr. Landi's opinion may support the inference that the six Plaintiffs experienced substandard care consistent with the allegations in the Settlement Agreement, it does not support the conclusion that their experiences are typical of the proposed classes as a whole.  Therefore, on the record before it, the court concludes that Plaintiffs have not satisfied Rule 23(a)(3)'s typicality requirement.

//

//

1                    *d.      Adequacy of Representation*

2              To establish adequacy of representation, Plaintiffs must show that "the

3    representative parties will fairly and adequately protect the interests of the class."  Fed. R.

4    Civ. P. 23(a)(4).  In evaluating adequacy, the court considers two questions:  "(1) do the

5    named plaintiffs and their counsel have any conflicts of interest with other class members

6    and (2) will the named plaintiffs and their counsel prosecute the action vigorously on

7    behalf of the class?"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)

8    (citation omitted).

9              The court cannot conclude, on the sparse record before it, that Plaintiffs have

10   proven that they are adequate class representatives.  Plaintiffs baldly assert that they are

11   adequate because they "do not have any conflicts of interest with class members," but

12   they do not cite evidence to support this claim.  (*See* Cert. Mot. at 20.)[11]

13             Plaintiffs also contend, without further explanation, that their attorneys are

14   adequate because they "are competent and suitable for appointment under Rule 23(g)."

15   (Cert. Mot. at 20 (citing Gilbert Decl. (Dkt. # 120); Richards Decl. ¶¶ 1-6; 11/22/23

16   Bollinger Decl. ¶¶ 2-16; Reed Decl. (Dkt. # 121)).)  Providence argues that Plaintiffs'

17   counsel are inadequate because none of them have shown that they have served as lead

18   counsel or been appointed as class counsel in any class action and because they filed this

19

20   ───────────────

       [11] Providence argues that the Plaintiffs are inadequate representatives because each "will
21   have to establish the timeliness of his or her claim" and their medical histories "may open up
     individual defenses concerning the surgeries they underwent, the care they received, and
22   causation of their alleged injuries."  (X-Mot. at 18-19.)  At this stage of the proceedings,
     however, these assertions are no more than speculation.

1   motion for class certification before conducting any discovery.  (X-Mot. at 19 (citing

2   *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (requiring plaintiffs to satisfy the Rule

3   23 requirements "through evidentiary proof")).)  Mr. Reed, however, has experience

4   litigating class actions (*see* Reed Decl. ¶ 9 (citing cases)), and Plaintiffs submitted a

5   declaration filed by a "class action attorney for 50 years" who describes Mr. Reed's

6   qualifications as lead counsel (*see* 1/31/24 Bollinger Decl. ¶ 11, Ex. P ("Langrock

7   Decl.")).  In addition, Plaintiffs' counsel have explained their reasoning behind filing a

8   pre-discovery motion for class certification.  (*See* Cert. Mot. at 4-5.)  The court declines

9   to find that counsel are inadequate based on the current record.

10              4.      Rule 23(b)(3) Requirements

11        Plaintiffs primarily seek certification of damages classes pursuant to Rule

12   23(b)(3), which provides that a class may be certified if "the court finds that the questions

13   of law or fact common to class members predominate over any questions affecting only

14   individual members," and that a class action is superior to other available methods for

15   adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  The court concludes that

16   Plaintiffs have not shown that their proposed classes satisfy the predominance

17   requirement.  It does not address the superiority requirement in this order.

18        The predominance inquiry is "more demanding" than Rule 23(a)'s commonality

19   requirement.  *Behrend*, 569 U.S. at 34.  The court must "give careful scrutiny to the

20   relation between common and individual questions in a case."  *Tyson Foods v.*

21   *Bouaphakeo*, 577 U.S. 442, 453 (2016).  "An individual question is one where members

22   of a proposed class will need to present evidence that varies from member to member,

1   while a common question is one where the same evidence will suffice for each member

2   to make a prima facie showing or the issue is susceptible to generalized, class-wide

3   proof." *Id.* (citation and internal question marks omitted).  Evaluating predominance

4   "begins, of course, with the elements of the underlying cause of action." *Olean*, 31 F.4th

5   at 665 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

6          Plaintiffs do not set forth the elements of each of their causes of action, let alone

7   demonstrate that those elements are capable of being established through class-wide

8   proof.  (*See generally* Cert. Mot.; Dreyer Cert. Reply; Providence Cert. Reply.)  Instead,

9   Plaintiffs again focus on their criminal profiteering claims.  (*See* Cert. Mot. at 21-22.)

10  They assert that common questions predominate because they "are derived from

11  Defendants' own practices, policies, and pattern of conduct, which in turn will determine

12  the damages, equitable relief, and particular issues that justify a class-wide response."

13  (*Id.* at 22.)  Thus, according to Plaintiffs, the existence of a common scheme underlying

14  their criminal profiteering claims supports a finding of predominance.  (*Id.* (citing

15  *Custom Hair Designs by Sandy v. Cent. Payment Co.*, 984 F.3d 595, 601 (8th Cir.

16  2020)).)

17         To establish that common questions predominate over individual questions

18  however, Plaintiffs must "demonstrate, on a class-wide basis through common proof . . .

19  that [D]efendants' alleged wrongdoing caused [P]laintiffs' injuries, and that such

20  common questions of causation predominate over any individualized ones." *White v.

21  Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1194 (9th Cir. 2024) (holding that

22  plaintiffs could not satisfy the predominance requirement for their RICO, WCPA, and

1   unjust enrichment claims because they did not demonstrate that causation could be shown

2   with class-wide proof); *see also Cashatt*, 2021 WL 1140227, at *2 (concluding that

3   individualized factual determinations predominated where the plaintiffs alleged a variety

4   of injuries allegedly caused by the carbon monoxide leaks and thus "[t]he inquiry into

5   causation . . . would require an individual analysis with respect to each patrol officer and

6   his or her vehicle").  Because Plaintiffs do not address how the key issue of causation is

7   susceptible to class-wide proof for *any* of their claims (*see generally* Cert. Mot.;

8   Providence Cert. Reply; Dreyer Cert. Reply), the court concludes that Plaintiffs fail to

9   satisfy the predominance requirement.

10        The court also concludes that Plaintiffs cannot demonstrate predominance because

11   individualized inquiries are required to determine the membership of the classes in the

12   first instance.  None of the three cases Plaintiffs cite to support their contention that

13   common questions predominate over individualized questions in medical negligence

14   cases (*see* X-Mot. Resp. at 2-4) convince the court to hold otherwise.

15        First, in *Fallows v. St. Joseph Medical Center*, the plaintiffs alleged, in relevant

16   part, that St. Joseph Medical Center ("SJMC") in Baltimore, Maryland failed to provide

17   informed consent to patients receiving coronary stent procedures conducted by a

18   cardiologist and failed to supervise the cardiologist's work.  (*See* 1/31/24 Bollinger Decl.

19   ¶ 5, Ex. J (Mem. Op., *Fallows v. St. Joseph Med. Ctr., Inc.*, No. 24-C-10-000-817 OT

20   (Baltimore City (Md.) Cir. Ct., Apr. 2, 2013)) at 5-9, 22-23.)  After an initial

21   investigation revealed that seven of the cardiologist's cases "were not within acceptable

22   standards," SJMC retained an independent peer review organization to review the

1   cardiologist's procedures.  (*Id.* at 8-10.)  The reviews concluded that approximately 31%

2   of the cardiologist's stent procedures were unnecessary according to accepted clinical

3   guidelines because the patients suffered "insignificant" artery blockage.  (*Id.* at 11-12.)

4   SJMC sent letters to 585 of the cardiologist's patients and their physicians altering them

5   that the review had revealed that the patient's blockage was insignificant and thus did not

6   require intervention.  (*Id.* at 12-13.)

7          Several patients brought claims against SJMC for lack of informed consent, unjust

8   enrichment, administrative negligence, fraud, and injunctive relief.  (*Id.* at 3-4.)  The

9   court certified the following class:

10         All persons who underwent stent placements performed by [the cardiologist]
           at [SJMC] between January 2004 and June 2009, and who received
11         notification letters and whose cardiologists and/or referring physicians
           received notification letters from SJMC concerning its review of those stent
12         placements.

13  (*Id.* at 3-4, 23.)  Because the class was defined as including only those patients who

14  received the clinical review letter from SJMC, individualized inquiries into medical

15  necessity were not required to determine the membership of the class.  (*Id.* at 12-13, 23;

16  *see also id.* at 47 (distinguishing *Fallows* from cases that involved "highly individualized

17  inquiries into liability, causation, affirmative defenses, and damages" (citations

18  omitted)).)  The *Fallows* court concluded that the named plaintiffs' claims were typical,

19  and that common questions predominated, because all class members "signed identical

20  consent forms" that "contained no written disclosure of material facts" and "underwent

21  the same catheterization and stent procedures at the hands of the same doctor who was

22  the agent of the same hospital."  (*Id.* at 40-41 (typicality); 43-44 (predominance).)  The

1    *Fallows* court did not, however, certify a proposed class of patients with insignificant

2    blockage who underwent stent placements performed by the cardiologist but did not

3    receive notification letters.  (*See id.* at 24 (noting, in considering numerosity, that the

4    court was "concerned" about certifying the subclass on the record before it).)

5         Here, by contrast, class membership depends on inquiries into whether the specific

6    treatment a class member received was "medically necessary or otherwise improper" and

7    whether the procedure caused the class member damages.  These inquiries are necessarily

8    individualized because patients presented to the Doctor Defendants with a wide range of

9    medical issues and were subjected to a variety of surgeries and treatments.  (*See, e.g.*, 3d

10   Am. Compl. ¶¶ 5.3-5.134 (describing the named Plaintiffs' medical issues, treatments,

11   and surgical results).)  For these reasons, the court does not find *Fallows* persuasive.

12        Plaintiffs also rely on the Washington Supreme Court's recent decision in *M.N. v.*

13   *MultiCare Health System, Inc.*, 541 P.3d 346 (Wash. 2024).  In that case, a nurse who

14   diverted injectable narcotics for her own use infected some patients with hepatitis C and

15   potentially exposed many other patients to the disease.  *Id.* at 350.  After learning about

16   the nurse's misconduct, MultiCare sent a letter to all of the patients who had received

17   injectable narcotics while the nurse was on duty—regardless of whether the nurse had

18   treated the patient.  *Id.* at 350-51.  The letter informed the patients that they risked

19   exposure to hepatitis C and offered them complimentary blood testing.  *Id.* at 351.  Two

20   patients brought a class action again MultiCare on behalf of the recipients of the letter for

21   "negligent supervision and hiring under a theory of corporate negligence and under

22   chapter 7.70 RCW."  *Id.*  They claimed damages for "severe emotional and mental

1   anguish" and for "medical care, treatment, and services." *Id.* The trial court certified two

2   classes of patients who received the notification letter: one comprising patients assigned

3   to the nurse who diverted the narcotics, and a second comprising patients who were not

4   assigned to that nurse. (*Id.*)

5   　　　The Court reviewed only the trial court's decision to grant MultiCare's motion for

6   summary judgment; it did not address class certification in its opinion. *See generally id.;*

7   *see also id.* at 357 (adopting "a new test for legal causation in chapter 7.70 RCW claims

8   involving fear of disease transmission"). Nevertheless, Plaintiffs contend that *M.N.*

9   demonstrates broadly that medical negligence claims under Washington state law can be

10  certified for class treatment. (*See, e.g.*, X-Mot. Resp. at 2, Providence Cert. Reply at 14.)

11  The *M.N.* trial court held, however, that the plaintiffs' proposed classes satisfied

12  typicality and predominance because (1) the plaintiffs' "claims rely on the same

13  underlying facts—all class members were patients at MultiCare and received the

14  Notification Letter from MultiCare"; (2) "[t]o recover on their claims, all members of

15  both classes will be required to make the same showing that MultiCare breached the

16  standard of care in its hiring or supervision of [the nurse], or its management of narcotic

17  pain medications, thereby causing damages"; and (3) the "central issue in [the] case—

18  whether MultiCare breached a duty of care . . . through negligent hiring and monitoring

19  of [the nurse]—is common among all class members and predominates over any

20  individual issues." (1/31/24 Bollinger Decl. ¶ 4, Ex. I (Order Granting Class

21  Certification, *M.N v. MultiCare Health Sys., Inc.*, No. 18-2-08055-5 (King Cnty Super.

22  Ct. Jan. 22, 2020)) at 8-9.) Thus, like *Fallows*, *M.N.* is easily distinguished from the case

1   at bar because individualized determinations were not required to determine class

2   membership.  (*See generally id*.)

3     Similarly, *Craft v. Vanderbilt University* involved classes of patients and the

4   patients' children who were exposed to the same experimental protocol at Vanderbilt's

5   prenatal clinic without their consent.  174 F.R.D. 396, 402 (M.D. Tenn. 1996).  Because

6   Vanderbilt kept records of the patients who were subjected to the protocol, *see id.* at 400,

7   individualized inquiries were again unnecessary to determine class membership.

8     In sum, the court cannot find that Plaintiffs have established that common

9   questions predominate over individual ones because Plaintiffs have not shown that

10  causation can be resolved with class-wide proof, and class membership requires an

11  individualized analysis of medical necessity.  *See Post v. AmerisourceBergen Corp.*, No.

12  1:19-CV-73, 2023 WL 5602084, at *4 (N.D. W. Va. Aug. 29, 2023) (compiling cases and

13  denying certification due to the need to conduct individualized inquiries into class

14  members' medical history).  Thus, even if Plaintiffs could show that their proposed

15  classes satisfied Rule 23(a), certification under Rule 23(b)(3) would be unwarranted.

16    <u>4.</u>  <u>Rule 23(b)(2)</u>

17    Plaintiffs ask the court to certify injunctive relief classes under Rule 23(b)(2).

18  Because Plaintiffs have not shown that their proposed classes satisfy the Rule 23(a)

19  prerequisites, certification of a Rule 23(b)(2) class is foreclosed.

20    Providence argues that Plaintiffs lack standing to seek injunctive relief under Rule

21  23(b)(2) because the Doctor Defendants have not performed surgeries at St. Mary since

22  2018 and at MultiCare since 2021.  (X-Mot. at 23.)  This argument is misplaced because

1    Plaintiffs do not ask the court to enjoin the Doctor Defendants from conducting surgery.

2    (*See* 3d Am. Compl. ¶ 24.21.)  Nevertheless, the court questions whether Plaintiffs have

3    standing to pursue the prospective injunctive relief described in their third amended

4    complaint.  (*See id.* ¶¶ 24.21.1, 24.21.2.)  Where there are multiple plaintiffs, "[a]t least

5    one plaintiff must have standing to seek each form of relief requested in the complaint."

6    *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).  To establish standing to

7    seek prospective injunctive relief, a plaintiff must demonstrate that he or she is likely to

8    suffer future injury from the conduct he or she seeks to enjoin.  *City of Los Angeles v.*

9    *Lyons*, 461 U.S. 95, 105-06 (1983); *see Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956,

10   969-70 (9th Cir. 2018) (holding that plaintiff in a proposed class action had standing to

11   seek injunctive relief where she alleged an "actual and imminent, not conjectural or

12   hypothetical threat of future harm" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488,

13   493 (2009))).  Because the question of standing has not been fully briefed, the court does

14   not decide the issue now and notes this concern only to inform next steps in this case.

15        5.    Rule 23(c)(4)

16        Finally, Plaintiffs ask the court to certify issue classes under Rule 23(c)(4).  Class

17   certification under Rule 23(c)(4) requires a showing that the proposed issue class meets

18   the requirements of Rule 23(a) and 23(b) (except the predominance requirement of Rule

19   23(b)(3)) and that certification of the issue will materially advance the litigation.  *See*

20   *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015)

21   (compiling cases so holding); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227,

22

1229 (9th Cir. 1996) (noting plaintiffs must show that certification of particular issues will "significantly advance the resolution of the underlying case").

Plaintiffs have not met their burden to show that certification of issues classes is appropriate.  First, as explained above, Plaintiffs have not demonstrated that their proposed classes satisfy the Rule 23(a) prerequisites.  Second, although Plaintiffs apparently seek certification of all of their purported common liability and remedy questions (*see* Cert. Mot. at 17 (citing 11/22/23 Bollinger Decl. ¶ 23, Ex. F); *id.* at 18-19), Plaintiffs only perfunctorily address how certification of those issues would materially advance the resolution of this case (*see generally id.*; *see* Providence Cert. Reply at 16; Dreyer Cert. Reply at 15-16); *see Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2018 WL 2325426, at *26 (N.D. Cal. May 8, 2018) ("The bottom line is that Plaintiffs' perfunctory request for Rule 23(c)(4) certification fails to show why certification would materially advance the litigation as a whole.").  As a result, the court denies Plaintiffs' request to certify issues classes under Rule 23(c)(4).

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiffs' motions to strike, DENIES Plaintiffs' motion for class certification (Dkt # 132), and GRANTS Providence's cross-motion to strike class allegations (Dkt. # 136).  Plaintiffs may file a fourth amended complaint that addresses the issues identified in this order by no later than **August 30, 2024**.  If Plaintiffs do not do so within the time provided, this action will proceed on Plaintiffs' individual claims.  The Clerk is DIRECTED to enter an initial case

scheduling order setting deadlines for the parties to exchange initial disclosures, to

conduct a Rule 26(f) conference, and to file a joint status report.

Dated this 9th day of August, 2024.

JAMES L. ROBART
United States District Judge

ORDER - 34